**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **PHILLIP BEVERLY and** ) | |
| **ROBERT BIONAZ,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. |
| v. ) | |
| ) | **COMPLAINT FOR INJUNCTIVE** |
| **CHICAGO STATE UNIVERSITY BOARD** ) | **AND DECLARATORY RELIEF** |
| **OF TRUSTEES, WAYNE D. WATSON,** ) | **AND DAMAGES** |
| **PATRICK CAGE, and** ) | |
| **JANELLE CARTER,** ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendants. ) | |

Plaintiffs Phillip Beverly and Robert Bionaz complain of Defendants and allege:

## I.      INTRODUCTION

1.      "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).  This is particularly true of public universities, where "the freedoms of speech, assembly, and petition must be zealously guarded because "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'"  *Healy v. James*, 408 U.S. 169, 180 (1972).  This protection extends to all types of discourse, including criticism directed against high-ranking university officials.

2.      Plaintiffs Phillip Beverly and Robert Bionaz, members of the faculty at Chicago State University, are frequent contributors to a blog titled *CSU Faculty Voice* that exposes mismanagement at Chicago State University ("CSU").  Although the United States Supreme Court has held that "state colleges and universities are not enclaves immune from the sweep of the First Amendment," *id.,* the Defendants, administrators at CSU, have engaged in an ongoing campaign to silence Plaintiffs' criticisms of how the University is run.  They have threatened

legal action in an effort to shut down the blog, taken other behind-the-scenes actions to achieve this objective, and ultimately adopted a "Cyberbullying Policy" that broadly prohibits electronic communication that may have an "adverse impact on the work environment of a CSU faculty member or employee" as another tool for restricting Plaintiffs' speech.

3.      CSU's actions ignore the fundamental principle that neither students nor teachers "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indpt. Comm. Sch. Dist.*, 393 U.S. 503, 506 (1969).  In particular, the Supreme Court has emphatically rejected the argument that "teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work."  *Pickering v. Bd. of Education*, 391 U.S. 563, 568 (1968).  Indeed, the Court most recently reaffirmed unanimously that "[s]peech by citizens on matters of public concern lies at the heart of the First Amendment," and the type of speech at issue in this case, "corruption in a public program and misuse of state funds – obviously involves a matter of significant public concern."  *Lane v. Franks*, 2014 WL 2765285 *6, 9 (U.S., June 19, 2014).

4.      This is a civil rights action to protect and vindicate the First and Fourteenth Amendment rights of Phillip Beverly, Robert Bionaz, and all faculty and students at CSU.  By policy and practice, CSU unlawfully restricts the free exercise of constitutional rights to free expression, and it has acted in this case to abridge the Plaintiffs' constitutional rights. Accordingly, these policies and enforcement practices are challenged on their face and as applied to the Plaintiffs.  This action seeks declaratory and injunctive relief, damages, and attorneys' fees.

## II.        JURISDICTION AND VENUE

5.        This action arises under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

6.        This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

7.        This Court has authority to grant the requested declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

8.        This Court has authority to issue the requested injunctive relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65.

9.        This Court has authority to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

10.        Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the instant claim occurred within this District and because at least one Defendant resides in this District.

## III.        PLAINTIFFS

11.        Plaintiff Phillip Beverly is, and was at all times relevant to this Complaint, a resident of Chicago, Illinois.  He is presently an associate professor at CSU, where he has taught political science for over 22 years, and is president of the faculty senate.  Professor Beverly is also one of the founders of, and contributors to, the blog *CSU Faculty Voice*.

12.        Plaintiff Robert Bionaz is, and was at all times relevant to this Complaint, a resident of Evergreen Park, Illinois.  Professor Bionaz is an associate professor of history at CSU.  He is also one of the founders of, and contributors to, *CSU Faculty Voice.*

## IV.     DEFENDANTS

13.     Defendant Chicago State University Board of Trustees has oversight of Chicago State University, a public university organized and existing under the laws of the State of Illinois.   Article 5 of the "Chicago State University Law," included in the Illinois Higher Education Act, provides that "[t]he Board shall have power to enter into contracts and to sue and be sued."  110 ILCS 660/5-40; *see Cannon v. University of Health Sciences/Chicago Medical School,* 710 F.2d 351, 356-57 (7th Cir. 1983).  The Board is sued for equitable relief only.

