IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PHILLIP BEVERLY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 14 C 4970 |
| | ) | |
| WAYNE D. WATSON, et al., | ) | Judge Joan B. Gottschall |
| | ) | Magistrate Judge Finnegan |
| Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Phillip Beverly and Robert Bionaz are members of the faculty at Chicago State University ("CSU"). They helped to found, and are the primary contributors to, a blog titled *CSU Faculty Voice*, which aims to expose perceived mismanagement at the university. This litigation presents Plaintiffs' First and Fourteenth Amendment claims against three CSU administration officials, now-former President Wayne Watson, Vice President of Labor and Legal Affairs and General Counsel Patrick Cage, and Associate General Counsel Janelle Carter (collectively "Defendants"), who allegedly attempted to shut down the blog. Plaintiffs seek a declaration that CSU's Computer Usage and Cyberbullying Policies are unconstitutional, a permanent injunction prohibiting Defendants from further censoring Plaintiffs' lawful speech, and monetary damages.

During Plaintiffs' depositions on September 18, 2015 and October 1, 2015, defense counsel made inquiries into the allegations that Defendants have unlawfully chilled Plaintiffs' free speech and expression. Plaintiffs testified that several "confidential sources" provided information that they and other contributors to the blog

could not publish out of fear that Defendants would discover the sources' identities (based on the nature of the information) and thereafter retaliate against those sources. Counsel then asked about the identity of the sources, and Plaintiffs' counsel objected, asserting that a "qualified reporter's privilege" protected Plaintiffs from answering. (*See* Doc. 136, at 23-25, 38-39) (Dep. Transcripts). Presently before the Court is Defendants' motion to compel Plaintiffs to answer the questions. (Doc. 136). For the following reasons, the motion is granted.

## BACKGROUND

### A.    The *CSU Faculty Voice*

Beverly and Bionaz are associate professors at CSU who teach political science and history, respectively. In March 2009, Beverly began publishing the *CSU Faculty Voice* "for the express purpose of exposing the continuing and impending corruption of the university." (Doc. 45, Beverly Aff. ¶ 2). He invited other faculty members to participate, including Bionaz, who has contributed regularly since its inception. (Doc. 46, Bionaz Aff. ¶ 2). In Plaintiffs' view, the blog "has evolved into a forum that seeks to inform readers about events at Chicago State University and expose malfeasance perpetrated by the school's administration." (*Id.*; Doc. 45, Beverly Aff. ¶ 2). According to Beverly, he and other contributors levy public document requests via the Illinois Freedom of Information Act ("FOIA"), thereby "operat[ing] very much like investigative journalists, seeking source materials, corroborating [their] authenticity, and providing opportunity to have those arguments rebutted." (Doc. 45, Beverly Aff. ¶ 5). Likewise, Bionaz "consider[s] [himself] an investigative journalist . . ." in his blog-related work. (Doc. 46, Bionaz Aff. ¶ 3). Early articles by Bionaz and Beverly focused on topics like a

proposed "CSU Policy Manual," the Board of Trustees' selection of Watson as the new CSU President, and a proposed "CSU Computer Usage Policy" prohibiting any electronic communication "which tends to embarrass or humiliate any member of the community." (*See* Doc. 45-1, at 4-8, 35-36; Doc. 1 ¶ 24).

On November 6, 2013, Watson and Cage questioned Beverly about the tone of posts on the blog. (Doc. 45, Beverly Aff. ¶ 8). Days later, on November 11, Cage mailed a cease and desist letter to Beverly that demanded he disable the blog by November 15, 2013. (Doc. 1-1, at 2). The demand letter stated that the blog had used CSU's trade name without permission or license, and also mentioned violations of CSU's policies regarding civility and professionalism, an apparent reference to the CSU Computer Usage Policy. (*Id.* at 2-3; Doc. 1 ¶ 24). On November 27, 2013, Plaintiffs and six other blog contributors made a counter-demand through counsel that Cage "stop threatening them with legal action for exercising their First Amendment rights," and that Watson resign as CSU's President. (Doc. 1-1, at 10). Their letter disputed Cage's contention that any person could be confused about the blog's non-official status given its highly critical content. (*See id.* at 10-11). Defendants responded on January 3, 2014 through outside counsel (who were not retained for this action), and in essence maintained that the association between the blog and CSU was sufficiently strong as to create plausible confusion among blog readers. (*Id.* at 14). The reply letter acknowledged that the blog had taken some steps to comply with the prior request to end infringement, but nevertheless reiterated that Plaintiffs needed to remove certain

