# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PHILLIP BEVERLY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  1:14-CV-04970 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| WAYNE D. WATSON, *et al.*, | ) | Magistrate Judge Sheila Finnegan |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND FOR SUMMARY JUDGMENT**

ROBERT CORN-REVERE
  (*pro hac vice*)
bobcornrevere@dwt.com
RONALD G. LONDON
  (*pro hac vice*)
ronnielondon@dwt.com
LISA B. ZYCHERMAN
  (*pro hac vice*)
lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC  20006
Telephone: (202) 973-4200

JESSICA TOVROV
GOODMAN TOVROV HARDY & JOHNSON LLC
105 West Madison Street, Suite 1500
Chicago, IL 60602
Telephone: (312) 252-7362
jessica@tovrovlaw.com

Attorneys for Plaintiffs
Phillip Beverly and Robert Bionaz

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

ARGUMENT ................................................................................................................9

I.     DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(1) UTTERLY MISCONSTRUES THE LAW ................................................................................9

II.    DEFENDANTS' RETALIATORY CONDUCT REMOVES ANY QUESTION REGARDING PLAINTIFFS' STANDING ................................................................11

III.   THE COURT MUST DENY DEFENDANTS SUMMARY JUDGMENT ON PLAINTIFFS' FACIAL CHALLENGES ................................................................15

IV.   THE FACTS IN THE RECORD PRECLUDE SUMMARY JUDGMENT FOR DEFENDANTS ON PLAINTIFFS' AS-APPLIED CLAIMS ................................21

V.    DEFENDANTS CANNOT GAIN SUMMARY JUDGMENT UNDER ANY OF THE FORMS OF IMMUNITY THEY INVOKE ................................................26

CONCLUSION ................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ........................................................................................9, 10

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ........................................................... *passim*

*Baggett v. Bullitt*,
377 U.S. 360 (1964) ................................................................................18

*Bair v. Shippensberg Univ.*,
280 F. Supp. 2d 357 (M.D. Pa. 2003) ................................................17

*Bart v. Telford*,
677 F.2d 622 (7th Cir. 1982) ..........................................2, 11, 22, 25

*Bartley v. Taylor*,
25 F.Supp.3d 521 (M.D. Pa. 2014) ......................................................28

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*,
482 U.S. 569 (1987) ................................................................................20

*Bell v. Keating*,
697 F.3d 445 (7th Cir. 2012) ..........................................................11, 13, 17

*Beverly v. Watson*,
78 F.Supp.3d 717 (N.D. Ill. 2015) ................................................8, 11, 13, 19

*Bill Johnson's Restaurants, Inc. v. NLRB*,
461 U.S. 731 (1983) ................................................................................27

*Bridges v. Gilbert*,
557 F.3d 541 (7th Cir. 2009) ..........................................................12, 14

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ................................................................................14

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011) ........................................................................15, 16

*Bynum v. U.S. Capitol Police Bd.*,
93 F.Supp.2d 50 (D.D.C. 2000) ..........................................................17, 19

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
208 F.3d 885 (10th Cir. 2000) ...............................................................27

*Center for Individual Freedom v. Madigan*,
697 F.3d 464 (7th Cir. 2012) ................................................................12

*Chaklos v. Stevens*,
560 F.3d 705 (7th Cir. 2009) ................................................................14

*Citizens for Responsible Gov't State Political Action Comm. v. Davidson*,
236 F.3d 1174 (10th Cir. 2000) .............................................................10

*City of Houston v. Hill*,
482 U.S. 451 (1987)......................................................................17, 18

*City of Madison Joint Sch. Dist. 8 v. Wisconsin Employment Relations Comm'n*,
429 U.S. 167 (1976).............................................................................22

*Cohen v. San Bernardino Valley Coll.*,
92 F.3d 968 (9th Cir. 1996) ...........................................................17, 26

*Coll. Republicans at San Fran. State Univ. v. Reed*,
523 F.Supp.2d 1005 (N.D. Cal. 2007) ...................................................17

*Commodity Trend Serv., Inc. v. CFTC*,
149 F.3d 679 (7th Cir. 1998) ..................................................................9

*Connick v. Myers*,
461 U.S. 138 (1983)..............................................................................21

*Corlett v. Oakland Univ. Bd. of Trustees*,
958 F.Supp.2d 795 (E.D. Mich. 2013)...................................................14

*Culver v. Gorman & Co.*,
416 F.3d 540 (7th Cir. 2005) ................................................................25

*Dambrot v. Central Mich. Univ.*,
55 F.3d 1177 (6th Cir. 1995) ..........................................................19, 20

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999)..............................................................................17

*Dean Foods Co. v. Brancel*,
187 F.3d 609 (7th Cir. 1999) ................................................................26

*Deida v. City of Milwaukee*,
192 F.Supp.2d 899 (E.D. Wis. 2002).....................................................10

*DeJohn v. Temple Univ.*,
  537 F.3d 301 (3d Cir. 2008)....................................................................17, 18, 19

*Denius v. Dunlap*,
  209 F.3d 944 (7th Cir. 2000) ...........................................................................29, 30

*Doe v. University of Mich.*,
  721 F.Supp. 852 (E.D. Mich. 1989).......................................................................14, 17

*Eng v. Cooley*,
  552 F.3d 1062 (9th Cir. 2009) ...............................................................................15

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975)........................................................................................18

*Ex Parte Young*,
  209 U.S. 123 (1908)........................................................................................26

*Ezell v. City of Chi.*,
  651 F.3d 684 (7th Cir. 2011) ...........................................................................12, 18

*Fairley v. Andrews*,
  578 F.3d 518 (7th Cir. 2009) ...........................................................................3, 4, 26

*FEC v. Wisconsin Right to Life*,
  551 U.S. 449 (2007)........................................................................................13

*Flynn v. Sandahl*,
  58 F.3d 283 (7th Cir. 1995) ................................................................................30

*Forsyth County v. Nationalist Movement*,
  505 U.S. 123 (1992)........................................................................................20

*Gilles v. Blanchard*,
  477 F.3d 466 (7th Cir. 2007) ...............................................................................20

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)........................................................................................15

*Hammer v. Ashcroft*,
  512 F.3d 961 (7th Cir. 2008), *vacated on reh'g en banc on other grounds*,
  570 F.3d 798 (7th Cir. 2009) ...............................................................................27

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982)........................................................................................30

*Harris v. Quinn*,
  2010 WL 4736500 (N.D. Ill. 2010), *aff'd in part, remanded in part*, 656 F.3d
  692 (7th Cir. 2011), *aff'd in part, rev'd in part and remanded*, 134 S. Ct. 2618
  (2014), *and rev'd in part sub nom. Harris v. Rauner*, 601 F. App'x 452 (7th
  Cir. 2015) ...................................................................................................................14

*Heffernan v. City of Paterson*,
  136 S. Ct. 1412 (2016) .................................................................................................2

*Kucharek v. Hanaway*,
  902 F.2d 513 (7th Cir. 1990) .....................................................................................10

*Lane v. Franks*,
  134 S. Ct. 2369 (2014).........................................................................................22, 28

*Levin v. Harleston*,
  966 F.2d 85 (2d Cir. 1992)..........................................................................................26

*Lewis v. Wilson*,
  253 F.3d 1077 (8th Cir. 2001) ...................................................................................17

*Lewis v. Wilson*,
  89 F.Supp.2d 1082 (E.D. Mo. 2000)..........................................................................19

*Love v. Chicago Bd. of Educ.*,
  5 F.Supp.2d 611 (N.D. Ill. 1998) ...............................................................................21

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)....................................................................................................15

*Malak v. Associated Physicians, Inc.*,
  784 F.2d 277 (7th Cir. 1986) .......................................................................................9

*Massey v. Johnson*,
  457 F.3d 711 (7th Cir. 2006) ..........................................................................15, 21, 25

*McCauley v. Univ. of V.I.*,
  618 F.3d 232 (3d Cir. 2010).......................................................................................19

*Meade v. Moraine Valley Cmty. Coll.*,
  770 F.3d 680 (7th Cir. 2014)................................................................................22, 29

*Members of City Council of L.A. v. Taxpayers for Vincent*,
  466 U.S. 789 (1984)....................................................................................................18

*MSA Realty Corp. v. Illinois*,
  990 F.2d 288 (7th Cir. 1993) .....................................................................................26

*Myers v. Hasara*,
    226 F.3d 821 (7th Cir. 2000) ........................................................30

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)............................................................16, 27

*New West, L.P. v. City of Joliet*,
    491 F.3d 717 (7th Cir. 2007) ........................................................27

*Norton v. City of Springfield*,
    768 F.3d 713 (7th Cir. 2014) ........................................................12

*Novoselsky v. Brown*,
    822 F.3d 342 (7th Cir. 2016) ....................................................21, 28

*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003)............................................................2

*Perry v. Sinderman*,
    408 U.S. 593 (1972)............................................................22, 23

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968)..................................................................22

*Pieczynski v. Duffy*,
    875 F.2d 1331 (7th Cir. 1989) ..................................................11, 26

*Power v. Summers*,
    226 F.3d 815 (7th Cir. 2000) ........................................................26

*Procunier v. Martinez*,
    416 U.S. 396 (1974)..................................................................17

*Reno v. ACLU*,
    521 U.S. 844 (1997)..................................................................29

*Rutan v. Republican Party of Ill.*,
    497 U.S. 62 (1990)....................................................................26

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001)..........................................................17