14.     Defendant Wayne D. Watson is, and was at all times relevant to this Complaint, President of Chicago State University.  He is CSU's chief executive officer, responsible for CSU's administration and policymaking, including the policies and procedures challenged herein.  Acting under color of state law, Defendant Watson acquiesced in, sanctioned, and supported the actions of the other Defendants.  Defendant Watson is sued in his official and personal capacities.  *MCI Telecommunication Corp. v. Illinois Bell Telephone Co.*, 222 F.3d 323, 345 (7th Cir. 2000).

15.     Defendant Patrick Cage is, and was at all times relevant to this Complaint, Vice President of Labor and Legal Affairs and General Counsel at CSU.  He is responsible for CSU's administration and policy-making, including the policies and procedures that were applied to deprive Professors Beverly and Bionaz of their constitutional rights.  Defendant Cage is sued in his official and personal capacities.

16.     Defendant Janelle Carter is, and was at all times relevant to this Complaint, an Associate General Counsel at CSU.  She is responsible for implementing the policies and procedures that were applied to deprive Professors Beverly and Bionaz of their constitutional rights.  Defendant Carter is sued in her official and personal capacities.

## V. STATEMENT OF FACTS

### A. Defendants' Efforts to Censor *CSU Faculty Voice*

17.     Since 2009, CSU Professor Phillip Beverly has published a blog titled *CSU Faculty Voice* with seven other CSU faculty members, including Plaintiff Robert Bionaz. *CSU Faculty Voice* was launched in part because of previous unsuccessful efforts by the university to censor the student newspaper for publishing articles critical of the administration, and illegal efforts by CSU to improperly withhold public records under the state's Freedom of Information Act.

18.     *CSU Faculty Voice*, which can be found online at csufacultyvoice. blogspot.com, is not housed on CSU's computer servers, but rather by the well-known, free blog hosting platform Blogspot (which is owned by Google Inc.).  Like most blogs, it can be accessed on any computer with Internet access, including those located on the CSU campus.

19.     *CSU Faculty Voice* is wholly noncommercial and serves as an outlet for the personal opinions of the contributing faculty members.  Articles appearing on *CSU Faculty Voice* often document allegations of mismanagement by the CSU administration, and provide links to relevant public documents.

20.     The site archives posts once a month, but the older entries remain available on the site.

21.     *CSU Faculty Voice* makes no claim that it is endorsed by, or speaks on behalf of, CSU in any official capacity.

22.     Because it is openly critical of the current administration, no reasonable person, upon visiting the *CSU Faculty Voice* blog, could mistake it for the official website of Chicago State University, or indeed any kind of official news outlet of the University.

23.     Defendant Patrick B. Cage sent a cease and desist letter to Professor Beverly dated November 11, 2013 ordering the Plaintiff to "immediately disable [the] Chicago State University Faculty Voice Blog . . . no later than November 15, 2013 in order to avoid legal action." Defendant Cage based this demand on the claim that *CSU Faculty Voice* did not comply with the "high standards of civility and professionalism [that] are central tenants [sic] of the University's values and included in the standards of conduct required of faculty members." Ex. A.

24.     The November 11, 2013 demand letter appeared to be predicated on CSU's Computer Usage Policy, which requires all electronic communication, "including websites and blog posts on the university server" to "adhere to the University standards of conduct which prohibit any communication which tends to embarrass or humiliate any member of the community." It also counsels "avoiding lewd, obscene, defamatory or harassing comments." Ex. B.

25.     Defendant Cage also alleged that use of "CSU's trade names and marks" on the blog caused confusion, diminished the University's brand, and implied CSU's endorsement of the blog's commentary.

26.     On November 11, 2013, CSU did not hold any registered trademarks.

27.     On November 14, 2013, three days after Defendant Cage sent the letter, CSU filed three trademark registration applications.