3

associations between the blog and CSU to eliminate any "impression that the site is authorized by CSU." (*Id.*).[1]

As this dispute developed, Plaintiffs continued to publish. On December 13, 2013, for example, Bionaz published a post entitled "More Administrative Lies and Blatant Cronyism: Angela Henderson, Wayne Watson and the University of Illinois Chicago," in which he criticized Watson's hiring of Henderson as interim provost. (Doc. 45-1, at 11-14). On January 24, 2014, Bionaz again blogged about Henderson in a story headlined "The Dissertation of Chicago State's Vice President and Chief Plagiarizing Officer." (*Id.* at 64-68). Bionaz wrote that Henderson had plagiarized portions of her dissertation, providing the text of her work along with the sources from which she allegedly plagiarized. (*Id.*). One day later, he published three additional articles about the alleged plagiarism, a topic to which he again returned in a post dated January 30, 2014. (*Id.* at 70-80, 82-83).

Around the same time, in January or February 2014 according to Plaintiffs, Watson, Cage, and others met to "discuss ways to silence Phillip Beverly's criticism of the CSU administration." (Doc. 1 ¶ 34). Chief among the actions that Defendants allegedly took to effect this goal was Watson's introduction on March 7, 2014 of a Cyberbullying Policy to the CSU Board of Trustees, which the Board adopted on May 9, 2014. (*Id.* ¶¶ 41, 42). Plaintiffs allege that following the Policy's adoption, Defendants relied upon it to challenge a post in which Bionaz questioned "the propriety of cronyism in CSU hiring decisions," and also in a "face-to-face conversation between Professor Bionaz and Tom Wogan, CSU's Director of Public Relations." (*Id.* ¶ 43).

---

[1]    Plaintiffs allege that, at the time of the first demand letter, CSU did not hold any registered trademarks and did not file trademark applications until November 14, 2013. (Doc. 1 ¶¶ 26, 27).

"Unsurprisingly," Bionaz asserts, he was the first person to face a disciplinary investigation under the policy, not even three weeks following its adoption by the Board. (Doc. 46, Bionaz Aff. ¶ 6).

### B.    Plaintiffs' Claims

To address these and related concerns, Plaintiffs filed a Complaint on July 1, 2014 asserting facial challenges to the Cyberbullying Policy and the Computer Usage Policy under the First and Fourteenth Amendments.   Plaintiffs also charge that Defendants have retaliated against them for exercising their free speech through "attempts to censor the Plaintiffs by demanding that they cease publication of the *CSU Faculty Voice* . . . [,]" "efforts to investigate or sanction Plaintiffs for views published in the *CSU Faculty Voice* . . . [,]" "efforts to subject the Plaintiffs to disciplinary procedures based on their expressive activities . . [,]" and deprivations of Plaintiffs' and others' "clearly established rights to freedom of speech and expression . . ."  (Doc. 1 ¶¶ 89, 90, 92, 93).   They seek declaratory and injunctive relief, money damages "to compensate [them] for the Defendants' censorship and threat of punishment that chilled Plaintiffs' expressive activity," costs, and reasonable attorneys' fees.  (*Id*. at 20).

In order to prevail on the retaliatory chilling claim, Plaintiffs will need to prove that they engaged in constitutionally protected speech, they have suffered a deprivation at Defendants' hands that is likely to deter their First Amendment rights to speech and expression, and the speech caused Defendants' actions.  *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006); *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011); *Surita v. Hyde,* 665 F.3d 860, 878-79 (7th Cir. 2011).   Plaintiffs must also prove that they suffered damages.  *Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009).