*Sherman v. Cmty. Consol. Sch. Dist. 21*,
    980 F.2d 437 (7th Cir. 1992) ........................................................10

*Silva v. Univ. of N.H.*,
    888 F. Supp. 293 (D.N.H. 1994)......................................................26

*Smith v. Goguen*,
    415 U.S. 566 (1974)...........................................................................18

*Spiegla v. Hull*,
    371 F.3d 928 (7th Cir. 2004) ..........................................................26

*Steffel v. Thompson*,
    415 U.S. 452 (1974)...........................................................................13

*Surita v. Hyde*,
    665 F.3d 860 (7th Cir. 2011) ..........................................12, 28, 29

*Susan B. Anthony List v. Driehaus*,
    814 F.3d 466 (6th Cir. 2016) ...................................................23, 24

*Swetlik v. Crawford*,
    738 F.3d 818 (7th Cir. 2013) ..........................................................27

*Texas v. Johnson*,
    491 U.S. 397 (1989)...........................................................................17

*Tri-Corp. Housing Inc. v. Bauman*,
    826 F.3d 446 (7th Cir. 2016) ....................................................27, 28

*United States v. Stevens*,
    559 U.S. 460 (2010)...........................................................................19

*Valentino v. Village of S. Chi. Heights*,
    575 F.3d 664 (7th Cir. 2009) ....................................15, 25, 28

*Virginia v. American Bookseller's Ass'n*,
    484 U.S. 383 (1988).....................................................................9, 13

*Virginia v. Black*,
    538 U.S. 343 (2003)...........................................................................16

*Virginia v. Hicks*,
    539 U.S. 113 (2003)...........................................................................12

*Wainscott v. Henry*,
    315 F.3d 844 (7th Cir. 2003) ..........................................................28

*Wallace v. Benware*,
    67 F.3d 655 (7th Cir. 1995) ............................................................26

*Wash. State Grange v. Wash. St. Repub. Party*,
    552 U.S. 442 (2008)...........................................................................18

*Wernsing v. Thompson,*
    423 F.3d 732 (7th Cir. 2005) ...................................................................28

*Wisconsin Right to Life, Inc. v. Paradise*,
    138 F.3d 1183 (7th Cir. 1998) ................................................................10

*Wisconsin Right to Life v. Barland,*
    751 F.3d 804 (7th Cir. 2014) ..................................................................18

*Zamecnik v. Indian Prairie Sch. Dist. 2047 Bd. of Educ.*,
    2009 WL 805654 (N.D. Ill. Mar. 24, 2009)............................................12

## Rules

Federal Rule of Civil Procedure 12(b)(1) ....................................................8, 9

Federal Rule of Civil Procedure 12(b)(6) .......................................................9

Federal Rule of Civil Procedure 25(d)......................................................11, 26

Federal Rule of Civil Procedure 56 ............................................................8, 9

Federal Rule of Civil Procedure 56(f)(1)...................................................20, 21

Local Rule 56.1 ......................................................................................8

## Constitutional Provisions

U.S. Const. amend. I .......................................................................... *passim*

U.S. Const. amend. XI ..............................................................................8

## Other Authorities

5 Wright & Miller, Federal Practice and Procedure § 1366 (1969)................................9

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| CSU | Chicago State University |
| Compl. | Complaint |
| PI Motion and PI Mot. | Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction (ECF 44) |
| MTD | Defendants' Amended Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF 216) |
| MSJ | Defendants' Motion for Summary Judgment (ECF 224) |
| Defs.' SMF | Defendants' Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (ECF 224-1) |
| Pls.' SMF | Plaintiffs' Statement of Additional Undisputed Material Facts in Opposition to Defendants Motion for Summary Judgment |
| Pls.' Resp. SMF | Plaintiff's Response to Defendants' Statement of Undisputed Material Facts |
| Beverly Decl. | Declaration of Phillip Beverly in Support of Motion for Preliminary Injunction (ECF 45) (Ex. 1) |
| Bionaz Decl. | Declaration of Robert Bionaz in Support of Motion for Preliminary Injunction (ECF 46) (Ex. 2) |
| Peebles Decl. | Declaration of LaShondra Peebles in Support of Motion for Preliminary Injunction (ECF 68) (Ex. 5) |
| Corn-Revere Decl. | Declaration of Robert Corn-Revere in Support of Motion for Preliminary Injunction (ECF 69) (Ex. 3) |
| Kanis Decl. | Declaration of David Kanis, Ph.D. (ECF 63-1) (Ex. 4) |

| | |
|---|---|
| Suppl. Bionaz Decl. | Supplemental Declaration of Robert Bionaz in Support of Motion for Preliminary Injunction (ECF 76) (Ex. 6) |
| Beverly Tr. | Transcript of Deposition of  Philip Beverly (excerpts attached as Ex. 7) |
| Bionaz Tr. | Transcript of Deposition of Robert Bionaz (excerpts attached as Ex. 8) |
| Peebles Tr. | Transcript of Deposition of LaShondra Peebles (excerpts attached as Ex. 15) |
| Cage Tr. | Transcript of Deposition of Patrick Cage (excerpts attached as Ex. 10) |
| Carter Tr. | Transcript of Deposition of Janelle Carter (excerpts attached as Ex. 11) |
| Watson Tr. | Transcript of Deposition of Wayne Watson (excerpts attached as Ex. 16) |
| Bush Tr. | Transcript of Deposition of Bernetta Bush (excerpts attached as Ex. 9) |
| Mitchell Tr. | Transcript of Deposition of Renee Mitchell (excerpts attached as Ex. 13) |
| Muscadin Tr. | Transcript of Deposition of Farah Muscadin (excerpts attached as Ex. 14) |
| Wogan Tr. | Transcript of Deposition of Tom Wogan (excerpts attached as Ex. 17) |
| Pls.' Dep. Ex. | Exhibits to depositions taken by plaintiffs |

Defendants appear to be deeply confused regarding what this case is about. They argue, among other things, that Plaintiffs' as-applied claim should be rejected because "retaliation was not even pleaded in the Complaint," *e.g.*, MSJ 14-15 & n.10, while simultaneously acknowledging – as undisputed fact, no less – that Count III "asserts that Defendants took certain actions against Plaintiffs either to deter or in retaliation for Plaintiffs' expressive activities." Defs.' SMF ¶ 12. But the nature of this case has always been clear. As the Complaint sets forth, Defendants "initiated various formal and informal actions in retaliation for Plaintiffs' speech criticizing the CSU administration." Compl. ¶ 36. *See also id.* ¶¶ 88-94. Were that not plain enough, the PI Motion focused almost entirely on this conduct, beginning with the line: "This is a textbook case of retaliation by a university administration trying to silence speech of undoubted public interest and importance by professors …." PI Mot. 1. *See also id.* 2-15.

The record bears this out. Defendants' retaliation began with a cease-and-desist letter to demand that Plaintiffs shut down their blog, the *CSU Faculty Voice*, claiming it failed to meet CSU's "civility" standards and superficially alleging trademark violations. When that failed to kill the blog, Defendants adopted a Cyberbullying Policy toward that same end. Were that not enough, they also tried to gin up false sexual harassment charges against Professor Beverly, suspended him for engaging in events critical of CSU, and threatened Professor Bionaz with sanctions under the Cyberbullying Policy for criticizing a CSU administration official. Such actions certainly confer standing and violate well-established First Amendment principles.

"A public official who tries to shut down an avenue of expression and ideas and opinions through actual or threatened imposition of government power or sanction is violating the First Amendment." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (internal quotation marks omitted). One "who threatens … coercive state power to stifle protected speech

violates … First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of … direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form." *Id*. at 230-31 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003)).

Claims that Plaintiffs' speech was not chilled flow from the same frail grasp of facts and law. They merely acknowledge Defendants' efforts to kill the blog were unsuccessful while ignoring various ways Professors Beverly and Bionaz were forced to limit some of what they published, and that other blog contributors were scared off. Even a "campaign of petty harassments" is actionable in the face of such efforts to suppress speech, because "there is no justification for harassing people for exercising [] constitutional rights." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). Such censorial tactics need not succeed to justify judicial involvement. Threat of sanctions – even if by a vaguely-worded, yet ominous letter – "is actionable and thus can be enjoined even if it turns out to be empty – the victim ignores it, and the threatener folds his tent." *Backpage*, 807 F.3d at 231. *See Heffernan v. City of Paterson*, 136 S. Ct. 1412 (2016) (government cannot pursue "constitutionally harmful policy" even if it does not actually affect the target's First Amendment rights).

Summary judgment cannot be granted for the Defendants on the facial challenge to the Computer Usage and Cyberbullying Policies because the rules are unconstitutionally vague and overbroad. None of the immunities Defendants assert warrants summary judgment, as the retaliation against Plaintiffs' speech was not a "petition" of any kind under the *Noerr-Pennington* doctrine, no damages are sought against Defendants in their official capacities, and First Amendment law barring retaliation against protected speech is exceptionally well-established.

"Threatening penalties for future speech goes by the name 'prior restraint' and … is the quintessential first-amendment violation." *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009).

## BACKGROUND

Factual Background. Since its inception in 2009, the *CSU Faculty Voice* has been a forum to expose administrative malfeasance to the CSU community. Pls.' SMF ¶ 13. Defendant Watson said he was in a "fight" with the *CSU Faculty Voice* and routinely had assistants print articles that angered him, which he would share with other CSU officials. Pls.' Resp. SMF ¶ 65. This prompted various efforts to shut down the blog and penalize Professors Beverly and Bionaz.