28.     Wesley Johnson, counsel for the contributors to *CSU Faculty Voice*, replied to Defendant Cage's letter on November 27, 2013, rejecting CSU's ultimatum and demanding that CSU cease its efforts to shut down the blog.  Ex. C.

29.     Donald Levine, external counsel retained by CSU to press CSU's trademark claims, wrote a follow-up letter to Plaintiffs on January 3, 2014, which alleged that *CSU Faculty Voice* falsely gave the impression that it represented the views of the entire CSU faculty.  Ex. D.

30.     Levine's assertion is implausible on its face.  The masthead of *CSU Faculty Voice* has an image of hedges trimmed to form the letters "CSU."  Superimposed on the image are the words "Chicago State University," but "Chicago" is crossed out and the word "Crony" is substituted.  Ex. E.  The caption above the image reads:  "Where We Hire Our Friends."

31.     Levine's letter also claimed that the blog's masthead used a "distinctive photographic image" of the "widely recognized CSU hedges," allegedly part of the University's trade dress, violated CSU's intellectual property rights and the Lanham Act.

32.     The letter demanded that *CSU Faculty Voice* cease using CSU's name, as well as any picture of CSU, on the website and that it place a disclaimer written by counsel for CSU prominently on the page.

33.     On March 3, 2014, the Foundation for Individual Rights in Education, a non-partisan watchdog group that monitors compliance with the First Amendment on college campuses, wrote Defendant Watson, explaining in detail why CSU's efforts to shut down the *CSU Faculty Voice* are unconstitutional.

**B.     Defendants' Other Efforts to Silence Plaintiff Phillip Beverly**

34.     On information and belief, Defendants Watson, Cage, and others met with other CSU administrators and lawyers at the end of January 2013, or beginning of February 2014 to discuss ways to silence Phillip Beverly's criticism of the CSU administration.

35.     On information and belief, those at the meeting, including Defendants Watson, Cage, and others, discussed the feasibility of contacting Google Inc., which controls Blogspot, the platform for *CSU Faculty Voice*, to demand that it shut down the site.

36.     Following this meeting, Defendants have initiated various formal and informal actions in retaliation for Plaintiffs' speech criticizing the CSU administration.

37.     Professor Beverly, who is the President of the CSU Faculty Senate, presided over a Faculty Senate Executive Committee Hearing on Repression on April 9, 2014 to discuss repression of free expression at CSU.  Shortly before the scheduled event, the organizers were informed that the room they had reserved was not available.  The event was then moved to a classroom.

38.     Students in Professor Beverly's public management class attended the April 9, 2014 Hearing on Repression.  Professor Beverly was later notified that he would face disciplinary hearings for having his class in an unauthorized location.

39.     At an initial hearing on the disciplinary charges, it was alleged that Professor Beverly had violated the CSU Board of Trustees policy forbidding professors from imposing their personal beliefs on students.

40.     As of June 30, 2014, the disciplinary charges against Professor Beverly are still pending.

**C.     Defendants' Other Efforts to Silence Professor Bionaz**

41.     On March 7, 2014, Defendant Watson introduced a proposed "Cyberbullying Policy" to the Board of Trustees, stating, "the purpose of this policy is to protect members of the CSU family from bullying through any form of electronic communication."  This policy was

later adopted (as detailed below) and has been applied to restrict the speech of Professor Bionaz. Ex. F.

42.     The "Cyberbullying Policy" was adopted by the CSU Board of Trustees on May 9, 2014, but the final approved policy does not yet appear on the CSU website and has not been made publicly available.  Nevertheless, the Defendants have taken steps to apply the policy to Professor Bionaz and to restrict his speech about matters of public concern.

43.     One effort to apply the "Cyberbullying Policy" to Professor Bionaz arose from a blog post in which the Plaintiff questioned the propriety of cronyism in CSU hiring decisions. Another effort to apply the policy governing electronic communications was inexplicably based on a face-to-face conversation between Professor Bionaz and Tom Wogan, CSU's Director of Public Relations.