### C.     Preliminary Injunction

On December 31, 2014, Plaintiffs moved for a preliminary injunction in which they alleged that Defendants "have attempted, and continue to attempt to silence Plaintiffs' speech in violation of the First Amendment . . ." (Doc. 42, at 1).[2]  They asked that Defendants be enjoined from: interfering with or shutting down the blog, imposing sanctions on Plaintiffs for blog posts or other expressions critical of CSU and its administration, and enforcing CSU's Computer Usage and Cyberbullying Policies.  (*Id.* at 1-2).

In an affidavit supporting the motion, Beverly stated that CSU had taken a variety of actions—adoption and enforcement of the policies, the cease-and-desist letter, and efforts to shut down the blog, among others—that had "affected [his] activities and the operations of the *CSU Faculty Voice* because of our concern that the school could take retaliatory actions against us."  (Doc. 45, Beverly Aff. ¶ 13).  As a result of this "climate of fear," Beverly registered an email address for the blog so that readers could contact blog contributors without posting public comments and thereby "expos[e] themselves online," and could "protect their anonymity given their fear[s] of losing their jobs."  (*Id.*).  He also claimed that Defendants' "efforts to censor the *CSU Faculty Voice* have had a chilling effect on speech at the university generally."  (*Id.* ¶ 23).  In support of that allegation, he stated that, when he contacted fellow faculty members to offer opportunities to publish articles on the blog, they expressed fear about having their names associated with critical writings of the administration.  (*Id.*).

---

[2]     The district judge referred the motion to this court for a Report and Recommendation, but due to timing considerations, the district judge vacated the referral of the motion (Doc. 106) and, in light of Defendants' agreement to abstain from certain actions during the pendency of this litigation, denied the motion without prejudice.  (Doc. 112).

Defendants responded to the motion on March 4, 2015, stressing in part that "[a]ll of the 'detrimental acts' Plaintiffs complain of occurred months ago, yet Plaintiffs continue to publish their blog, continue to publish content just as, if not more, critical of CSU, and are undeterred from their activity." (Doc. 63, at 13). By way of example, Defendants attached a March 4, 2015 blog post entitled "Musings on Another Rigged Search: Who is on the Presidential Search Committee? Which 'Executive' Search Firm Will Get the Handout of Taxpayer Dollars? Will Wayne Watson Essentially Succeed Himself? All These Questions to be Answered Soon." (Doc. 63-1, at 71).

During oral argument on April 7, 2015, the Court asked the parties to discuss the extent to which Plaintiffs' speech had been chilled (if at all) in light of the fact that they continued to post to the *CSU Faculty Voice*. The Court ultimately instructed Plaintiffs to submit supplemental affidavits explaining in more detail their claims of ongoing chilling effects. In his supplemental affidavit, Beverly stated that, "since July 1, 2014, when the Complaint in this action brought public light to the retaliatory tactics of the Watson administration against the blog and speech critical of the administration, [the] number [of individuals who had regularly posted to the blog] has been cut in half . . ." (Doc. 75, Beverly Aff. 2 ¶ 5).

Similarly, Bionaz stated in his supplemental affidavit that he had "outlined [in this case] steps taken by the administration of CSU President Wayne Watson to stifle free speech on campus, including steps that appear to be retaliation against [him] and other contributors to the *CSU Faculty Voice* . . . ." (Doc. 76, Bionaz Aff. 2 ¶ 3). Out of "concern for the CSU administration retaliating against me . . . ," Bionaz had "refrained from publishing a number of pieces that would further demonstrate the misdeeds of the

7

Watson administration." (*Id.* ¶ 7). Also, in the stories he did publish, he "refrained from providing the names of the affected persons or even the specific number of persons to whom [he] referred[]" "out of concern that more specificity would enable the administration to determine from whom I had received information and to retaliate against them." (*Id.* ¶ 8).