***First***, Defendants Watson and Cage admonished Professor Beverly at CSU's President's Executive Council meeting on November 6, 2013 for violating CSU "civility" standards by publishing the blog. Pls.' Resp. SMF ¶ 45. Tom Wogan, CSU's Director of Public Relations, confirmed Watson criticized the "overall tone of the blog" at the meeting, and said it "was having a negative effect on the university's image."[1] Within a week, Cage sent a cease-and-desist letter that ordered Beverly to "disable" the *CSU Faculty Voice*, alleging it "lack[ed] civility and professionalism" in violation of CSU policy, and because it assertedly violated CSU trademarks.[2] Though Cage denied the "civility standard" he cited was CSU's Computer Usage Policy, he could not name any other policies intended by that reference.[3]

---

[1] *Id.* Cage confirmed that the issue of the blog's content was raised: "I asked him in that meeting, I said, 'Do you have content standards?' And I believe he said, 'No.'" Pls.' SMF ¶ 14.

[2] Ex. 19. Cage was not alone in conceiving and drafting the letter. Carter reviewed a draft and assisted in its editing. Pls.' SMF ¶ 16. Watson testified he "assume[d] that my general counsel would have shared it with me beforehand." *Id.*

[3] Pls.' SMF ¶ 15. The Computer Usage Policy requires electronic mail and all other electronic communication "including websites and blog posts on the university server," to "adhere to the University standards of conduct which prohibit any communication which tends to embarrass or humiliate any member of the community." Ex. 36.

Notwithstanding Cage's claim that the letter "had nothing to do with content," Pls.' Resp. SMF ¶ 45, other participants told a very different story. LaShondra Peebles, CSU's then-interim Vice President of Enrollment Management and Student Affairs, said attendees at a November 2013 meeting discussed "how you could shut down the blog using a cease-and-desist." *Id*. According to Peebles, the letter was drafted to address Watson's repeated requests for "different ways that we could … shut down the blog." *Id*.

Although Cage claims he sent the cease-and-desist to prevent "confusion of source," other CSU witnesses confirmed there was no actual confusion on this point.[4] Cage took no actions consistent with claims that the letter was sent to address trademark concerns and he admitted CSU held no registered trademarks when he sent the cease-and-desist, and that he did not research whether the blog engaged in commerce. Ans. ¶ 26; Pls.' Resp. SMF ¶¶ 45, 46; Pls.' SMF ¶ 18. Ultimately, Cage acknowledged he was concerned the blog had "capacity to do harm," based on "subject matter" and asserted "people at the university have been defamed by the blog." Pls.' SMF ¶ 18. And it was Watson who "suggested the letter reference CSU's civility standard, as set forth in the Computer Use Policy." Pls.' Resp. SMF ¶ 45; *see also id*. (citing Peebles Decl. ¶ 12 ("Watson suggested that even if the intellectual property claim did not 'stick' he wanted the letter sent.")).

The admonition at the November President's Executive Council meeting followed shortly by cease-and-desist letters convinced Plaintiffs they needed to protect their sources from retaliation, and affected what they were willing to publish. Pls.' SMF ¶ 19. For example, Beverly testified that if an untenured, confidential source shared potentially newsworthy information, he

---

[4] *Id*.; Pls.' SMF ¶ 17 (citing Mitchell Tr. 130:24-131:23; Muscadin Tr. 85:21-86:17 (acknowledging articles that criticized administration, *e.g.*, that Watson gave friends jobs, did not come from administration)).

would post a story reporting it only if he could cite other sources, so that confidential sources remained anonymous, a process he called "triangulation." *Id.* ¶ 20. Plaintiffs also adopted ways to allow contributors to blog anonymously. If they could not assure sources' anonymity, they would not publish new information over concern Defendants would retaliate against the source. *Id.* ¶ 21. Further, although Beverly and Bionaz continued to publish the blog because they are protected by tenure, the threatened restrictions affected ***their own*** willingness to post certain materials. *Id.* ¶ 22.

***Second***, when Plaintiffs refused to cease publication, Defendants admit Watson, Cage and other CSU administrators met to address ways of dealing with the *CSU Faculty Voice*, including possibly contacting Google, Inc., owner of the blog's host service, to take down the site. Ans. ¶¶ 34-35. Muscadin and Peebles confirmed the details of the meeting, as well as the fact that Cage attended, as did numerous CSU administrators and Watson's community allies. Pls.' Resp. SMF ¶ 65; Pls.' SMF ¶ 23. They met after the *Chicago Tribune* reported allegations – from a story on the *CSU Faculty Voice* – that CSU's then-interim Provost Angela Henderson had plagiarized portions of her dissertation. Pls.' SMF ¶ 24.[5] Muscadin confirmed attendees discussed the blog, "content on it," and its "impact on the university," as well as the need to "protect[] the brand" of CSU, which Watson and others believed the blog harmed. Pls.' Resp. SMF ¶ 65.

Peebles testified that Watson went so far as to try to coerce her into filing a false sexual harassment claim against Beverly despite her assurances to Watson and other administrators she never felt harassed or intimidated by Beverly. Pls.' Resp. SMF ¶ 65. Those at the meeting discussed "the fact that they needed me to file this sexual harassment claim that could also be

---

[5] Peebles testified to "lots of discussions about Angela's plagiarism," with her husband "being extremely upset" over Cage's inability to "shut down the blog." *Id.*

used to terminate Dr. Beverly." *Id*. Peebles recalls Watson haranguing her as "not being a team player," and that he yelled: "you were threatened, you were harassed, and you need to file this claim." *Id*.

**Third**, Defendants punished Beverly for his involvement in an April 2014 event entitled *Repression at CSU*, intended to highlight free speech abuses on the CSU campus. Compl. ¶ 37. Though Defendants would later claim to be only reacting to two students' complaints, the record shows they monitored Beverly's activities in advance. Cage was notified when Beverly's room request for the event was denied, then copied Watson, Henderson, and Bush. Pls.' Resp. SMF ¶ 59; Pls.' SMF ¶ 25. Cage admitted his actions arose from concerns about speech at the event: "There was some noise that in spite of the room request denial that they were going to move forward with this protest – I mean with this event, with this forum. * * * * I was alerting the president … about my response to that[.]" *Id*. "My concern was that … in spite of the denial," they "were insisting that they were going to go ahead …." *Id*.

David Kanis, the then-interim Dean of the College of Arts & Sciences, who investigated complaints of two students who claimed they felt compelled to attend *Repression at CSU*, "interpreted" the event, and Beverly's involvement in it, as "an instructor attempting to influence the personal choices on political action of people in the room." *See* Pls.' Resp. SMF ¶ 59; Pls.' SMF ¶ 26. However, he was concerned not that Beverly spoke to influence anyone, but that "It was what he let happen as the [event's] moderator." *Id*. Kanis felt students were encouraged to engage in political action to "rise up against the administration." *Id*. He ultimately recommended a one-day suspension of Beverly for his involvement, but Watson doubled it. Pls.' Resp. SMF ¶¶ 59, 61; Pls.' SMF ¶ 27.

*Fourth*, following their unsuccessful demand that Plaintiffs take down the *CSU Faculty Voice*, Defendants adopted a Cyberbullying Policy in May 2014 specifically to target the blog. Watson admitted he believed CSU needed such a policy, asserting "students were being bullied" by the blog. Pls.' SMF ¶¶ 28, 29. Watson cited the *Repression at CSU* event for which Beverly was punished as an example of such bullying, even though it occurred in April 2014, *after* the Cyberbullying Policy's introduction to CSU's Board of Trustees in March. *Id.* ¶ 29.

Watson's claim of need for the Policy focused on actions of Beverly, Bionaz and another blog contributor, Pls.' SMF ¶ 30, motivations that were confirmed by Peebles, who testified he told her and others "the faculty blog was something that needed to be shut down and that participants could be reprimanded, and since we didn't have a policy, we needed to have one." Pls.' Resp. SMF ¶ 65. After a meeting Peebles attended with Henderson, Cage, Watson, and others, she was asked to draft a policy that could "be used potentially to shut down the blog." *Id.*; Pls.' SMF ¶ 31. Muscadin confirmed, recalling a conversation with Cage, Henderson, and Peebles "about the blog as it related to cyberbullying," where they "discussed a [draft] policy that [] Peebles presented." *Id.*

*Fifth*, Defendants applied the Cyberbullying Policy to Professor Bionaz based on a brief in-person exchange in which Bionaz called Wogan Watson's "mouthpiece." Pls.' SMF ¶ 32. Defendant Carter investigated the remark under CSU's Cyberbullying Policy, even though she admitted "Wogan did not find it … threatening," and she ultimately "determined [Bionaz's behavior] wasn't threatening." *Id.* ¶ 33. Carter confirmed the terms "harass" and "bully" are not defined in the Policy, nor are "severe and pervasive," nor "harm." *Id*. ¶ 34. She added she did not consider the three-minute exchange the complaint described to be severe harassment, a pervasive atmosphere of harassment, or repeated harassment. *Id*. Nevertheless, she investigated

the matter and kept Cage informed of her communications with Bionaz. *Id.* And while CSU did not impose sanctions on Bionaz, Carter warned him, based on his "inflammatory comments," that "if your behavior continues, you could be found responsible for violating the policy and subjected to disciplinary action." *Id.* ¶ 35.