**D.     Unconstitutional Computer Usage Policy**

44.     The policies that Defendants have utilized to restrict the Plaintiffs' speech are facially unconstitutional.

45.     CSU's Computer Usage Policy includes a directive to "[r]espect the rights and sensibilities of others."   Under this policy, electronic mail and all other electronic communication (including websites and blog posts on the university server) must "adhere to the University standards of conduct which prohibit any communication which tends to embarrass or humiliate any member of the community."   It also requires users to avoid "lewd, obscene, defamatory or harassing comments."   The Policy admonishes users to "[r]espect the mission of the University in the larger community."

46.     Under CSU policies, "[a]ll University codes of conduct apply to information technology as well as to other forms of communication and activity."

47.      Anyone using CSU information systems must certify the user's understanding that failure to comply with applicable laws, rules, policies, and procedures may lead to disciplinary action up to and including termination of University employment and possible criminal prosecution, depending on the nature of the violation.

48.      The provision in the Computer Usage Policy that prohibits "any communication which tends to embarrass or humiliate any member of the community" does not define the terms "embarrass" or "humiliate," nor does it provide any type of threshold that speech or conduct must reach in order to meet these standards.  This allows the policy to be enforced on the basis of mere hurt feelings, subjective damage to reputation, and alleged mental or emotional harm.

49.      The Computer Usage Policy does not define "lewd" or "harassing," leaving the Defendants with unbridled discretion to expand or restrict the definition of "lewd" and "harassing" to sanction speech they do not like or allow speech with which they agree.  The policy likewise does not define "obscene" comments, leaving the Defendants with unbridled discretion to enforce the policy against the mere use of profane language or commentary on a topic of a sexual nature.

50.      The Computer Usage Policy also requires CSU computer users to "Respect the mission of the University in the larger community."  Neither "respect" nor the "larger community" is defined.  Anyone accessing the Internet through CSU's servers is thus required to express themselves in private communications or non-university forums, such as Facebook, in a way that "respects" the University or be potentially subject to discipline for violating that nebulous standard.

51.     The Computer Usage Policy vests Defendants with unbridled discretion to expand or restrict the definition of "respect" to sanction speech they do not like or allow speech with which they agree.

52.     Plaintiffs fear that they will be disciplined under this policy for posting entries on their blog, *CSU Faculty Voice* even though the blog is not maintained on university servers.  The Policy does not provide standards or definitions to guide the discretion of the public officials of CSU tasked with determining whether a computer user's speech can be properly sanctioned. Thus, CSU public officials are empowered to administer the Computer Usage Policy arbitrarily or on the basis of impermissible factors, such as the content and viewpoint of speech as well as whether particular speech is critical of the university or its leadership.

**E.      Unconstitutional Cyberbullying Policy**

53.     On May 9, 2014, CSU adopted a new "Cyberbullying Policy" that prohibits "deliberate or repeated conduct" that "harasses [or] intimidates an individual … or has the effect of substantially disrupting the individual's daily life via the use of electronic information and communication devices; [] the use of information and communication technologies to support a deliberate, repeated, and hostile course of conduct that is intended to harm others; or [] intentional and repeated harm inflicted through the use of computers, cell phones, and electronic devices."

54.     This policy applies to any and all "electronic speech," defined as: "expressive conduct (verbal, aural [sic], graphic, symbolic, or written) that is conveyed or otherwise communicated via electronic information and communication technology devices and/or media" including e-mail messages, instant messaging, text messaging, cellular telephone

communications, internet blog postings, social media site postings, internet chat room posts, and/or internet postings."

55.    As written, CSU's "Cyberbullying Policy" is not limited to "harassment" that is severe, pervasive, and objectively offensive.

56.    The policy's definition of cyberbullying, prohibiting, in part, "conduct or activity" that "harasses . . . an individual," does not define the term "harass," nor does it limit the University's ability to intervene in communications faculty or students might have with those not affiliated with the University.  This vests Defendants with unbridled discretion to expand or restrict the definition of "harass" to sanction speech they do not like or allow speech with which they agree.