###    D.    Plaintiffs' Depositions

Not surprisingly in light of Plaintiffs' affidavits and also the claims in this case, Defendants sought discovery about the allegedly extensive chilling effects. At Beverly's October 1, 2015 deposition, defense counsel asked about occasions when Beverly felt he could not post, or was hesitant to do so. Beverly explained that on those occasions, he felt that posting "might identify and implicate . . . some sort of misdeed on [a source's] part" or that a source "might be retaliated against." (Doc 36, at 24). He estimated that between 2011 and 2015, he had declined to post on 15 to 20 occasions. (*Id.* at 24-25). When Beverly was asked about the identity of those sources whom he felt were vulnerable, Plaintiffs' counsel objected on the basis of a reporter's privilege. (*Id.* at 25). Beverly then declined to identify the sources but described them as "[p]eople who have access to information that aren't tenured faculty." (*Id.*). Shortly after, Beverly stated that there were at least 15 to 20 "people," and possibly 30 to 40, but he later clarified that these figures were instances he withheld publication, rather than the number of individual sources which he said ranged from 5 to 7. (*See id.* at 26-27, 29).

Defense counsel asked Beverly a second time to name the sources, excluding those who were untenured faculty for whom he feared. Plaintiff's counsel again objected. (*Id.* at 27). Beverly stated that naming them would "compromise their

confidentiality" and he was "not prepared to do that." (*Id.*).  He then proceeded to explain his "process" for posting information as it related to the confidential sources. The sources would "come to [him] and say, 'Did you know . . . that something was occurring?' And [Beverly would] say, 'Oh, that's very curious.'  And they would say something like, 'But you can't tell anybody, you can't put this on the blog,' because it essentially would identify them as the source." (*Id.* at 30).  Since those sources "can't possibly see everything that goes on at the university," however, Beverly would "get three sources to validate [the information the confidential source provided.]" (*Id.*).  His FOIA requests in part sought to "substantiate [the] claim[s] made by [these] confidential informant[s]." (*Id.*).  So, although the confidential sources said they feared that the information "[c]ould be traced back to them[,]" Beverly might post it later so long as he "could corroborate it without them being identified." (*Id.* at 31).  This process entailed some delay, and sometimes he would not post the information.  (*Id.* at 32).  Beverly cited "absence of corroboration" or the lack of salience—"old news as it were"—as the usual reasons for not posting.  (*Id.*).

Bionaz similarly spoke of chilling effects during his deposition on September 18, 2015.  Defense counsel asked him about the contributors to the blog (*i.e.*, those persons who had the ability to publish or post articles to it), and Plaintiffs' counsel objected on the basis of a reporter's privilege to the extent that any contributors were confidential sources.  (*Id.* at 38-39).  Bionaz then named several individuals (each of whom are openly involved with the blog): Beverly, "Ann Kuzdale, who is a colleague in the history department; Doug Thomson, who is in criminal justice, Louis Poncho McFarland; Lionel Kimball. . . . I think Laurie Walter has posting privileges. . . . Steve

Rowe, also." (*Id.* at 39-40). Defense counsel then asked if Bionaz had ever posted on behalf of someone who lacked posting privileges, and Bionaz indicated that he had "posted on behalf of . . . Janet Halpin[,]" a fellow faculty member, and also a "nontenured faculty member." (*Id.* at 40-41). When Bionaz was asked about the identity of the untenured faculty member, Plaintiffs' counsel again "object[ed] to the extent that this is a confidential source." (*Id.* at 41). Bionaz stated that he considered this person confidential. (*Id.*). He later explained that this source had shared information regarding "how the university was being run," and although he posted that information under his own name—while noting that it was from another faculty member—he did not identify her in the post (and would not during his testimony) because the faculty member "feared retaliation, and the post, as I recall, would have potentially exposed that person to what she feared would take place." (*Id.* at 43).

Defense counsel made additional inquiries of Bionaz about blog contributors on whose behalf he had posted, and Bionaz stated that "[t]here may have been a couple people that are outside the university and one of whom I believe is an adjunct faculty member at the City Colleges." (*Id.* at 42). When Defense counsel asked for the adjunct professor's identity, Plaintiffs' counsel repeated his objection and instruction not to answer, and Bionaz confirmed that he considered each of these latter sources confidential. (*Id.* at 42). He did so for "several reasons," including that the information they provided "would jeopardize their jobs" and "[t]hey've asked [him] to keep this information confidential." (*Id.*). The City College source, in particular, "expressed fear that if [his or her] identity became public[,] . . . there would be repercussions." (*Id.* at 44).