Procedural Background. The Complaint was filed on July 1, 2014. After conferring with then-opposing counsel in hopes of resolving the case, Plaintiffs did not oppose a motion to dismiss the CSU Board on Eleventh Amendment grounds, ECF 18; ECF 21, and Defendants submitted an Answer. ECF 20; *see also* Corn-Revere Decl. ¶ 3. However, Defendants obtained new counsel, ECF 31, then moved to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1). ECF 36; *see also* Corn-Revere Decl. ¶¶ 4-10. The Court denied the motion. *Beverly v. Watson*, 78 F.Supp.3d 717, 723 (N.D. Ill. 2015).

Plaintiffs moved for a preliminary injunction, seeking an order barring Watson, Cage, and Carter from interfering with or imposing sanctions on Plaintiffs for criticizing administrators or for publication of the *CSU Faculty Voice.* ECF 42, 44. The parties ultimately agreed that Defendants will not "take any steps to shut down the … blog or interfere with its operation" or restrict "any other lawful expression critical of [CSU] officials" during the litigation. ECF 112 (formalizing "Standstill Agreement").

Near the end of discovery, Plaintiffs moved pursuant to Fed. R. Civ. P. 56 and LR 56.1 for summary judgment on the facial challenges in Counts I and II of the Complaint. ECF 163. On the eve of the parties' mediation, *see* ECF 211, Defendants filed the instant motion to dismiss, again pursuant to Fed. R. Civ. P. 12(b)(1). ECF 216. Defendants then moved for summary judgment as to all counts. ECF 224. The Court denied Plaintiffs' partial summary judgment motion without prejudice, pending decision on the jurisdictional issue. ECF 225.

**ARGUMENT**

**I.      DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(1) UTTERLY MISCONSTRUES THE LAW**

Defendants' "Amended Motion to Dismiss for Lack of Subject Matter Jurisdiction" boils down to the simplistic claim that if Plaintiffs are still publishing the blog they could not have been harmed, and therefore no First Amendment claim may be raised. This misconstrues Article III standing requirements, misunderstands substantive First Amendment law, and even fails to get the procedural aspects of the motion right.[6] As noted above, Defendants fail to grasp that this is a retaliation case, making their entire motion beside the point.

Even without the threats of punishment and application of policy shown on this record as discussed in more detail below, a plaintiff has standing to bring a pre-enforcement challenge to a speech regulation when there is intent "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," but in doing so would face "a credible threat of prosecution." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). This test is a forgiving one. Generally, courts find standing where a plaintiff has serious intent to engage in protected conduct, and "the Government fails to indicate affirmatively that it will *not* enforce the statute." *Commodity Trend*, 149 F.3d at 687 (citing *Virginia v. American*

---

[6] Defendants' renewed motion to dismiss for lack of subject matter jurisdiction, this time on a "factual" basis, MTD 2-3, 7, *see also supra* 8, must proceed under Rule 12(b)(6), and ultimately Rule 56, because the underlying facts are "inextricably intertwined" with the merits of Plaintiffs' claims. Where a motion questioning jurisdiction also challenges the existence of a federal claim, the Court must treat the motion as an "indirect attack[] on the merits," and, if it relies, as here, on facts outside the pleadings, must convert it to a Rule 56 motion for summary judgment, *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 280 (7th Cir. 1986), on which the Court no longer takes plaintiff's allegations true, but finds the facts itself. *Commodity Trend Serv., Inc. v. CFTC*, 149 F.3d 679, 685 (7th Cir. 1998). This "higher level of protection for plaintiff is warranted since in this situation he is in reality facing a challenge to the merits" of his complaint. *Malak*, 784 F.2d at 280. *See also* 5 Wright & Miller, Federal Practice and Procedure § 1366 (1969) ("The element that triggers the conversion is … extra-pleading material. It is not relevant how the defense actually is denominated.").

*Bookseller's Ass'n*, 484 U.S. 383, 393 (1988)).  It is not enough for the government to say it has not previously enforced the law against the plaintiff, that it does not intend to do so, or even that it may *never* prosecute.  *Babbitt*, 442 U.S. at 301-02; *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1192-93 (10th Cir. 2000).  Rather, the government must "take some affirmative step *against* enforcement."  *Deida v. City of Milwaukee*, 192 F.Supp.2d 899, 906 (E.D. Wis. 2002) (emphasis added).  Accordingly, courts often find a credible threat of prosecution against a plaintiff who wishes to engage in protected speech even where the state never directly threatened to enforce the law against the plaintiff or anyone else.[7]

Here, of course, Defendants have directly threatened Plaintiffs for their speech, and even have imposed penalties.  Pls.' Resp. SMF ¶¶ 45, 59, 65; Pls.' SMF ¶¶ 14-18, 23-35.  Their claim that standing (and therefore, jurisdiction) is lacking, because the Plaintiffs have continued to post articles to their blog, simply misunderstands the law.  Rather than providing a reason to doubt standing, the fact that Beverly and Bionaz did not cave in to the demands helps establish Article III standing, because it shows they intend to engage in protected speech notwithstanding Defendants' threats.  Thus, in *Deida*, 192 F.Supp.2d at 907, the court found that standing requirements were easily met where the plaintiff "continued to leaflet cars at times in knowing violation of the law" and said she "will continue to do so," because it demonstrated intent to engage in the protected conduct.  In any event, the Defendants fail even to ask the right question.  The issue is not whether Plaintiffs have been intimidated into silence – it is whether Defendants' retaliatory

---

[7] *E.g.*, *Sherman v. Cmty. Consol. Sch. Dist. 21*, 980 F.2d 437, 441 (7th Cir. 1992); *Kucharek v. Hanaway*, 902 F.2d 513, 516 (7th Cir. 1990).  Defendants' citation of *Wisconsin Right to Life , Inc. v. Paradise*, 138 F.3d 1183 (7th Cir. 1998), is not to the contrary.  MTD 8.  The court there agreed an actual and well-founded fear of enforcement suffices for standing, but that WRTL had "not engaged in any speech the Board has found inappropriate."  *Wis. Right to Life* at 1185-86.

acts would "deter a person of ordinary firmness." *Bart*, 677 F.2d at 625. *See Backpage*, 807 F.3d at 231. On this record, Defendants' motion to dismiss is not just wrong, it is frivolous.

## II. DEFENDANTS' RETALIATORY CONDUCT REMOVES ANY QUESTION REGARDING PLAINTIFFS' STANDING

Plaintiffs' standing is obvious in light of Defendants' retaliatory conduct. "Chilled speech is, unquestionably, an injury supporting standing," *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012), and Defendants are wrong in asserting that Plaintiffs cannot identify "any instances where [the] Policies had a chilling effect." MTD 9. Beverly and Bionaz testified that Defendants' policies and actions required additional steps that interposed delay before information could post to the blog due to a need to protect sources, that they had to allow some contributors to post anonymously, and that some postings by Plaintiffs themselves were delayed or abandoned for fear they would trigger the Policies.[8] Additionally, the Defendants ignore other ways the Plaintiffs were affected by the threats of retaliation. Pls.' SMF ¶ 36. *Compare Bart*, 677 F.2d at 625.

In any event, the relevant question is not whether the Plaintiffs in this case were silenced, but whether a person of ordinary firmness would be deterred from exercising constitutional rights. *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989); *Bart*, 677 F.2d at 625. The Policies' vagueness and overbreadth clearly imposed an objectively chilling effect, *infra* § III,[9]

---

[8] Pls.' SMF ¶ 21. That Plaintiffs continued to blog once they filed this action, moved for a preliminary injunction and entered a Court-brokered Standstill Agreement (ECF 112) hardly proves lack of chill. As this Court has noted, it would work to Defendants' great detriment to further interfere with Plaintiffs' speech given the lawsuit and active judicial oversight. *See also Beverly v. Watson*, 78 F.Supp.3d at 723 n.4 ("if the defendants, in fact, have no intention of ever enforcing" the Policies "this case is ripe for settlement").

[9] This is one reason why Watson's and Carter's departures do not divest Plaintiffs of standing, MTD 3-4, *i.e.*, the Policies allow successors to punish speech. *See Bell*, 697 F.3d at 455 ("vagueness surrounding [] triggering events … *compounds* chilling"). Another reason is that Rule 25(d) substitutes successors for injunctive and declaratory relief. *See infra* n.23.

which was only magnified by Defendants' actions invoking and applying the Policies. Accordingly, Plaintiffs have standing where they risk future sanctions under the Policies. *Norton v. City of Springfield*, 768 F.3d 713, 714 (7th Cir. 2014). *See Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011); *Bridges v. Gilbert*, 557 F.3d 541, 555 (7th Cir. 2009). This is not mere notional or "subjective" fear of chill that cannot sustain jurisdiction like Defendants cite in *Zamecnik v. Indian Prairie Sch. Dist. 2047 Bd. of Educ.*, 2009 WL 805654 (N.D. Ill. Mar. 24, 2009).[10]

Demands that Plaintiffs offer evidence of real or substantial threat of subjective chill not only ignore the facts, but are wholly misplaced. MTD 8-9. Courts need assess only "the [policy] itself" to see if it unconstitutionally restricts speech, *Ezell v. City of Chi.*, 651 F.3d 684, 697 (7th Cir. 2011); *cf. Virginia v. Hicks*, 539 U.S. 113, 119 (2003) ("threat of enforcement of an overbroad law may deter or 'chill' [] protected speech"), and may also examine "potential chilling effect on protected expression," rather than, necessarily, whether a policy was applied. *Center for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012). *See also infra* 18-19.