57.    The policy does not define the term "harm" in its prohibition on "the use of information and communication technologies to support a deliberate, repeated, and hostile course of conduct that is intended to harm others."  Nor does it define the term "harm" in its ban on "intentional and repeated harm inflicted through the use of computers, cell phones, and electronic devices."  These provisions vest Defendants with unbridled discretion to expand or restrict the definition of "harm" to sanction speech they do not like or allow speech with which they agree.

58.    Plaintiffs fear that the lack of any definition, illustration, or limitation for the term "harm" means that the "Cyberbullying Policy" will be used to punish speakers, such as the Plaintiffs, whose speech causes hurt feelings, embarrassment, subjective damage to reputation or emotional harm.

59.    Plaintiffs' fear about the expansive conception of "harm" is amplified by the fact that subsection ii requires only "hostile" expression that "is *intended* to harm others" (emphasis

12

added).  Under this formulation, speech is subject to censorship and discipline if it is "hostile" to another person or entity and is deemed to demonstrate an "intent" to harm others, even if no such harm, however slight, ever occurs.

60.     As used in the "Cyberbullying Policy," the term "repeated" encompasses any "conduct that is engaged in on more than one occasion as well as conduct that has a continuing manifestation beyond the time of the conduct itself, including, without limitation, internet blog postings, social media site postings, internet chat room postings, and/or other internet postings." Thus, refusal to remove an offensive online message would be considered a "repeated" violation of the policy.

61.     The policy does not provide adequate standards or definitions to guide the public officials of CSU tasked with determining whether a student's or faculty member's expression can be properly sanctioned.  Thus, CSU public officials are empowered to administer the policy arbitrarily or on the basis of impermissible factors, such as the content and viewpoint of speech as well as whether particular speech is critical of the university or its leadership.

62.     The policy provides for disciplinary action "under the relevant collective bargaining agreements, Board of Trustees Regulations, State Universities Civil Service Status and Rules, or University Student Conduct Code" regulations.

## VI.     CAUSES OF ACTION

### COUNT I
### Facial Challenge to Violation of Right to Free Speech Under the Plaintiffs'
### First and Fourteenth Amendment Rights (42 U.S.C. § 1983) – (Computer Usage Policy)
### (All Defendants)

63.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

64.     Defendants' Computer Usage Policy is unconstitutionally overbroad due to its prohibition on "any communication which tends to embarrass or humiliate any member of the

community." This restricts any discussion that criticizes university leadership or decision-making, as well as any speech that sheds a negative light on the institution, as the University could argue that such discourse creates public "embarrassment" or "humiliation" for the institution.

65.     The Computer Usage Policy is also overbroad because of its ban on "lewd, obscene, defamatory or harassing comments," as well as its instruction to "Respect the mission of the University in the larger community." While speech that is "lewd" or lacking in "respect" may be distasteful to some or even many individuals, such speech is protected by the First Amendment.

66.     The government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

67.     The Computer Usage Policy burdens far more speech than is necessary to serve any asserted interests on the part of the University. Rather than being narrowly tailored to protect speech as the Constitution requires, this policy broadly prohibits speech, and thus inhibits the free exchange of ideas that is central to higher education.

68.     Even if narrowly tailored, a restriction on speech is void for vagueness if the prohibitive terms are not clearly defined such that a person or ordinary intelligence can readily identify the applicable standard for inclusion and exclusion. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

69.     Vague and undefined policies vest in the public officials who must enforce them an unbridled discretion that may be exercised in an inconsistent or discriminatory manner.

70.     Restrictions on expression in CSU's Computer Usage Policy do not provide standards to guide the discretion of CSU officials who must enforce it. This empowers them to administer the policy arbitrarily or on the basis of impermissible factors, including the content and viewpoint of speech.

71.     Defendants' Computer Usage Policy is unconstitutionally vague because it fails to define or illustrate key terms such as "embarrass," "humiliate," "lewd," and "respect." The policy ignores the fact that speech that is "embarrassing" or "disrespectful" in one person's eyes, for example, may be perfectly innocuous to another person.