## DISCUSSION

### A.    Qualified Reporter's Privilege

Plaintiffs argue that they should not have to disclose the identities of their confidential sources because the information is protected by a qualified reporter's privilege.  They first suggest that this Court already recognized such a privilege when it denied a previous motion to compel production of a single document identified on their privilege log as ID027043, an email that Bionaz received from a confidential source on February 19, 2014.  (Doc. 124; Doc. 136, at 1).  This is inaccurate.  In an oral ruling, the Court expressly "agree[d] that there's no reporter's privilege" available in the Seventh Circuit, but determined based on an *in camera* review that the document in question had "minimal probative value to defendants' arguments," so declined to order production of the document that would reveal a third-party's identity.  (Doc. 130, at 2).  Given the parties' dispute as to the contours of that ruling, the Court provides further explanation here.  (*Id.*).

Though several jurisdictions have recognized a qualified reporter's privilege, the Seventh Circuit is not one of them.  The court addressed the issue in *McKevitt v. Pallasch*, 339 F.3d 530 (7th Cir. 2003), where the plaintiff was being prosecuted in Ireland on terrorism and related charges.  He secured an order from the district court enforcing a subpoena to journalists for their tape recordings of a key prosecution witness, which he believed would be useful for his cross-examination of the witness at trial.  The journalists moved for a stay of the district court's order enforcing the subpoena.  *Id.* at 531.  The Seventh Circuit declined to issue a stay on the grounds that the First Amendment offers no protection to newsgatherers by which they may refuse to

11

comply with otherwise applicable discovery requests.  *Id.* at 532-33.  Even if it was "obvious that the newsgathering and reporting activities of the press are inhibited when a reporter cannot assure a confidential source of confidentiality[,]" *id.* at 532, the court saw no reason "why there need to be special criteria merely because the possessor of the documents or other evidence sought is a journalist." *Id.* at 533.  As a result, discoverability of the tapes had to be evaluated according to whether the third-party subpoena was "reasonable in the circumstances, which is the general criterion for judicial review of subpoenas." *Id.*

In reaching this conclusion, the court acknowledged the "large number of cases" from sister circuits that recognize a qualified reporter's privilege, but characterized those holdings as "rather surprising[] in light of *Branzburg* [*v. Hayes*, 408 U.S. 665 (1972)]," where the Supreme Court provided a lengthy analysis explaining why it declined to recognize such a privilege.  *McKevitt*, 339 F.3d at 531-32.  In the Seventh Circuit's view, the courts that had reached contrary rulings had either ignored *Branzburg* entirely, treated the majority opinion as only a plurality decision, or "audaciously" read Justice Powell's concurring opinion as *creating* a privilege (in effect, elevating his concurrence's suggestion that a privilege be evaluated on a case-by-case basis to a majority opinion on the point due to the strongly pro-privilege views of the four dissenting Justices).  With respect to this latter outcome, the court explained that it overlooked the fact that Justice Powell joined Justice White's five-member majority opinion, which soundly rejected the claim of privilege.  *See id.*  For these reasons, the Seventh Circuit stated that cases finding a privilege "may be skating on thin ice[,]" *id.* at 533, and later cited *McKevitt* in dictum for the proposition that "[t]here isn't even a reporter's privilege in federal cases[.]"

12

*U.S. Dep't of Educ. v. National Collegiate Athletic Ass'n*, 481 F.3d 936, 938 (7th Cir. 2007).

Despite these clear admonitions from the Seventh Circuit, Plaintiffs rely on decisions from other jurisdictions to support their privilege claim, primarily the D.C. Circuit's opinion in *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981). In doing so, Plaintiffs argue that *McKevitt* stands only for the narrow proposition that no qualified reporter's privilege exists when a source is not in fact confidential and there is a strong, countervailing interest for disclosure of the information, such as the federal interest in cooperating with a foreign nation's criminal proceeding at issue in *McKevitt*. (Doc. 138, at 7-8). Stated differently, Plaintiffs urge that the *McKevitt* decision is limited to its particular facts, and thus offers this Court no counsel in a civil case such as this one, where the information that Defendants seek is the undisclosed identities of Plaintiffs' sources.