As to the Computer Usage Policy in particular, Defendants demanded disabling the blog based in part on CSU "values and policies requiring civility," the only mention of which appears in the Computer Usage Policy. Defendants have disclaimed applying that Policy, MTD 10, but when pressed to identify another source of CSU's "civility" standard, could cite nothing else – so, at best, there is a question of fact as to invocation of the Policy. Pls. SMF ¶ 15. Notwithstanding Defendants' denials, their cease and desist letter on its face demands "the blog's "disabling," Ex. 19, and this Court already has refused to ignore how "a letter ostensibly about

---

[10] MTD 8-9. *Zamecnik* analyzed whether a high school student had standing to enjoin administrators from preventing him from bringing his Bible to school where he previously had done so without interference and no policy prohibited it. This is a far cry from present circumstances, where Plaintiffs' speech was threatened and policies were adopted to further restrict it.

alleged trademark violations contain[ed] assertions about the tone and content of the … blog." *Beverly v. Watson*, 78 F.Supp.3d at 723. An official need not find a violation of policy, or impose a penalty under it to "apply" it. *FEC v. Wisconsin Right to Life*, 551 U.S. 449 (2007) (as-applied challenge to federal statute banning electioneering communications brought by advocacy group that had run TV advertisements it believed would be covered by the statute if group continued to run them during 60-day pre-election blackout period). A general reference to the policy made in the context of a threat is sufficient. *Backpage*, 807 F.3d at 230-31.

But this case involves far more than mere oblique references to a policy. The Cyber-bullying Policy was enacted specifically to target the *CSU Faculty Voice*, and Watson acknowledged that he fixated on finding ways to "shut down" the blog. Pls.' SMF ¶¶ 28-29; *see also* Pls.' Resp. SMF ¶ 65. Soon after its enactment, the Policy was invoked against Bionaz for criticizing Wogan, constituting both direct application of it, and threat of future application. Pls.' SMF ¶¶ 32-35. These facts support standing both for the as-applied and facial challenges. *Am. Booksellers*, 484 U.S. at 393; *see also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (when plaintiff engages in course of conduct and state instructed him to stop or face disciplinary action, court may infer threat of prosecution). Standing is obvious where, as here, the Policy governs speech and is so vague and/or overbroad as to give no clear indication of its scope, and it affords officials unfettered discretion to identify violations. *Bell*, 697 F.3d at 452-54.

Defendants challenge standing by pointing to the Policies' scope, such as whether they apply to on-campus speech or off, or could otherwise reach the blog, MSJ 7-10, **but they do not dispute** that the Policies govern Plaintiffs' on-campus speech and use of CSU technology. That admission is all that is necessary to support standing. *Bell*, 697 F.3d at 453. Indeed, Bionaz's interaction with Wogan, which Carter deemed covered by the Cyberbullying Policy involved on-

campus speech. In any event, in the case of an overbreadth challenge, third-party standing exists to challenge policies that govern the speech of others. *See, e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973).

None of the cases Defendants cite affect Plaintiffs' standing to bring this case. For example, in *Corlett v. Oakland Univ. Bd. of Trustees*, 958 F.Supp.2d 795, 810 n.5 (E.D. Mich. 2013), MTD 9, the court expressed concern over standing for a facial challenge "if [the policy] was not applied to stifle his protected expression." But the court nevertheless adjudicated Corlett's facial claims, noting a plaintiff "has standing to challenge [] constitutionality" if he can show "realistic and credible threat of enforcement." *See id.* (quoting *Doe v. University of Mich.*, 721 F.Supp. 852, 859 (E.D. Mich. 1989)) (internal quotation marks omitted). Here, Plaintiffs showed not only a "realistic and credible threat" of enforcement, but *actual* enforcement of challenged policies. For that reason, Defendants' overriding focus on whether future enforcement of the challenged Policies puts Plaintiffs in "immediately in danger of [] some direct injury" is misplaced. *E.g.*, MTD 8 (citing *Harris v. Quinn*, 2010 WL 4736500, at *10 (N.D. Ill. 2010), *aff'd in part, remanded in part*, 656 F.3d 692 (7th Cir. 2011), *aff'd in part, rev'd in part and remanded*, 134 S. Ct. 2618 (2014), *and rev'd in part sub nom. Harris v. Rauner*, 601 F. App'x 452 (7th Cir. 2015)). Although Plaintiffs clearly face that risk, they have shown they *already* "sustained" sufficient "direct injury" to establish standing.

Beyond the Policies themselves, Plaintiffs clearly have standing to challenge Defendants' other retaliatory acts. *Bridges*, 557 F.3d at 552. Defendants suspended Beverly for two days for participating in the *Repression at CSU* event, and for using it as an object lesson to teach his public management class. Pls.' SMF ¶¶ 25-27. Standing to seek redress for such direct penalties for speech is beyond doubt. *Chaklos v. Stevens*, 560 F.3d 705, 710 (7th Cir. 2009).

Defendants may claim the punishment was imposed not for the substance of the event or Beverly's support of it, MSJ 14-15,[11] but that creates *at most* questions of fact for which the Defendants have the burden of proof. *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006); *Valentino v. Village of S. Chi. Heights*, 575 F.3d 664, 672-74 (7th Cir. 2009). Meanwhile, Defendants' attempts to trump up false sexual harassment claims against Beverly – the kind of allegation that carries devastating impact if leveled, even if charges never are brought – obviously would chill a professor of ordinary firmness. *Eng v. Cooley*, 552 F.3d 1062, 1065-66, 1074 (9th Cir. 2009). Plaintiffs clearly "suffered an invasion of a legally protected interest" in free speech, and easily satisfy the injury-in-fact requirement of standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

## III. THE COURT MUST DENY DEFENDANTS SUMMARY JUDGMENT ON PLAINTIFFS' FACIAL CHALLENGES

The Court should deny Defendants summary judgment on Plaintiffs' facial challenges to CSU's Computer Usage and Cyberbullying Policies because they are unconstitutionally vague and overbroad. When First Amendment interests are affected, "precise" enactments describing the "specific conduct … proscribed" are required. *Grayned v. City of Rockford*, 408 U.S. 104, 109 n.5 (1972). The Policies' operative terms here do not "give people of ordinary intelligence fair notice of what is prohibited," *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 807 (2011), and impose a chilling effect while giving CSU officials unfettered discretion to regulate speech. Such policies cannot withstand constitutional scrutiny, and Defendants thus cannot be granted summary judgment.

---

[11] Notably, even CSU administrators cannot agree among themselves whether the punishment was because Beverly moved class improperly and "compelled" students to attend the event, or because he remained silent as other speakers at the event criticized student-government officers, some of whom were present as members of his class. Pls.' SMF ¶ 26.

It is undisputed the Computer Usage Policy requires CSU students, faculty, and staff to "[r]espect the rights and sensibilities of others," and "the mission of the University in the larger community," without defining either "respect" or the "larger community." Pls.' SMF ¶ 2. It also commands students, faculty and staff to "adhere to the University standards which prohibit any communication which tends to embarrass or humiliate any member of the community," and to "[r]espect others you contact electronically by avoiding … harassing comments," without defining "embarrass" or "humiliate," or what it means to "harass." *Id.* Users of CSU information systems must certify that failure to comply can "result in disciplinary action up to and including termination of [] employment and possible criminal prosecution." *Id.* ¶ 3.

There is likewise no dispute that CSU's Cyberbullying Policy broadly applies to any (a) "deliberate or repeated conduct [that] harasses [or] intimidates an individual … or has the effect of substantially disrupting the individual's daily life," (b) "deliberate, repeated, and hostile course of conduct that is intended to harm," and (c) "intentional and repeated harm inflicted through … computers, cell phones, and electronic devices," all falling under the misnomer "electronic speech." *Id*. ¶ 4. The Cyberbullying Policy does not define "harm," or "harass," nor requires harassment to be "severe," pervasive," and/or "objectively offensive." *Id*. ¶ 5. Defendants call focusing on these terms "cherry-picking," MSJ 10, but there is no escaping that these descriptors determine whether speech is protected or punishable.

Speech restrictions that employ such expansive and malleable terms violate the First Amendment. Expression "does not lose its protected character," for example, "simply because it may embarrass," *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910 (1982), or even if an "overwhelming majority" find it "distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003). The government "may not prohibit [] expression … simply because society finds

[an] idea itself … disagreeable," *Texas v. Johnson,* 491 U.S. 397, 414 (1989), or, as the Computer Usage Policy puts it, "unacceptable." There is also "no categorical 'harassment exception' to the First Amendment[]" that could save the Cyberbullying Policy.[12] Reliance on expression being "embarrassing," "humiliating," "negative," "distasteful," "inflammatory," or "unacceptable" is, "sufficiently broad and subjective" as to include "'core' political and religious speech" and thus unconstitutionally overbroad.[13]

In this way, the Policies make it "impossible to discern any limitation on [their] scope or any conceptual distinction between protected and unprotected conduct," *Doe*, 721 F. Supp. at 867, and as such are too vague to withstand constitutional review. *E.g.*, *Cohen*, 92 F.3d at 972; *see also Coll. Republicans at San Fran. State Univ. v. Reed*, 523 F.Supp.2d 1005, 1018 (N.D. Cal. 2007). They also give CSU officials unfettered discretion to punish speech and violate the First Amendment.[14] Defendants admit the Policies' operative terms are undefined, and do not dispute that Cage, CSU's General Counsel, insisted such key qualifiers were omitted intentionally. Pls.' SMF ¶ 6. Where nebulous concepts are used in this way, "'[i]t is not the penalty itself

---

[12] *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001); *Bair v. Shippensberg Univ.*, 280 F. Supp. 2d 357, 372 (M.D. Pa. 2003) (constitutional issues not avoided by "[s]imply utilizing buzzwords applicable to anti-discrimination"). Regulation of harassment must be narrowly drafted to avoid violating the First Amendment, *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 972 (9th Cir. 1996), which the Supreme Court has held means prohibiting actions only if they are "severe, pervasive, and objectively offensive." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 631-32 (1999); *DeJohn v. Temple Univ.*, 537 F.3d 301, 316-18 (3d Cir. 2008).