72.     The Computer Usage Policy's vague command to "[r]espect the mission of the University in the larger community" does not provide the requisite specificity as to the regulation's reach into expressive activity. This allows the University to broadly enforce the provision against speech that is critical of CSU or sheds a negative light on it in the community.

73.     The Computer Usage Policy's lack of guidance leaves faculty members and students to guess at the type of expression it may restrict. Students and faculty members will likely self-censor rather than risk disciplinary action.

74.     As a direct result of Defendants' Computer Usage Policy, faculty and students at CSU are deprived of their right to free speech under the First and Fourteenth Amendments to the Constitution.

75.     As a legal consequence of Defendants' violation of Plaintiffs' and other similarly situated faculty members' and students' First and Fourteenth Amendment rights, as alleged above, Plaintiffs are entitled to injunctive relief and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## COUNT II
### Facial Challenge to Violation of Right to Free Speech Under the Plaintiffs'
### First and Fourteenth Amendment Rights (42 U.S.C. § 1983) – (Cyberbullying Policy)
### (All Defendants)

76.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

77.     Defendants' Cyberbullying Policy is unconstitutionally overbroad due to its prohibition on "the use of information and communication technologies to support a deliberate, repeated, and hostile course of conduct that is intended to harm others," as well as on "intentional and repeated harm inflicted through the use of computers, cell phones, and electronic devices."

78.     The Cyberbullying Policy lacks any definition, illustration, or limitation for the term "harm," giving Defendants unfettered discretion to punish speech that causes hurt feelings, embarrassment, subjective damage to reputation or emotional harm.

79.     The Cyberbullying Policy is also unconstitutionally overbroad because it purports to regulate all speech in any medium of electronic communication both on and off campus.

80.     The Cyberbullying Policy burdens far more speech than is necessary to serve any asserted interests on the part of the University.  Rather than being narrowly tailored to protect speech as the Constitution requires, this policy broadly prohibits speech, and thus inhibits the free exchange of ideas that is central to higher education.

81.     Defendants' Cyberbullying Policy is also unconstitutionally vague because it bans speech protected by the First Amendment without defining its key terms.  The policy does not define the term "harm" at all, nor does it define what it means to "harass" an individual.  These omissions allow the policy to be enforced against virtually any expression that offers a

negative or unflattering opinion of another person, including speech that is critical of a university official or leadership.

82.     Faculty and student First Amendment rights are subject to the unfettered discretion CSU administrators, such as the Defendants, who are given the discretion to enforce the Cyberbullying Policy, no matter how unreasonable or hypersensitive their interpretations of particular speech may be.

83.     The resulting uncertainty will lead many faculty members and students to censor their own expression rather than risk disciplinary action, creating a harmful chilling effect on campus discourse.

84.     As a direct result of Defendants' Cyberbullying Policy, faculty and students at CSU are deprived of their right to free speech under the First and Fourteenth Amendments to the Constitution.

85.     As a legal consequence of Defendants' violation of Plaintiffs' and other similarly situated faculty members' and students' First and Fourteenth Amendment rights, as alleged above, Plaintiffs are entitled to injunctive relief and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**COUNT III**
**As-Applied Violation of Plaintiffs' Right to Free Speech**
**Under the First and Fourteenth Amendments (42 U.S.C. § 1983)**
**(Defendants Watson, Cage, and Carter)**

86.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

87.     All of the acts of Defendants, their officers, agents, employees, and servants were executed, and are continuing to be executed, by the Defendants under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the State of Illinois.

88.     The views expressed on *CSU Faculty Voice* are protected under the First Amendment.  Defendants' attempts to silence them violate the constitutional rights of the authors.

89.     Defendants' attempts to censor the Plaintiffs by demanding that they cease publication of the *CSU Faculty Voice* and threatening legal action violate the First and Fourteenth Amendments.

90.     Defendants' efforts to investigate or sanction the Plaintiffs for views published in the *CSU Faculty Voice* under CSU's Computer Usage Policy violate the First and Fourteenth Amendments.

91.     Defendants' efforts to investigate or sanction the Plaintiffs for views published in the *CSU Faculty Voice* under CSU's Cyberbullying Policy violate the First and Fourteenth Amendments.