The problem for Plaintiffs is that nothing in *McKevitt* suggests that its holding is so narrow. The court did contemplate, at least superficially, that a different result might be appropriate when confidential sources are at issue, taking care to point out that, unlike *Branzburg*, there was "no conceivable interest in confidentiality in th[e] case" at hand because the identity of the source (the prosecution witness) was already known and the sole question was whether the journalists' tapes of his statements should be produced. 339 F.3d at 532. The court also stated, however, that facts related to disclosure of a source or a journalist's confidential information are "consideration[s] that a district court might properly consider in deciding on a challenge to a subpoena . . ." *Id.* at 535. In other words, concerns about confidentiality enter the analysis only under

the relevant legal standard and do not establish a freestanding privilege. Notably, though *McKevitt* did not involve a confidential source, the *Branzburg* case did and the Supreme Court still was not moved to adopt the privilege Plaintiffs seek here.

Instructive on this point is *Davis v. City of Springfield, Ill.*, No. 04-3168, 2009 WL 910204 (C.D. Ill. Apr. 1, 2009), *aff'd*, 2009 WL 1161619 (C.D. Ill. Apr. 28, 2009), where the court considered a subpoena to a third-party journalist under Federal Rule of Civil Procedure 45. Finding no reporter's privilege available in light of *McKevitt*, the court determined whether to enforce the subpoena by applying the Seventh Circuit's "relative hardship test" for analyzing burden under Rule 45. *Id.* at *3. This involved considering whether "the burden of compliance with [the] subpoena would exceed the benefit of production of the material sought by it." *Id.* (citing *Nw. Mem. Hosp. v. Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004)). The court found that the journalist's interest in maintaining the confidentiality of her sources (along with other factors, such as availability of the information by other means) rendered the burden of production greater than the benefit. *Id.* at *4-5. Adhering to the approach counseled in *McKevitt*, the court made clear that the confidential nature of the source was not dispositive, but was "one factor that clearly increase[d] the burden of production" in that case. *Id.* at *3.

In the absence of a *per se* rule that a confidential source must be protected, each case turns on the specific facts presented. For this reason, the Court need not discuss at any length the various decisions Plaintiffs cite from this district where subpoenas to third-party journalists were quashed, thereby relieving journalists of an obligation to disclose confidential materials or a source's identity. (*See* Doc. 138, at 8-9, 13 (discussing *Solaia Tech., LLC v. Rockwell Automation, Inc.*, No. 03 C 6904, 2003 WL

22597611, at *2 (N.D. Ill. Nov. 10, 2003); *Hobley v. Burge*, 223 F.R.D. 499, 504-05 (N.D. Ill. 2004); *Patterson v. Burge*, No. 03 C 4433, 2005 WL 43240, at *3 (N.D. Ill. Jan. 6, 2005)).  None of these cases held that the subpoenas should be quashed on the basis of a privilege, and since "each turn[] on the peculiar facts that were presented[]" to the courts for their Rule 45 analyses, they are not "particularly helpful." *Taylor v. City of Chicago*, No. 14 C 737, 2015 WL 6561437, at *10-11 (N.D. Ill. Oct. 29, 2015).  It is also worth noting that those cases involved subpoenas to third-party journalists, not discovery to the parties who initiated the litigation and seek to recover damages.