[13] *E.g.*, *DeJohn*, 537 F.3d at 317-18. If it is unconstitutional for *prison* officials, for reasons unrelated to legitimate penological interests, to prohibit "inflammatory … views, and matter deemed … otherwise inappropriate," *Procunier v. Martinez,* 416 U.S. 396, 415 (1974), CSU cannot constitutionally ban "inflammatory" or "otherwise unacceptable" remarks.

[14] *See*, *e.g.*, Pls.' SMF ¶ 10 (Cage testified "fact finder's" perspective applies to determine if Cyberbullying Policy has been violated). *Compare*, *e.g.*, *City of Houston v. Hill*, 482 U.S. 451, 465-67 (1987); *Bell*, 697 F.3d at 454, 462-63. *Cf. Bynum v. U.S. Capitol Police Bd.*, 93 F.Supp.2d 50, 58 (D.D.C. 2000); *Lewis v. Wilson*, 253 F.3d 1077, 1080-81 (8th Cir. 2001).

that is invalid, but the exaction of obedience to a rule or standard that is so vague … as to be really no rule or standard at all.'" *Baggett v. Bullitt*, 377 U.S. 360, 374 (1964) (citation omitted).

Defendants do not address these core failings of the Policies, but instead pursue tangents that confuse and misapply a grab-bag of First Amendment principles. Most prominently, they incorrectly contend Plaintiffs must prove the challenged Policies have chilled their own speech, or that of others, MSJ 7, 10, when chilling effect is properly assessed under an objective test based on the language of the Policies. *Ezell*, 651 F.3d at 697. This examines whether a policy "unquestionably attaches sanctions to protected conduct," and whether the likelihood it will deter that conduct is "sufficiently great." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984) (citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217 (1975)). It is thus not incumbent on Plaintiffs to offer "evidence" of chilling effect (although there is substantial evidence of that in the record – *see supra* 4-5), because vague and overbroad policies, like those challenged here, unlawfully chill speech due to the uncertainty created, and inherently pose "unacceptable risk that speakers will self-censor." *Wisconsin Right to Life v. Barland*, 751 F.3d 804, 835 (7th Cir. 2014) (citing *Smith v. Goguen*, 415 U.S. 566, 573 (1974)). *See also DeJohn*, 537 F.3d at 314 ("overbreadth [] may be invoked" if policies "suppress *or even chill* core protected speech) (emphasis added).

Defendants also fundamentally misconstrue applicable standards in arguing Plaintiffs fail to show the Policies impact a "substantial amount" of constitutionally protected speech and have "real and substantial" chilling effect. MSJ 8. A policy is overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. St. Repub. Part*y, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks and citation omitted). *See Hill*, 482 U.S. at 458-59. This test looks at the quality and

amount of speech policies encompass. Here, broad swaths of protected speech may be perceived as "humiliating," "embarrassing" or "harassing," etc., by those to whom or about whom it may be directed. *See United States v. Stevens*, 559 U.S. 460, 473 (2010) (invalidating statute based on proffer of "common depictions of ordinary and lawful activities" to which it applied). For this reason, virtually every campus speech code that uses such expansive terms has been struck down as unconstitutional when challenged.[15]

Defendants claim the Computer Usage Policy is "limited by its own terms" because it "only applies to CSU-owned technology assets," MSJ 8, but this Court has already noted there is nothing in the language of the Policies that so limits them. *Beverly v. Watson*, 78 F. Supp. 3d at 722-23. Each policy has, in fact, been applied beyond that limit. Pls.' SMF ¶ 15, 32-35. Also, students and faculty use CSU technology for various activities and expression, to communicate within and beyond the CSU community. In this way, the Policies reach all manner of speech communicated across CSU technology – regardless of whether it is constitutionally protected.

Even if Defendants were correct that the Computer Usage Policy applies only to a nonpublic forum (which is not conceded), MSJ 9, that is irrelevant, as the policy still may not impose vague or overbroad speech restrictions. *See, e.g.*, *Bynum*, 93 F.Supp.2d at 56-60; *Lewis v. Wilson*, 89 F.Supp.2d 1082 (E.D. Mo. 2000). Defendants are incorrect that a policy directed to a nonpublic forum meets constitutional requirements so long it is viewpoint neutral, MSJ 9,

---

[15] *See*, *e.g.*, *McCauley v. Univ. of V.I.*, 618 F.3d 232, 247-51 (3d Cir. 2010) (invalidating campus policies prohibiting unauthorized "offensive or obstructive signs" and "conduct which causes emotional distress"); *DeJohn*, 537 F.3d at 305, 317-18 (invalidating sexual harassment policy that prohibited all "expressive, visual, or physical conduct of a sexual or gender-motivated nature" when "such conduct has the purpose or effect of creating an intimidating, hostile, or offensive environment"); *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1182-85 (6th Cir. 1995) (invalidating anti-discrimination and harassment policy prohibiting "demeaning or slurring individuals … because of their racial or ethnic affiliation" or "using symbols, [epithets] or slogans that infer negative connotations about the individual's racial or ethnic affiliation").

because imposing standardless, overly broad restrictions on speech is ***always*** unreasonable and unconstitutional, *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992), and over-breadth challenges against unreasonable restraints succeed regardless how a forum is classified. *See Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 573-74 (1987); *Gilles v. Blanchard*, 477 F.3d 466, 474 (7th Cir. 2007) (once vagueness is addressed, determining specific forum "is an unnecessary flourish").

As to contentions that Plaintiffs "mischaracterize the scope of the Cyberbullying Policy," MSJ 10, Defendants cannot escape the Policy's expansive terms that reach all "expressive conduct," including not only that which is "verbal, physical, aural, graphic, symbolic, or written … on or off campus," but also "off-campus expressive conduct" that is "intended by the speaker to reach the CSU campus and [that] does … reach the CSU campus." Ex. 37. Any effort to minimize the Cyberbullying Policy's scope to electronic speech occurring only on CSU-owned technology or when "conduct … invade[s] the campus space," MSJ 10, is thus belied by the Policy's plain terms.[16] Likewise, a defective policy cannot be saved by general language saying it is not intended to infringe First Amendment rights. *See*, *e.g.*, *Dambrot*, 55 F.3d at 1182-83 (pledge of enforcement consistent with constitutional requirements did not save speech code from facial challenge where "there is nothing to ensure the University will not violate First Amendment rights even if that is not their intention").

---

[16] As the Policies' constitutionality is judged on their plain language – a matter on which there is no dispute of material fact – summary judgment should, if anything, be granted to Plaintiffs, for reasons set out in their motion for partial summary judgment and accompanying reply. Rule 56(f)(1) authorizes the Court to grant summary judgment to Plaintiffs on that basis on Defendants motion, but if necessary, upon denial of summary judgment to Defendants, Plaintiffs will accept the invitation to renew their own motion. *See* ECF 225.

## IV.   THE FACTS IN THE RECORD PRECLUDE SUMMARY JUDGMENT FOR DEFENDANTS ON PLAINTIFFS' AS-APPLIED CLAIMS

Summary judgment cannot be granted for Defendants on Plaintiffs' remaining claims because construing the facts and drawing inferences most favorably for Plaintiffs, it cannot be said there is no genuine question of material fact or that Defendants are entitled to judgment as a matter of law, *Novoselsky v. Brown*, 822 F.3d 342, 348-49 (7th Cir. 2016), despite their myriad references to what *they view* as "undisputed."  Public employers like CSU "may not respond to [] employees' protected activity with actions aimed to deter that activity."  *Massey*, 457 F.3d at 716.  To state a *prima facie* case of First Amendment retaliation, a speaker need only show (1) his speech is constitutionally protected, (2) he suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor in the adverse action.  *Id.*  Plaintiffs clearly satisfy all three factors here.[17]

First, Defendants already have grudgingly admitted "some of" Plaintiffs' speech was "on matters of public concern," Defs.' Opp. PI Mot. 11 – though in truth, the speech they retaliated against involves ***nothing but*** matters of public concern, ranging from CSU's censorship of its student paper to illegal withholding of public records, from cronyism at CSU to plagiarism by a top administrator, and from the administration's lack of transparency to enrollment impacts of its governance failures.  Beverly Decl. ¶ 7 & Exs. A-I, N.  There can be no argument but that such criticism "relates to a matter of political, social, or other concern [to] the community," *see Love v. Chicago Bd. of Educ.*, 5 F.Supp.2d 611, 614 (N.D. Ill. 1998) (citing *Connick v. Myers*, 461 U.S. 138, 146 (1983)), nor doubting the law has been clear for nearly fifty years that public school and university employees have a First Amendment right to comment on how schools are

---

[17] Here, too, we submit there is enough on the undisputed facts to allow summary judgment ***for Plaintiffs*** on retaliation generally on Count III under Rule 56(f)(1), even if, at the same time, points on which Defendants rely to seek summary judgment implicate factual disputes.

run.[18]  The Supreme Court has affirmed time and again that "corruption in a public program and misuse of state funds … obviously involves a matter of significant public concern."  *Lane v. Franks*, 134 S. Ct. 2369, 2377, 2380 (2014).  Defendants' concession and the substance of Plaintiffs' criticisms defeat Defendants' breathless assertions that "Plaintiffs absolutely fail to demonstrate" their speech was constitutionally protected.  MSJ 14.