92.     Defendants' efforts to subject the Plaintiffs to disciplinary procedures based on their expressive activities violate the First and Fourteenth Amendments.

93.     Defendants have deprived Plaintiffs and others of their clearly established rights to freedom of speech and expression secured by the First and Fourteenth Amendments to the Constitution of the United States.  By attempting to shut down Plaintiffs' blog and punish them for expressing their views, Defendants have violated a clearly established constitutional right of which all reasonable college administrators and staff should have known, rendering them liable to Plaintiffs under 42 U.S.C. § 1983.

94.     The denial of constitutional rights is irreparable injury *per se*, and Plaintiffs are entitled to declaratory and injunctive relief.  As a consequence of being denied the First

Amendment right to express themselves, Plaintiffs experienced significant emotional pain and anguish.

95.     As a legal consequence of Defendants' violation of Plaintiffs' and other similarly situated faculty members' and students' First and Fourteenth Amendment rights, as alleged above, Plaintiffs are entitled to injunctive relief and the reasonable costs of this lawsuit, including their reasonable attorneys' fees. Plaintiffs are also entitled to damages in an amount to be determined by the court.

### COUNT IV
### Declaratory Judgment and Injunction (28 U.S.C. § 2201, et seq.)

96.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

97.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning Plaintiff's rights under the United States Constitution.  A judicial declaration is necessary and appropriate at this time as to Counts I through III above.

98.     Plaintiffs desire a judicial determination of their rights against Defendants as they pertain to Plaintiffs' right to speak without being subjected to regulations that are overbroad, that are not narrowly tailored to serve a substantial governmental interest, and that are vague.

99.     To prevent further violation of Plaintiffs' constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed.R.Civ.P. 57, declaring Chicago State University's Student Conduct Code policies unconstitutional.

100.     Furthermore, pursuant to 28 U.S.C. § 2202 and Fed.R.Civ.P. 65, it is appropriate and hereby requested that this Court issue a permanent injunction prohibiting the Defendants from enforcing their restrictions on Plaintiffs' expressive activities to the extent they are

unconstitutional and to prevent the ongoing violation of Plaintiffs' constitutional rights. Plaintiffs and their fellow faculty, as well as CSU students, are suffering irreparable harm from continued enforcement of CSU's unconstitutional policies, monetary damages are inadequate to remedy their harm, and the balance of equities and public interest both favor a grant of injunctive relief.

## VII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Phillip Beverly and Robert Bionaz respectfully request that the Court enter judgment against Defendants and provide Plaintiffs the following relief:

A.     A declaratory judgment stating that Defendants' Computer Usage and Cyberbullying Policies are unconstitutional facially and as-applied, and that they violate Plaintiffs' rights as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

B.     A permanent injunction restraining enforcement of Defendants' unconstitutional speech codes and enforcement practices;

C.     A declaratory judgment that Defendants' censorship of Plaintiffs' expressive activity violated their First and Fourteenth Amendment rights;

D.     Monetary damages in an amount to be determined by the Court to compensate for the Defendants' censorship and threat of punishment that chilled Plaintiffs' expressive activity;

E.     Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees, in accordance with 42 U.S.C. § 1988, and other applicable law; and

F.     All other further relief to which Plaintiffs may be entitled.

## VIII.     DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues properly triable by jury in this action.

DATED:  July 1, 2014

By: _____/s/_____
ROBERT CORN-REVERE
   (*pro hac vice application to be filed*)
bobcornrevere@dwt.com
RONALD G. LONDON
   (*pro hac vice application to be filed*)
ronnielondon@dwt.com
LISA B. ZYCHERMAN
   (*pro hac vice application to be filed*)
lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC  20006
Telephone: (202) 973-4200

JESSICA TOVROV
GOODMAN TOVROV HARDY & JOHNSON LLC
105 West Madison Street, Suite 1500
Chicago, IL 60602
Telephone: (312) 252-7362
jessica@tovrovlaw.com

Attorneys for Plaintiffs Phillip Beverly
   and Robert Bionaz