In sum, Plaintiffs' confidential sources are not protected by a reporter's privilege, and their identities must be disclosed unless doing so violates the legal rules applicable to all motions to compel such discovery.[3]

## B.    Relevance

The standard for determining whether parties to a lawsuit must produce evidence is found in Federal Rule of Civil Procedure 26.[4]  Rule 26(b) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim

---

[3]    Although Plaintiffs do not develop arguments about other sources of a privilege, the Court nevertheless notes the following in light of their brief's reference to the Illinois statutory reporter's privilege.  First, there are no alternate bases under federal law for the existence of the privilege that Plaintiffs claim.  As this Court so recently observed in *Taylor*, courts in this district that have considered and addressed the issue have consistently found that there are no other sources of a privilege.  2015 WL 6561437, at *2; *Wilson v. O'Brien*, No. 07 C 3994, 2009 WL 763785, at *5 (N.D. Ill. Mar. 20, 2009) ("[A]fter sifting through the jurisprudential remains of *Branzburg* and its progeny, [the court] cannot locate any legal artifacts indicating the existence of the federal reporter's privilege independent of the First Amendment[.]").  Second, the Illinois Reporter's Privilege statute, 735 ILCS 5/8-901 *et seq.*, is a state-law privilege that, per *McKevitt*, is "not 'legally applicable' in federal-question cases, like this one."  339 F.3d at 533 (citing FED. R. EVID. 501).

[4]    Plaintiffs' suggestion that a reasonableness standard applies to the discovery of information from putative journalists even outside the context of a Rule 45 subpoena is contrary to *McKevitt* in that it would require the use of "special criteria [to resolve a discovery dispute] merely because the possessor of the documents or other evidence sought is a journalist."  339 F.3d at 533.

or defense . . ." FED. R. CIV. P. 26(b)(1). There is little doubt that the discovery Defendants seek is relevant, as details about the chilling of Plaintiffs' speech—specifically, whether they were chilled, to what extent, and how—is at the heart of their retaliation claims. Plaintiffs have chosen to raise the issue of chilling repeatedly in their complaint, (*see, e.g.,* Doc. 1 ¶¶ 2, 4, 34, 41, 44, 88, 89, 100) (alleging that Defendants have tried to "silence," "restrict" and "censor" Plaintiffs' speech), and have taken the position that several sources provided information they declined to communicate to blog readers out of fear of retaliation. Yet as Defendants correctly observe, Plaintiffs now "refuse to identify the very individuals who could provide direct evidence and testimony as to these allegations." (Doc. 136, at 4).

Plaintiffs insist that the sources' identities are irrelevant because that information has no bearing on whether and how Plaintiffs themselves were chilled—a matter about which they claim to have "provided illustrative testimony" at their depositions—and also because the as-applied First Amendment challenge does not assert claims on behalf of the sources. (Doc. 138, at 10-12). Consistent with this view, Plaintiffs have proposed a stipulation they believe "addresses Defendants' concerns that they have been unable to learn the identities of the sources and take discovery from those individuals, while protecting the sources' identities." (Doc. 154, at 6-7).

First, Plaintiffs will agree to limit their testimony to the following:

1.     Plaintiffs' method for using information obtained from confidential sources, in particular, Plaintiffs' practice of verifying confidential tips with publicly available documents and on-the-record sources before publication.

2.     ***Plaintiffs'*** subjective belief, based on ***their*** experiences with the CSU administration, that revealing sources' identities could expose

16

sources to retaliation from CSU administrators like Defendants Watson and Cage.

(*Id.* at 6) (emphasis in original). In addition, Plaintiffs further agree to preclude testimony about the following matters:

1.     The state of mind of Plaintiffs' confidential sources.

2.     Any statements made by Plaintiffs' confidential sources.

3.     Whether Plaintiffs' sources asked to be treated as confidential sources.

4.     Whether Plaintiffs believed their confidential sources sought confidentiality because the sources feared retaliation from Defendants.

5.     The number of confidential sources Plaintiffs relied upon or how often their reporting included information from confidential sources.

(*Id.*).

This proposal, and the arguments on which it is based, overlooks several important points. First and foremost, Plaintiffs' theory of chilling presumes the existence of confidential sources that Plaintiffs claim they were afraid to expose. Defendants have no idea whether Plaintiffs actually received stories from confidential sources; cannot confirm whether Plaintiffs in fact declined to publish some of those stories and, if so, which ones; and have no way to verify whether the stories were withheld due to fear for the sources as opposed to some other reason (perhaps, in Beverly's words, because it became "old news"). Contrary to Plaintiffs' suggestion, the testimony provided to date is far from "illustrative" on these points, consisting entirely of conclusory assertions of chilling with no supporting factual details (let alone corroboration for those details).