Second, the record shows that Plaintiffs suffered deprivations likely to deter free speech.  Defendants again obsess on whether they succeeded in preventing Plaintiffs from speaking, MSJ 12, but this argument cannot support their bid for summary judgment.  When officials threaten to punish the exercise of protected speech they violate the First Amendment ***regardless*** of whether they succeed in silencing it.  Even threats and petty harassments suffice, *Backpage*, 807 F.3d at 230-31; *Bart*, 677 F.2d at 625, and Plaintiffs have adduced evidence of such actions in spades – from the cease-and-desist letter raising dubious trademark claims and invoking "civility" standards, to Beverly's punishment for the *Repression at CSU* event, to forcing Bionaz to answer for criticism of Wogan under the Cyberbullying Policy.  *See supra* 3-8.  Beyond threats, the unconstitutionally vague and overbroad Cyberbullying Policy, *see supra* § III, was a direct reaction to the *CSU Faculty Voice*.

Defendants quibble over whether any of this "deterred" speech, or whether their actions were motivated in substantial part by Plaintiffs' criticism, but that only underscores the reason summary judgment on these claims fails – specifically, that Defendants at best identify questions of material fact.  On the overarching issue of whether Plaintiffs' speech was deterred, the facts that the blog continued, or that its volume of entries increased, are beside the point.  MSJ 3.  Not

---

[18]  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 572 (1968); *Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680 (7th Cir. 2014).  The Supreme Court consistently has reaffirmed the right of public educational employees to speak out on such matters.  *E.g.*, *City of Madison Joint Sch. Dist. 8 v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167 (1976); *Perry v. Sinderman*, 408 U.S. 593 (1972).

only do threats and harassment alone violate the First Amendment, *see supra* 11-15, the evidence shows blog contributors dropped off and that Beverly and Bionaz delayed publishing some matters – and refrained from publishing others altogether – due to the Computer Usage and Cyberbullying Policies and the Defendants' actions. *See supra* 4-5.

Carter's investigation of Bionaz for comments to Wogan under the Cyberbullying Policy and warning that he could be punished for violating it if his "conduct" were to "continue," *supra* 7-8, also raise questions of fact, leaving it far from "undisputed that CSU did not enforce the policy against Bionaz."[19]  It *is*, however, undisputed the investigation resulted from Bionaz's on-campus, in-person comment to Wogan.  Thus, the Policy was "applied" even if no penalty was assessed – this time.

Regarding Defendants' cease-and-desist "demand" that Plaintiffs "immediately disable" the *CSU Faculty Voice*, Ex. 19, it is far from "undisputed … the letter had nothing to do with the Computer Usage Policy."  *See* MSJ 12.  Quite to the contrary, whatever Cage "explained," *see id*. 12 n.6, there is at least a fact question of whether the letter invoked the Computer Usage policy.  Its citation to supposed "civility" standards – found only in that CSU policy and no other, and which Defendants could tie to no other source, *see supra* 3-4 – and the superficiality of the trademark claims allow an inference that the letter sought to silence criticism.[20]

---

[19]  MSJ 11.  Defendants' argument that it is "undisputed" they were "*required* CSU to investigate" is misplaced.  *Id*.  Even if true, Carter could have left Bionaz out of it altogether, by talking to Wogan and confirming he did not feel threatened, which was the basis of Carter's no-violation finding.  Such alternatives are required before questioning or challenging speakers for protected expression.  *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 474-75 (6th Cir. 2016) (law regulating speech was unconstitutional where "[t]here is no process for screening out frivolous complaints or complaints that, on their face, only complain of non-actionable statements").

[20]  Pls.' SMF ¶¶ 15-18.  Mitchell's declaration also does not dispute the facts around either the cease-and-desist, or those involving the Bionaz-Wogan contretemps.  And, neither Mitchell, nor Defendants' other declarant Prashant Shinde, address or otherwise dispute the Peebles testimony that CSU officials – including Defendants – adopted the Cyberbullying Policy with the

The Defendants' repeated assertion that "Plaintiffs admit that the policies were never 'applied' against them," MSJ 11, is blatantly false. Defendants repeatedly cite testimony of their Human Resource Manager, Renee Mitchell, *e.g.*, Defs.' SMF ¶ 18, who only testified her office undertook no ***formal*** investigation or disciplinary action under the Computer Usage Policy. Pls.' SMF ¶ 11. But Mitchell could not confirm there were no ***informal*** investigations (such as that here), or that other administrators may have enforced the policy without her knowledge.[21] Meanwhile, Bernetta Bush's testimony confirmed she regularly contacted CSU faculty to enforce the Policy. Pls.' SMF ¶ 12. Moreover, even if rank-and-file CSU administrators did not "enforce" the Policy, Watson and Cage's invocation of "civility" requirements would constitute a First Amendment violation under *Backpage*. *See* 807 F.3d at 230-31. Separately, Carter's own correspondence and records show she applied the Cyberbullying Policy to Professor Bionaz. *See supra* 7-8.

The punishment of Beverly for the *Repression at CSU* event likewise cannot be brushed off on summary judgment. To be sure, Defendants have their explanation for why punishment was imposed. *See* MSJ 14-15. But given other surrounding events – including the cease-and-desist, consideration of asking Google to disable the blog, adoption of a Cyberbullying Policy in response to the blog, trumping up sexual harassment charges, *see supra* 3-8, it is at least a fair inference, which must be taken in Plaintiffs' favor, that Beverly's speech lead Defendants to opportunistically sanction him based on complaints of students criticized at the event. This is

---

express objective to use it to shut down the blog and discipline Plaintiffs. *E.g.*, Pls.' Resp. SMF ¶ 65.

[21] *Id.* Mitchell's declaration also does not dispute the facts around either the cease-and-desist, or those involving the Bionaz-Wogan contretemps. And, neither Mitchell, nor Defendants' other declarant Prashant Shinde, address or otherwise dispute the Peebles testimony that CSU officials – including Defendants – adopted the Cyberbullying Policy with the express objective to use it to shut down the blog and discipline Plaintiffs. *E.g.*, Pls.' Resp. SMF ¶ 65.

only reinforced by the implausibility of Defendants' explanation that the punishment "was not related … to Beverly's speech," MSJ 15, but rather *his silence* while *other members* of the CSU campus community "maligned" certain members of student government. *See id*. *See also* Pls.' SMF ¶ 26. These competing explanations at a minimum raise questions of fact, and prevent summary judgment being entered for Defendants.

Whether Count III alleges "an 'as applied' challenge to either policy" is beside the point, MSJ 14. The claim on this aspect of Defendants' retaliation is that the *CSU Faculty Voice*'s criticism of CSU's administration was at least one motivating factor for the sanction. Courts recognize that "direct evidence" of unconstitutional motivation in retaliation cases is rare, as it would require defendants to admit actions were based on "prohibited animus." *Massey*, 457 F.3d at 717 n.2. With such "smoking guns" in short supply, it is sufficient to rely on circumstantial proof, such as "the timing of events," like those set out above. *Id*. *See Culver v. Gorman & Co*., 416 F.3d 540, 545-46 (7th Cir. 2005). Given such factors, "the burden rests on the defendant to show a lack of but-for causation once the plaintiff has shown that retaliation was at least a motivating factor," *Massey*, 457 F.3d at 717; *Valentino v. Village of S. Chi. Heights*, 575 F.3d 664, 672-74 (7th Cir. 2009), and Defendants fall far short of the required burden of proof here.

Rather, the evidence in this case shows far more than a mere "campaign of petty harassments" which alone would be sufficient to establish deterrence. *Bart*, 677 F.2d at 625. Threatening sanctions (and, in at least one instance, actually imposing them), selectively applying work rules, and adopting policies designed to deter speech are precisely the types of action that would deter persons of ordinary firmness form exercising their rights.[22] In the

---

[22] *E.g.*, *Fairley*, 578 F.3d at 525; *Wallace v. Benware*, 67 F.3d 655, 662-64 (7th Cir. 1995). The Seventh Circuit has recognized that even modest deprivations or threats can deter protected speech. *See, e.g.*, *Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004) (transfer to more demanding

academic context, threats of discipline and manipulating a professor's relationship with his students are considered "judicially cognizable chilling effects." *Levin v. Harleston*, 966 F.2d 85, 89 (2d Cir. 1992). *See also Cohen*, 92 F.3d at 971-72; *Silva v. Univ. of N.H.*, 888 F. Supp. 293, 313-14 (D.N.H. 1994). Defendants cannot legitimately claim a right to summary judgment here.