In addition, without speaking to the confidential sources, Defendants cannot test whether Plaintiffs altered their stated methods for corroborating tips in response to

17

Defendants' alleged retaliatory actions. Beverly testified that he declined to post information that could disclose the identities of his confidential sources as far back as 2011, well before Defendants sent the November 11, 2013 cease and desist letter that set this lawsuit in motion. Defendants should be allowed to determine (independently from Plaintiffs' own assertions) how Plaintiffs handled confidential sources in 2011 compared with late 2013 and beyond.

Plaintiffs argue that Defendants should instead talk to other known contributors "whose names are publicly available on the blog." (Doc. 138, at 11). As Defendants note, however, none of those known contributors claims that their speech was chilled, and Plaintiffs do not contend that they declined to publish stories from those individuals for fear of retaliation. (Doc. 160, at 5 n.2). In addition, Plaintiffs themselves did not identify those individuals as knowledgeable witnesses in their own Rule 26(a) disclosures, and there is nothing to suggest that they have, or will be willing to disclose pertinent information about Plaintiffs' confidential sources. Deposing the known contributors is thus not an alternate means of obtaining the discovery in question.

Plaintiffs make a brief argument that the burden of disclosure outweighs the benefit, referencing "Defendants' campaign to silence the *CSU Faculty Voice* . . . for the sole purpose of shutting down the blog and otherwise chilling Plaintiffs . . . [,]" and urging that "[e]xposure of Plaintiffs' confidential sources will result in further chilling impact . . ." (Doc. 138, at 14). In essence, Plaintiffs ask Defendants to simply accept as true an essential fact they must prove, the chilling of their speech, and prohibit discovery on the basis that there would be more of said chilling were they required to provide even minimal support for their underlying allegations. Of course, that is not how

18

discovery works. Plaintiffs cannot take the stand at trial and testify that a handful of fellow CSU employees provided confidential information on multiple occasions that they felt obliged to withhold out of fear of reprisal, while at the same time refusing to provide any details that would allow Defendants to obtain discovery or cross-examine them about those contentions. Defendants understandably wish to explore this given that Plaintiffs' attacks against the university have continued unabated with no evidence of any chilling effect.[5]

To summarize, the information Defendants seek is relevant to this litigation. Only Plaintiffs know of the sources' identities, and Defendants cannot discover facts about the alleged chilling, including whether it actually occurred, without also knowing that information. Plaintiffs have not demonstrated that the burden of production outweighs the likely benefit, and so Defendants' motion is granted. Plaintiffs are ordered to answer the questions to which they claimed a reporter's privilege at their respective depositions, or to accept Defendants' proposal and stipulate that "they will not rely on any interactions with 'confidential sources' for any purpose within their case[,] or that their speech was not in fact chilled by any actions of the Defendants." (Doc. 160, at 6).

## CONCLUSION

For the reasons stated above, Defendants' Supplement to their Motion to Compel (Doc. 136) is granted.

---

[5] *See, e.g.*, "Another Case of Retaliation at Chicago State: The Watson Administration Closes the HIV-AIDS Research Institute to Punish its Director for Standing Up to Them" (2/27/15); "Use Them Then Screw Them" (4/12/15); "The Chicago State Administration: Pigs at the Trough" (4/29/15); "Our Orwellian Administration and Its Data: A Prediction for Fall 2015 Enrollment" (5/4/15); "Breaking News: It's Raining Vice Presidents Here at Chicago State" (5/4/15); "How Does the Smallest School in the Illinois Public University System Have So Many 'Administrators'? Ask Wayne Watson and the Chicago State Board" (5/24/15); "Putting Lipstick on a Pig: Propaganda and Truth in Chicago State's 'Factbook'" (6/11/15); "More New Vice Presidents at Cesspool State" (6/19/15).

ENTER:

Dated:  July 7, 2016

SHEILA FINNEGAN
United States Magistrate Judge