## V. DEFENDANTS CANNOT GAIN SUMMARY JUDGMENT UNDER ANY OF THE FORMS OF IMMUNITY THEY INVOKE

<u>Sovereign Immunity.</u> Defendants cannot escape liability by invoking sovereign immunity because all three are sued in both their individual and official capacities, with damages sought only as to the former. *See, e.g.*, *MSA Realty Corp. v. Illinois*, 990 F.2d 288, 291 (7th Cir. 1993) ("official who acts in violation of the federal Constitution is stripped of his official or representative character and is subjected in his person to the consequences"). Only Complaint Counts I and II, which assert facial challenges, are addressed to Defendants in their official capacities, and those seek only prospective injunctive and declaratory relief, which sovereign immunity allows. *E.g.*, *Dean Foods Co. v. Brancel*, 187 F.3d 609, 613 (7th Cir. 1999). Sovereign immunity therefore has no application here. *Ex Parte Young*, 209 U.S. 123 (1908).[23]

*<u>Noerr-Pennington</u> Doctrine.* Defendants' claim of immunity from suit for Defendant Cage is likewise entirely misplaced under the *Noerr-Pennington* doctrine, MSJ 12-13, as it

---

duties); *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000) (harassment and ridicule); *Pieczynski*, 875 F.2d at 1333. *See also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 n.8 (1990) (First Amendment "protects state employees … from even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights") (quoting Seventh Circuit).

[23] That some Defendants have left CSU does not alter this. Plaintiffs are not required to "show that those currently acting in the official positions formerly held by Watson and Carter are violating their rights in any way." MSJ n.12. Instead, under Federal Rule of Civil Procedure 25(d), the Court substitutes current officeholders for official-capacity claims, and considers which of them are proper defendants for injunctive relief under *Ex Parte Young*, 209 U.S. at 157. *See Hammer v. Ashcroft*, 512 F.3d 961, 971 (7th Cir. 2008), *vacated on reh'g en banc on other grounds*, 570 F.3d 798 (7th Cir. 2009).

applies solely based on the right to petition, which is not at issue here. *See Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 742-43 (1983); *NAACP*, 458 U.S. at 913-14. The First Amendment right to petition and the *Noerr-Pennington* doctrine protects only entreaties to ***the government***, and Cage's cease-and-desist letter threatening suit – the only basis on which he claims *Noerr-Pennington* immunity – does not qualify. It was "never sent to the government; did not ask the government for any response or 'redress of grievances'; [and] was not even known to the government" before Plaintiffs' suit. *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 892 (10th Cir. 2000). Nothing in *Noerr-Pennington* case law – or any other First Amendment precedent – supports immunizing those who retaliate against protected speech.

Defendants cite no authority suggesting otherwise. *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) (cited MSJ 13), held only that municipalities have a right to speak and petition federal agencies for redress of grievances, while the opinion of the court in *Swetlik v. Crawford*, 738 F.3d 818 (7th Cir. 2013) (cited MSJ 13), did not decide any question under the *Noerr-Pennington* doctrine. Only Judge Easterbrook addressed the doctrine in concurring, and even then solely in the context of a public official's "right to petition for redress of grievances." *Id.* at 830 (Easterbrook, J., concurring). Elsewhere, Judge Easterbrook confirmed that *Noerr-Pennington* protects "speech and other efforts to influence governmental activity" only "as long as [government officials] refrain from making the kind of threats that the Supreme Court treats as subject to control" in First Amendment case law. *Tri-Corp. Housing Inc. v. Bauman*, 826 F.3d 446, 449-50 (7th Cir. 2016). *Bartley v. Taylor*, 25 F.Supp.3d 521, 538 (M.D. Pa. 2014) (cited MSJ 14), provides no support for the same reason, because in that case, unlike here, the plaintiff "was not threatened with intimidation, or sanctions." *See id.* at 538-39.

Qualified Immunity. Finally, Defendants fare no better invoking qualified immunity, which must be denied where facts set forth by Plaintiffs make out a violation of a constitutional or statutory right that was clearly established at the time of Defendants' misdeeds. *Novoselsky*, 822 F.3d at 354 (court assesses first prong taking facts in light most favorable to plaintiff). The record makes clear Defendants retaliated against Plaintiffs for their blog posts and other speech criticizing the CSU administration, *see supra* § IV, and as a matter of bedrock law it is "well established that the government may not arbitrarily silence the constitutionally-protected speech of its employees." *Wernsing v. Thompson*, 423 F.3d 732, 750 (7th Cir. 2005). No competent college administrator – much less university counsel – could be ignorant of this basic principle. Indeed, it is well-settled not only that public employees like Professors Beverly and Bionaz have a right to speak out on "corruption in a public program and misuse of state funds," which "obviously involve[ ] matter[s] of significant public concern," *Lane*, 134 S. Ct. at 2380; *see also Valentino*, 575 F.3d at 672-73, but also that "ability to highlight the misuse of public funds or breaches of public trust is a critical weapon in the fight against government corruption and inefficiency." *Wainscott v. Henry*, 315 F.3d 844, 849 (7th Cir. 2003).

Even if the particular action in question has not previously been held unlawful, "a case with similar facts is not necessarily required; the violation may be so obvious in light of law existing at the time that a reasonable person would have known that his or her conduct was unconstitutional." *Surita*, 665 F.3d at 868. In this case, there is ample precedent that Defendants were acting in violation of well-established constitutional law. Of particular relevance, the Seventh Circuit has confirmed a public college violates the First Amendment when it retaliates against a faculty member for publicly criticizing the school's administration. *Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680 (7th Cir. 2014). *See also*, *e.g.*, *Surita*, 665 F.3d at 874.

Defendants cannot legitimately claim qualified immunity on grounds that "the Challenged Policies cannot be said to affect a 'clearly established right'" because they regulate "off-campus or online speech or the impact of computer usage or cyberbullying on speech at public universities." MSJ 20. Online speech is fully protected, *Reno v. ACLU*, 521 U.S. 844, 885 (1997), and cases involving schools' punishment of students for off-campus speech unrelated to the officials who sanctioned them, MSJ 19-20, do not undermine established law that administrators may not retaliate against speakers for their criticism of the officials. *Supra* 28. Defendants' reliance on a district court decision questioning "teacher-speech rights" cannot overcome the subsequent, Seventh Circuit decision in *Meade*, cited above, that is directly on point.

Besides, Plaintiffs' claims cover ***all*** of Defendants' retaliatory conduct – not merely application of the policies to the blog – much of which conduct targeted speech on-campus. That includes Beverly's punishment for the *Repression at CSU* event, application of the Cyberbullying Policy to Bionaz for remarks to Wogan, and efforts to trump up false sexual harassment charges. *See supra* 5-8. There is also evidence the policies affected ***readership*** of the blog ***on-campus*** as well. Beverly Decl. ¶ 23. These are all factual predicates for the retaliation claim, and all rest on clearly established rights.

It adds nothing to cite the discretionary nature of each Defendant's position and actions, *see* MSJ 21-24, which as even the authority Defendants rely on makes clear, is just a prerequisite to qualified immunity. *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000) (cited MSJ 20-21). Governmental actors performing discretionary functions enjoy qualified immunity only "***insofar as*** their conduct does not violate clearly established … rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Myers v. Hasara*, 226 F.3d 821 (7th Cir. 2000). What matters here, for example, is that a reasonable university

official would know – as Carter found, *see supra* 7-8 – that a harassment complaint based on a minutes-long exchange was invalid on its face, and that threatening Bionaz not to engage in similar future speech was an unconstitutional restraint. That Carter engaged in a "discretionary function" when investigating Bionaz and threatening future sanction thus cannot "fall[] squarely within … qualified immunity," MSJ 21-22.

Similarly, issuance of the cease-and-desist was not a protected discretionary act, *see* MSJ 22-23, where Cage's goal was to retaliate against and intimidate Plaintiffs for criticizing CSU administrators, something reasonable university officials – ***especially legal counsel*** – would know violates the First Amendment. Likewise, the discretionary nature of Watson's decision to sanction Beverly for assembling with like-minded faculty at the *Repression at CSU* event and for conducting his class as he saw fit does not automatically trigger qualified immunity, MSJ 23-24, where any reasonable university president would know such retaliatory efforts to quell or silence critical speech violates well-settled rights to free speech and academic freedom.

Finally, qualified immunity does not preclude suits seeking declaratory or injunctive relief from defendants in their official capacities. *Denius*, 209 F.3d at 950. There is accordingly no basis to dismiss Plaintiffs' claims for prospective relief, as "[q]ualified immunity only shields defendants … from money damages." *Flynn v. Sandahl*, 58 F.3d 283, 289 (7th Cir. 1995). But in all particulars, qualified immunity does not shield the Defendants here.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court to deny Defendants' Motion to Dismiss and Motion for Summary Judgment.

DATED:  February 10, 2017

Respectfully submitted,

_____/s/  Robert Corn-Revere_____

ROBERT CORN-REVERE (*pro hac vice*)
bobcornrevere@dwt.com
RONALD G. LONDON (*pro hac vice*)
ronnielondon@dwt.com
LISA B. ZYCHERMAN (*pro hac vice*)
lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC  20006
Telephone: (202) 973-4200

JESSICA TOVROV
GOODMAN TOVROV HARDY &
   JOHNSON LLC
105 West Madison Street, Suite 1500
Chicago, IL  60602
Telephone: (312) 252-7362
jessica@tovrovlaw.com

Attorneys for Plaintiffs Phillip Beverly
and Robert Bionaz

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Consolidated Response in Opposition to Defendants' Motions to Dismiss for Lack of Subject Matter Jurisdiction and for Summary Judgment was served upon all counsel of record on this 10th day of February, 2017 via use of the Court's ECF system.


_/s/ Robert Corn-Revere_
Robert Corn-Revere