**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| PHILLIP BEVERLY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:14-CV-04970 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| WAYNE D. WATSON, *et al.*, | ) | Magistrate Judge Sheila Finnegan |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'**
**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Phillip Beverly and Robert Bionaz, by and through their undersigned counsel, pursuant to Fed. R. Civ. P. 56(c) and LR 56.1(b)(3), hereby submit their Response to Defendants' Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

**The Parties**

**1.      More than two years ago, on July 1, 2014, Plaintiffs Phillip Beverly and Robert Bionaz, professors at Chicago State University ("CSU" or the "University"), filed this lawsuit alleging violations of the First Amendment.  *See generally* Complaint. Plaintiffs are CSU faculty members and founders and frequent contributors to an independent blog entitled *CSU Faculty Voice* that is critical of the CSU administration. Compl. ¶ 2.**

**RESPONSE:**  Undisputed, except the "frequency" of Plaintiffs' posts to the *CSU Faculty Voice* is immaterial to their claims.

**2.      Plaintiff Bionaz is a tenured, associate professor of history at CSU.  Tab "A" – Deposition transcript of Robert Bionaz 14:3-8; 15:3-5.  He has worked at CSU for more than 15 years, and is the President of the CSU Faculty Union and a member of the Faculty Senate.  Tab "A" – Bionaz Dep. Tr. at 15:13-23.**

**RESPONSE:**  Undisputed, however Professor Bionaz's role in the CSU Faculty Union and membership in the Faculty Senate is immaterial to whether, as a matter of law, the

challenged policies impermissibly infringe protected expression or whether Defendants have unconstitutionally retaliated against Plaintiff's speech.

**3.      Plaintiff Phillip Beverly is a tenured, associate professor of political science at CSU.  He has worked at CSU since the fall of 1991 (approximately 25 years).  He is the past President of the CSU Faculty Senate.  Tab "B" – Deposition transcript of Phillip Beverly 22:3-10; 100:14-16.  *See also* Statements of Plaintiffs in Support of Motion for Partial Summary Judgment (Doc. 165 ¶ 1).**

    <u>**RESPONSE:**</u>  Undisputed, however Professor Beverly's role in the CSU Faculty Senate is immaterial to whether, as a matter of law, the challenged policies impermissibly infringe protected expression or whether Defendants have unconstitutionally retaliated against Plaintiff's speech.

**4.      Defendant Wayne Watson is the former President of CSU.  Ans. ¶ 14. According to CSU's bylaws, the President is the chief executive officer of the University and reports to the CSU Board of Trustees.  *See* Tab "C" – CSU Bylaws at Article VII.  The President is responsible for the "organization, management, direction, and general supervision of the University and … [its] effective administration and management …." *Id.* Watson described his CSU President role as executing the "mission and vision of the university; to govern the academic, financial and operational components of the university; to look out for the overall health of the university both in terms of resources and students; and to engage the community."  Tab "D" – Deposition transcript of Wayne Watson at 15:17-24.**

    <u>**RESPONSE:**</u>  Undisputed.

**5.      Defendant Watson retired from his position as CSU President in December 2015.  *See* Tab "E" – CSU Board of Trustees, Full Board Meeting Minutes at 7-8 (Dec. 10, 2015).  President Watson was succeeded as President of CSU by Thomas Calhoun.  Doc 165 ¶ 3.  Thomas Calhoun separated from CSU in September 2016, at which time the CSU Board of Trustees named CSU's Interim Vice President of Administration and Finance, Cecil Lucy, as the Interim President.  *See* Tab "F" – CSU Board of Trustees, Full Board Meeting Agenda (Sept. 16, 2016); CSU Board of Trustees, Full Board Meeting Minutes at 1-2; 9 (Sept. 16, 2016).**

    <u>**RESPONSE:**</u>  Undisputed, however information regarding Watson's successors to the role of CSU President is material only insofar as pursuant to Federal Rule of Civil Procedure

25(d) the Court should substitute the current officeholders for Plaintiffs' official-capacity claims and consider which of them are proper defendants for injunctive relief under *Ex Parte Young*, 209 U.S. 12, 157 (1908) (requiring a "special relation" between the public official sued and the challenged rule); *Hammer v. Ashcroft*, 512 F.3d 961, 971 (7th Cir. 2008), *reh'g en banc granted, opinion vacated on other grounds* (Aug. 19, 2008), *on reh'g en banc*, 570 F.3d 798 (7th Cir. 2009). *See also* Pls.' Consol. Opp. MSJ & MTD n.23. In addition, information regarding Watson's successors to the role of CSU President is immaterial to Plaintiffs' claims against Watson for damages in his individual capacity because Plaintiffs' seek relief for Watson's past actions while he served as CSU President.

**6.      Defendant Janelle Carter is a former Associate General Counsel and Equal Employment Opportunity ("EEO") coordinator at CSU. Tab "G" – Deposition transcript of Janelle Carter 13:20-22; 53:18. In her role as Associate General Counsel, Ms. Carter, an attorney, was responsible for providing legal advice and counsel to various stakeholders on behalf of the University; representing the University before a number of administrative agencies; conducting investigations, including EEO investigations; and overseeing some disciplinary matters. Tab "G" – Carter Dep. Tr. at 16:10-22.**

**RESPONSE:** Undisputed.

**7.      Defendant Carter's employment at the University ended on April 30, 2016. Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts (Doc. 190) ¶ 5.**

**RESPONSE:** Undisputed but immaterial insofar as information regarding Carter's successors to her role as CSU Associate General Counsel does not affect Plaintiffs' claims against Carter for damages in her individual capacity because Plaintiffs seek relief for Carter's past actions while she served as CSU legal counsel.

**8.      Defendant Patrick Cage is the Vice President of Labor and Legal Affairs and the General Counsel at CSU. Ans. ¶ 15. As General Counsel, he is responsible for management of all legal issues and claims related to the University. Tab "H" – Deposition transcript of Patrick Cage 13:3-8. In this capacity, Defendant Cage also oversaw the**

management of Freedom of Information Act requests. Tab "H" – Cage Dep. Tr. at 218:2-19.

> **RESPONSE:** Undisputed.

9. The CSU Board of Trustees also was a Defendant to this lawsuit (*see* Compl. ¶ 13), but all claims against the Board were dismissed on September 12, 2014 on sovereign immunity grounds. Minute Entry Granting Motion to Dismiss CSU Board of Trustees, Sept. 12, 2014 (Doc. 21).

> **RESPONSE:** Immaterial and disputed insofar as Defendants' motion to dismiss was
>
> submitted unopposed and the Court's minute entry granting Defendants' motion did not state an
>
> opinion as to whether the Board was dismissed on sovereign immunity grounds. *See* Pls.'
>
> Consol. Opp. MTD & MSJ 8.

10. Defendants Watson, Carter, and Cage remain individual Defendants in this lawsuit and are sued in their official and personal capacities. Compl. ¶¶ 14-16.

> **RESPONSE:** Undisputed.

## Plaintiffs' Complaint Counts

11. In Counts I and II of Plaintiffs' Complaint, Plaintiffs assert that the University's Computer Usage and Cyberbullying policies (the "Challenged Policies") are unconstitutional on their face. Compl. ¶¶63-85. Plaintiffs seek injunctive relief related to these counts. *Id.*

> **RESPONSE:** Undisputed with the clarification that Plaintiffs also seek declaratory
>
> relief related to Counts I and II of their Complaint. Compl. ¶¶ 97-100**.**

12. Plaintiffs style Count III of their Complaint as an "As-Applied Violation of Plaintiffs' Right to Free Speech," asserting that Defendants violated their right to free speech through their application of the Challenged Policies. Compl. ¶¶90-91. Count III also asserts that Defendants took certain other actions against Plaintiffs either to deter or in retaliation for Plaintiffs' expressive activities. Compl. ¶¶89, 92. Count III seeks injunctive relief and monetary damages. Compl. ¶95. However, when asked to identify the monetary damages he is seeking as a result of Defendants' action, Plaintiff Beverly responded: "I haven't even thought that far yet" and "I don't know." Tab "B" – Beverly Dep. Tr. at 186:8-20.

**RESPONSE:** Plaintiffs do not dispute the first three sentences of Defendants' Statement No. 12, with the clarifications that (a) beyond the allegations set forth at Compl. ¶¶ 89, 92, the Complaint asserts numerous allegations that Defendants retaliated against Plaintiffs, *e.g.*, Compl. ¶¶ 23-43, 87-95; and (b) Defendants seek a declaratory judgment as to Count III of their Complaint, Compl. ¶¶ 97-100. Plaintiffs dispute that Professor Phillip Beverly is unaware of the monetary damages Plaintiffs' seek, *see* Ex. 35, Pls.' First Am. Rule 26(a)(1)(A) Init. Disclosures § C, and otherwise respond that the calculation of such damages is immaterial to the resolution of the merits of Count III of Plaintiffs' Complaint.

**13.    In Count IV, Defendants seek a declaratory judgment and injunction based on Counts I - III. Compl. ¶¶ 96-100.**

**RESPONSE:** Undisputed.

## Plaintiffs' Challenges to CSU Policies

**14.    As mentioned, Plaintiffs challenge the constitutionality of two CSU policies: the CSU Computer Usage Policy (Tab "I") and the CSU Cyberbullying Policy (Tab "J"). According to Plaintiff Beverly, Plaintiffs filed suit related to the Challenged Policies because they "felt [the policies] were just not on." Tab "B" – Beverly Dep Tr. at 31:24-32:7.**

**RESPONSE:** Undisputed with the clarification that Plaintiffs brought their facial challenges on the grounds set forth in the Complaint, *see* Compl. ¶¶ 44-85, and for the reasons stated in their sworn declarations. *See* Ex. 1, Beverly Decl. ¶¶ 9-11 (Computer Usage Policy), 21 (Cyberbullying Policy); Ex. 2, Bionaz Decl. ¶¶ 5-7 (Computer Usage Policy), 16-17 (Cyberbullying Policy).

**15.    The Computer Usage Policy, as confirmed through the declaration of CSU Chief Information Officer, Prashant Shinde, regulates only technology assets owned and operated by CSU. *See* Tab "K" – Declaration of Prashant Shinde in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction at ¶ 3. Further,**

**Mr. Shinde confirmed the policy does not apply to *CSU Faculty Voice* blog activities that have no connection to CSU technology assets. *Id.* at ¶ 4.**

**RESPONSE:** Defendants' statement is immaterial to Counts I-II of the Complaint because whether the Computer Usage Policy only applies to CSU technology assets has no bearing on whether the policy is facially unconstitutional in restricting protected speech and expression. Plaintiffs are as much subject to the Computer Usage Policy in the ordinary course as are all other members of the CSU community. *See also* Pls.' Resp. Defs.' Statement Add'l Facts ¶¶ 6-9, ECF 201.

With regard to Count III of the Complaint, this statement is disputed insofar as Defendants' November 11, 2013 cease-and-desist letter demanded that Plaintiffs shut down the *CSU Faculty Voice* blog on the grounds that "the lack of civility and professionalism expressed on the blog violates the University's values and policies requiring civility and professionalism of all University faculty members." The Plaintiffs reasonably believed the cease-and-desist letter referenced and sought to enforce the Computer Usage Policy, which requires electronic mail and all other electronic communication "including websites and blog posts on the university server," to "adhere to the University standards of conduct which prohibit any communication which tends to embarrass or humiliate any member of the community." Ex. 36 (Computer Usage Policy). *See also* Ex. 1, Beverly Decl. ¶ 11; Ex. 8, Bionaz Tr. 78:16-79:24; Ex. 7, Beverly Tr. 236:3-13. At the time Defendants sent the cease-and-desist letter, no other written policy at CSU referenced or enforced a "civility" standard. *See also* Pls.' Consol. Opp. MTD & MSJ 3-4; Pls.' SMF ¶ 15. And, although Cage denied the "civility standard" he cited was CSU's Computer Usage Policy, he could not name any other policies intended by that reference. Ex. 10, Cage Tr. 70:4-8,

16. **The scope of the Computer Usage Policy was further confirmed by the following deponents: former CSU Chief Ethics Officer, Hon. Bernetta Bush, testified the**

policy "**prevents people from utilizing *CSU's computers* for anything other than university business. (Tab "L" – Deposition Transcript of Hon. Bernetta Bush 66:6-7) (emphasis added); CSU General Counsel, Defendant Patrick Cage, testified that the policy only applies to information on the University's servers (Tab "H" – Cage Dep. Tr. at 77:15-78:5); and Renee Mitchell, CSU Associate Vice President of Human Resources, testified the policy only regulates activity related to CSU-owned or operated technology assets (Tab "M" – Deposition Transcript of Renee Mitchell Dep. 114:13-115:13 and Tab "N" – Declaration of Renee Mitchell in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction at ¶ 3, 8).**

**RESPONSE:** Defendants' statement is immaterial to Counts I-II of the Complaint because whether the Computer Usage Policy only applies to CSU technology assets has no bearing on whether the policy is facially unconstitutional in restricting protected speech and expression. Plaintiffs are as much subject to the Computer Usage Policy in the ordinary course as are all other members of the CSU community. *See also* Pls.' Resp. Defs.' Statement Add'l Facts ¶¶ 6-9, ECF 201.

With regard to Count III of the Complaint, this statement is disputed insofar as Defendants' November 11, 2013 cease-and-desist letter demanded that Plaintiffs shut down the *CSU Faculty Voice* blog on the grounds that "the lack of civility and professionalism expressed on the blog violates the University's values and policies requiring civility and professionalism of all University faculty members." Ex. 19 (cease-and-desist letter); Ans. ¶ 23. The Plaintiffs reasonably believed the cease-and-desist letter referenced and sought to enforce the Computer Usage Policy, which requires electronic mail and all other electronic communication "including websites and blog posts on the university server," to "adhere to the University standards of conduct which prohibit any communication which tends to embarrass or humiliate any member of the community." Ex. 36 (Computer Usage Policy). *See also* Ex. 1, Beverly Decl. ¶ 11; Ex. 8, Bionaz Tr. 78:16-79:24; Ex. 7, Beverly Tr. 236:3-13. At the time Defendants sent the cease-and-desist letter, no other written policy at CSU referenced or enforced a "civility" standard. *See also* Pls.' Consol. Opp. MTD & MSJ 3-4; Pls.' SMF ¶ 15. And, although Cage denied the

"civility standard" he cited was CSU's Computer Usage Policy, he could not name any other policies intended by that reference.  Ex. 10, Cage Tr. 70:4-8.

**17.    The only punishment that is even possible under the policy itself is the "suspen[sion] [of] some or all privileges associated with [University] computer use."  Tab "I" – CSU Computer Usage Policy at 3, Implementation ¶ B.**

**RESPONSE:**    Disputed.    Users of CSU Information systems must certify their understanding that failure to comply with applicable laws, rules, policies, and procedures may lead to disciplinary action up to and including termination of University employment and possible criminal prosecution, depending on the nature of the violation.  Ex. 36. (Computer Usage Policy); Ans. ¶ 47.  Insofar as conduct on CSU technology can result in penalties ranging from suspension of privileges to disciplinary actions including termination and possible criminal prosecution, the degree of the penalty for violating the Computer Usage Policy is immaterial vis-à-vis facial constitutionality to the extent there is any penalty for failure to comply with unconstitutionally vague and overbroad terms.  *See* Pls.' Consol. Opp. MSJ & MTD 17-18.  And the degree of penalties that may result from a violation of the Computer Usage Policy is immaterial to an assessment of the "potential chilling effect on protected expression" necessary to find that the Policy is unconstitutionally vague and overbroad.  *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012).

**18.    No investigations or disciplinary action has occurred under the Computer Usage Policy against any CSU employee – including Plaintiffs.  Tab "M" – Mitchell Dep. Tr. at 118:6-19; Tab "N" – Mitchell Decl. at ¶¶ 5-7.**

**RESPONSE:**    Immaterial to Counts I-II.  It is undisputed that conduct and speech covered by the Computer Usage Policy may be disciplined pursuant to the terms of the policy and may lead to disciplinary action under unspecified "applicable laws, rules, policies, and procedures."  Whether the policy cited for disciplining CSU faculty and students in such

instances is the Computer Usage Policy or some other policy is immaterial to whether the terms of the Computer Usage Policy are unconstitutionally vague and overbroad and limit protected speech and expression.

As to Count III, whether no CSU employee has ever been disciplined for violating the Computer Usage Policy is disputed insofar as Bernetta Bush, CSU's Ethics Officer, testified that she enforces the Computer Usage Policy by sending notices to CSU employees regarding their misuse of the University's computer systems and that she does not report her enforcement emails to the Human Resources department. Bush testified that her responsibilities include "computer use issues." Ex. 9, Bush Tr. 64:22-65:13. Bush enforces the Computer Usage Policy by sending notices to CSU employees regarding their misuse of the University's computer systems, instructing the users to "cease and desist" from engaging in and violating CSU's policy, and threatening that failure to do so "could result in disciplinary action being taken against you." *Id.* 66:19-69:10. Bush further testified that she does not report her Computer Usage Policy enforcement emails to the Human Resources department. *Id.* 70:24-72:2.

Moreover, it is disputed whether Plaintiffs have ever been disciplined for violating the Computer Usage Policy (although that is also immaterial to its facial unconstitutionality). On November 11, 2013, Defendant Cage sent a cease and desist letter to Professor Beverly ordering the Plaintiffs to "immediately disable [the] Chicago State University Voice Blog … no later than November 15, 2013, in order to avoid legal action." Among other things, the letter stated the *CSU Faculty Voice* did not comply with the "high standards of civility and professionalism [that] are central tenants [sic] of the University's values and included in the standards of conduct required of faculty members." Ans. ¶ 23. The Plaintiffs reasonably believed the cease-and-desist letter referenced and sought to enforce the Computer Usage Policy, which requires

electronic mail and all other electronic communication "including websites and blog posts on the university server," to "adhere to the University standards of conduct which prohibit any communication which tends to embarrass or humiliate any member of the community." Ex. 36 (Computer Usage Policy). *See also* Ex. 1, Beverly Decl. ¶ 11; Ex. 8, Bionaz Tr. 78:16-79:24; Ex. 7, Beverly Tr. 236:3-13. At the time Defendants sent the cease-and-desist letter, no other written policy at CSU referenced or enforced a "civility" standard. *See also* Pls.' Consol. Opp. MTD & MSJ 3-4; Pls.' SMF ¶ 15. And, although Cage denied the "civility standard" he cited was CSU's Computer Usage Policy, he could not name any other policies intended by that reference. Ex. 10, Cage Tr. 70:4-8.

19.  **Plaintiff Bionaz testified that the Computer Usage Policy has never been enforced with respect to the *CSU Faculty Voice* blog. Tab "A" – Bionaz Dep. Tr. at 78:16-19.**

**RESPONSE:** Disputed. Bionaz testified that "[t]he cease and desist letter included language that certainly sounded like it came right out of the computer usage policy," insofar as the policy requires the campus community to "adhere to certain standards of civility" and Defendants' November 11, 2013 cease-and-desist letter "talks about how the faculty blog has no content civility standards," which "sounded like it came out of the computer usage policy." Ex. 8, Bionaz Tr. 78:20-79:24. Bionaz believed the cease-and-desist letter constituted "an attempt to stop us from publishing the blog." *Id.*

20.  **Specifically, Plaintiff Bionaz testified that no enforcement action was ever taken against content posted on the *CSU Faculty Voice* by the CSU administration using the Computer Usage Policy. Tab "A" – Bionaz Dep. Tr. at 80:1-4.**

**RESPONSE:** Disputed. Bionaz testified that "[t]he cease and desist letter included language that certainly sounded like it came right out of the computer usage policy," insofar as the policy requires the campus community to "adhere to certain standards of civility" and

Defendants' November 11, 2013 cease-and-desist letter "talks about how the faculty blog has no content civility standards," which "sounded like it came out of the computer usage policy." Ex. 8, Bionaz Tr. 78:20-79:24. Bionaz believed the cease-and-desist letter constituted "an attempt to stop us from publishing the blog." *Id.*

**21. Plaintiff Beverly testified that the Computer Usage Policy was never enforced against him. Tab "B" – Beverly Dep. Tr. at 235:13-15.**

**RESPONSE:** Disputed. Beverly testified that he understood the reference to content civility standards and a lack of civility and professionalism in the CSU Faculty Voice blog to be a reference to the Computer Usage Policy. Ex. 7, Beverly Tr. 236:3-13. *See also* Ex. 1, Beverly Decl. ¶ 11 ("The [cease-and-desist] letter also appeared to be based on the Computer Usage Policy because it claimed that the blog violated 'standards of civility and professionalism.'").

**22. As set forth in the CSU Cyberbullying Policy "Rationale," the purpose of the policy is "to prevent and redress harassment within the CSU community…" Tab "J" – CSU Cyberbullying Policy at 1. The policy contains an entire paragraph dedicated to acknowledging CSU's commitment to principles of free speech, even when University community members may find the speech "abhorrent." Tab "J" – CSU Cyberbullying Policy at 1, ¶ 4.**

**RESPONSE:** Plaintiffs do not dispute that the introduction to the Cyberbullying Policy states that it seeks to "prevent and redress harassment within the CSU community by expressly addressing the problem of electronic harassment/cyberbully," but dispute that this was the only reason the policy was adopted insofar as deposition testimony confirmed that the Cyberbullying Policy was also proposed to address Plaintiffs' activities on their blog. Ex. 16, Watson Tr. 134:19-136:2; Ex. 14, Muscadin Tr. 58:22-61:18; Ex. 15, Peebles Tr. 50:8-51:2. Moreover, the reasons why CSU adopted the Cyberbullying Policy and its reference to free speech rights are immaterial to whether the regulation adopted is unconstitutionally vague and overbroad on its face. *See* Pls.' Consol. Opp. MTD & MSJ 20.

23.     The CSU Cyberbullying Policy expressly limits its application to off-campus speech *only* when it is "intended by the speaker to reach the CSU campus *and, does, in fact, reach the CSU campus*." **Tab "J" – Cyberbullying Policy at 5, "Expressive conduct" definition.**

**RESPONSE:**  Disputed.  *See Beverly v. Watson*, 78 F. Supp. 3d 717, 723 (N.D. Ill. 2015) ("the Cyberbullying Policy is not limited to communications made using CSU's computer equipment").  *See also* Ans. ¶ 54.  The Policy incongruously defines "[e]lectronic speech" as all "expressive conduct," and restricts all "[e]xpressive conduct (verbal, physical, aural, graphic, symbolic, or written) … on or off campus," as well as "[o]ff-campus expressive conduct … intended by the speaker to reach the CSU campus and [that] does, in fact reach the CSU campus."  The similar restriction on "[e]lectronic speech and/or cyberbullying that is transmitted, received, or disseminated through … University-owned information technology resources, computer networks or systems," etc., does not limit the policy to only such uses.  Further, these interpretative issues must be answered based on the face of the Cyberbully Policy and present solely legal questions.


24.     The CSU Cyberbullying Policy "specifically addresses the obligations of the institution under the following laws and regulations," and then lists eight applicable federal and state statutory obligations to which the policy is limited. **Tab "J" – Cyberbullying Policy at 2.**

**RESPONSE:**  Immaterial because whether the policy cites the university's statutory obligations is irrelevant to whether the terms of the Cyberbullying Policy are unconstitutionally vague and overbroad and limit protected speech and expression.  And immaterial as to constitutionality to the extent the federal and/or state authority is contrary to the fact of the Policy.


25.     The CSU Cyberbullying Policy details what conduct is considered "harassment" by listing seven specific categories and examples of conduct that are prohibited as harassment. **Tab "J" – Cyberbullying Policy at 4-5.**

**RESPONSE:** Disputed because the Cyberbullying Policy does not define the term "harass," and does not require all harassment that it prohibits to be "severe," "pervasive," and/or "objectively offensive" to another.  Ans. ¶ 55.

26.    **There has been no disciplinary action under the Cyberbullying Policy against any member of the CSU community – including Plaintiffs.  Tab "M" – Mitchell Dep. Tr. At 81:6-9.**

**RESPONSE:**   Disputed.   Less than two weeks after the University enacted the Cyberbullying Policy it was invoked in connection with CSU Public Relations Director Thomas Wogan's May 20, 2014 Discrimination/Harassment complaint against Professor Bionaz. Ex. 20 (Wogan harassment complaint form).  CSU Defendant CSU Associate General Counsel Janelle Carter commenced an investigation, and on May 29, 2014, began efforts, by phone and by email to have Professor Bionaz appear before her in connection with the complaint.  Ex. 31.  A meeting was held on June 11, 2014, as memorialized in notes take by Carter, in which Professor Bionaz was called on to respond to the complaint.  Ex. 34.  On September 22, 2014, Carter sent Professor Bionaz a letter explaining that Wogan's complaint had alleged violation of the Cyberbullying Policy, that she had applied the Policy to the matter, and that based on her investigation, "it cannot be determined that [Bionaz] harassed Mr. Wogan in violation of the Policy."   Ex. 21.    However,  the  letter  characterized  Professor  Bionaz's  conduct  as "inflammatory" and "unprofessional," and stated that "if your behavior continues, you could be found responsible for violating the Policy and subjected to disciplinary action."  *Id.*

27.    **Plaintiff Bionaz testified that the Cyberbullying Policy has never been applied to Plaintiffs' blog.  Tab "A" – Bionaz Dep. Tr. at 89:21-23.**

**RESPONSE:**  Disputed.  Bionaz testified that he was unaware of an instance where the Cyberbullying Policy had been "applied with respect to the blog."  Ex. 8, Bionaz Tr. 89:21-23.

Bionaz went on to clarify that he was "investigated" under the Policy for "face to face" communication "but not for anything I posted on the blog." *Id.* 89:24-90:5. *See* Ex. 2, Bionaz Decl. ¶¶ 18-21. Whether or not the Cyberbullying Policy has been applied to the blog or to the Plaintiffs personally is immaterial to whether the policy is unconstitutionally vague and overbroad.

28. **Plaintiff Bionaz also testified he has never been disciplined under the Cyberbullying Policy for anything he posted on the blog, nor is he aware of anyone who has been disciplined for anything posted on the blog. Tab "A" – Bionaz Dep. Tr. at 89:24-90:11.**

<u>RESPONSE</u>: Disputed insofar as (a) deposition testimony confirmed that the Cyberbullying Policy was proposed to address Plaintiffs' activities on their blog, Ex. 16, Watson Tr. 134:19-136:2; Ex. 14, Muscadin Tr. 58:22-61:18; Ex. 15, Peebles Tr. 50:8-51:2; (b) Defendants investigated Bionaz under the Cyberbullying Policy based on his interaction with Wogan in retaliation for the blog, Pls.' SMF ¶¶ 32-35; (c) Plaintiffs were constrained by operation of the Cyberbullying Policy, Pls.' SMF ¶¶ 19-22; and (d) the imposition of the Cyberbullying Policy, as well as Defendants' pattern of retaliation, caused a drop-off in contributors to the blog, Suppl. Beverly Decl. ¶¶ 5-9 (ECF 75). Moreover, whether or not the Cyberbullying Policy has been applied to the blog or to the Plaintiffs personally is immaterial to whether the policy is unconstitutionally vague and overbroad.

29. **Like Plaintiff Bionaz, Plaintiff Beverly testified that the Cyberbullying Policy was never enforced against him. Tab "B" – Beverly Dep. Tr. at 235:10-12.**

<u>RESPONSE</u>: Undisputed with the clarification that deposition testimony confirmed that the Cyberbullying Policy was proposed to address Plaintiffs' activities on their blog. Ex. 16, Watson Tr. 134:19-136:2; Ex. 14, Muscadin Tr. 58:22-61:18; Ex. 15, Peebles Tr. 50:8-51:2. Professor Beverly also testified that he was given a copy of the Cyberbullying Policy when he

was being investigated for his involvement in the Repression at CSU event. Ex. 1, Beverly Decl. ¶ 19. Whether or not the Cyberbullying Policy has been applied to the blog or to the Plaintiffs personally is immaterial to whether the policy is unconstitutionally vague and overbroad.

**30.     Plaintiff Bionaz also testified that the Cyberbullying Policy has not impacted his expression or blog posts on the *CSU Faculty Voice*.  Tab "A" – Bionaz Dep. Tr. at 148:21-149:4.**

<u>**RESPONSE:**</u>  Disputed.  Bionaz merely testified that he could not recall "off the top of my head" any information that he specifically refrained from posting because of the Cyberbullying Policy. Ex. 8, Bionaz Tr. 148:24-149:4.  Bionaz has otherwise stated that he has "refrained from publishing a number of pieces that would further demonstrate the misdeeds of the Watson administration," due to Defendants' "threatened future enforcement action under, e.g., the Cyberbullying Policy."  Ex. 6, Bionaz Suppl. Decl. ¶¶ 6-7.  In particular, (a) for an April 12, 2015 blog post "describing the failure of the CSU administration to adhere to both contractual and policy obligations to notify … probationary faculty going through the tenure process," Bionaz "refrained from providing the names" or "specific number of persons" affected by the administration's failings "out of concern that more specificity would enable the administration to determine from whom I had received information and to retaliate against them," *id*. ¶ 8 & Ex. G, *How the Watson Administration Treats Chicago State's Tenure-Track Faculty: Use Them Then Screw Them* (Apr. 12, 2015); (b) Bionaz held a story concerning "irregularities in the creation of a CSU degree program and … potential financial violations," until his source was willing to be associated with the content and "[e]ven then, certain details were left out due to fear of repercussions," *id*. ¶ 9 & Ex. H, *If Going Through the Proper Channels Doesn't Work, Open up the Floodgates: The Hopelessly Incompetent Watson*

*Administration Puts Chicago State at Risk Again* (April 17, 2015); (c) Bionaz refrained from posting or "even revealing the existence" of a recording "of a conversation between former CSU student Jokari Miller and President Watson and Defendant CSU Vice President and General Counsel Patrick Cage, in which Watson pressured Miller to cease his own activism, and to drop his support of CSU students Willis Preston and Brittany Bailey, who have alleged constitutional violations by CSU's administration," deciding to only publish an blog entry that included Miller's attorney's press release describing the recording, *id.* ¶¶ 10-11 & Exs. I, J, *Wayne Watson Unscripted: Press Release From Willie Preston's Attorney* (Apr. 3, 2015).

**31.    Overall, readership of Plaintiffs' blog, the *CSU Faculty Voice*, has increased dramatically.  When started in 2009, the blog was "lucky to get 30 hits a day."  Tab "A" – Bionaz Dep. Tr. at 28:1-9; *see also* 182:21-24.  The blog now gets an average of 700 "hits" per day – 20,000 a month.  Tab "A" – Bionaz Dep. Tr. at 180:21-24.  The blog recently reached a million views.  *See* Robert Bionaz, *Welcome to 2017*, CSU FACULTY VOICE (Jan. 9, 2017, 4:02 AM), <u>http://csufacultyvoice.blogspot.com/2017/01/welcome-to-2017_9.html</u>.  According to Plaintiff Beverly, a post related to a cease-and-desist letter authored by Defendant Patrick Cage related to the blog received the all-time highest number of views.  Tab "B" – Beverly Dep. Tr. at 47:18-24.**

**RESPONSE:**    Immaterial and disputed.   The volume of the blog's readership is irrelevant to an assessment of the "potential chilling effect on protected expression" necessary to find that the Computer Usage and Cyberbullying Policies are unconstitutionally vague and overbroad.  *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012).  *See also* Pls.' Consol. Opp. Resp. MTD & MSJ 11-12.  And the number of articles posted provides no evidence regarding whether Plaintiffs or other blog contributors have been chilled from posting articles on topics that they believe will result in retaliation by Defendants.

**32.    Also, since the filing of this lawsuit and with the Challenged Policies in effect, Plaintiffs have continued to post blog articles critical of the CSU administration.  *See, e.g.* Phillip Beverly, *And I Was Thinking We Were Headed to Double Secret Financial Exigency*, CSU FACULTY VOICE (Dec. 9, 2016, 12:00 PM), <u>http://csufacultyvoice</u>. blogspot.com/2016 /12/and-i- was-thinking-we-were-headed-to.html; Robert Bionaz, *Still**

*in the Grip of Wayne Watson and His Crony Army,* **CSU FACULTY VOICE** (Jan. 9, 2017, 2:39 PM), **http://csufacultyvoice. blogspot.com / 2017/01/ still-in-grip-of-wayne-watson-and-his.html. In fact, the number of blog posts authored by Plaintiffs increased – at times significantly – since this lawsuit was filed. Tab "O" – Defendants' Disclosure of Expert Testimony and Expert Report of Michal A. Malkiewicz, at p. 5, ¶ 6; p. 18, ¶ 23.**

**RESPONSE:** Immaterial and disputed. The frequency of articles posted to the *CSU Faculty Voice* blog is irrelevant to an assessment of the "potential chilling effect on protected expression" necessary to find that the Computer Usage and Cyberbullying Policies are unconstitutionally vague and overbroad. *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012). *See also* Pls.' Consol. Opp. Resp. MTD & MSJ 11-12. And the number of articles posted provides no evidence regarding whether Plaintiffs or other blog contributors have been chilled from posting articles on topics that they believe will result in retaliation by Defendants. Furthermore, that Plaintiffs have continued posting articles on their blog is a function of the protections set forth in the Court-brokered Standstill Agreement, (ECF 112), and the pendency of this suit.


**33.     According to Plaintiff Bionaz, "as far as [he] can tell" the policies have never been enforced against the blog. Tab "A" – Bionaz Dep. Tr. at 78:16-19; *see also* 90:21-23. And, the blog always continued operating without interruption. Tab "A" – Bionaz Dep. Tr. at 178:20-179:4.**

**RESPONSE:** Disputed. With regard to the Computer Usage Policy, Bionaz testified that "[t]he cease and desist letter included language that certainly sounded like it came right out of the computer usage policy," insofar as the policy requires the campus community to "adhere to certain standards of civility" and Defendants' November 11, 2013 cease-and-desist letter "talks about how the faculty blog has no content civility standards," which "sounded like it came out of the computer usage policy." Ex. 8, Bionaz Tr. 78:20-79:24. Bionaz believed the cease-and-desist letter constituted "an attempt to stop us from publishing the blog." *Id.* Bionaz testified that he was unaware of an instance where the Cyberbullying Policy had been "applied

with respect to the blog." Ex. 8, Bionaz Tr. 89:21-23. Bionaz went on to clarify that he was "investigated" under the Policy for "face to face" communication "but not for anything I posted on the blog." Ex. 8, *id.* 89:24-90:5. *See* Ex. 2, Bionaz Decl. ¶¶ 18-21. The number of articles posted provides no evidence regarding whether Plaintiffs or other blog contributors have been chilled from posting articles on topics that they believe will result in retaliation by Defendants. Also, whether or not the Cyberbullying Policy has been applied to the blog or to the Plaintiffs personally for criticizing the administration is immaterial to whether the policy is unconstitutionally vague and overbroad.

## Plaintiffs' "As-Applied" Challenges

**34.** **Plaintiffs' Complaint asserts three "as-applied" challenges related to the following: (1) a 2014 investigation by Defendant Carter of a harassment complaint filed by Tom Wogan, the former CSU Director of Public Relations, against Plaintiff Bionaz (Compl. ¶ 43); (2) a 2013 cease-and-desist letter related to the *CSU Faculty Voice* blog sent by Defendant Patrick Cage (Tab "A" – Bionaz Dep. Tr. at 67:1-14; *see also* Tab "B" – Beverly Dep. Tr. at 167:8-169:6); and (3) a 2014 disciplinary sanction issued by Defendant Watson against Plaintiff Beverly Compl. ¶¶ 37-39; *see also* Tab "B" – Beverly Dep. Tr. at 119:13-24.**

**RESPONSE:** Disputed. In addition to the allegations detailed in Defendants' statement, the Complaint alleges Defendants "initiated various formal and informal actions in retaliation for Plaintiffs' speech criticizing the CSU administration." Compl. ¶ 36.

## Plaintiffs' Claims Related to Defendant Carter

**35.** **With respect to Defendant Carter, Plaintiff Beverly testified that Defendant Carter did not directly violate his First Amendment rights. Tab "B" – Beverly Dep. Tr. at 166:22-24; 167:4-5.**

**RESPONSE:** Disputed. The Plaintiffs jointly allege that Carter's warning to Professor Bionaz that "if your behavior continues, you could be found responsible for violating the [Cyberbullying Policy] and subjected to disciplinary action," Ex. 21, was a warning that applied

to both of them.  In addition, Carter reviewed a draft of the cease-and-desist letter and assisted in its editing.  Ex. 11, Carter Tr. 37:14-22.

**36.    Plaintiff Bionaz testified the only allegations related to Defendant Carter concern her investigation of a May 2014 harassment complaint made by former CSU Director of Public Relations, Tom Wogan, against him.  Tab "A" – Bionaz Dep. Tr. at 64:16-65:8.**

**RESPONSE:**  Disputed because Carter reviewed a draft of the cease-and-desist letter and assisted in its editing.  Ex. 11, Carter Tr. 37:14-22.  And Professor Bionaz alleges that, beyond conducting an investigation into Wogan's claims, Carter's warning that "if your behavior continues, you could be found responsible for violating the [Cyberbullying Policy] and subjected to disciplinary action," Ex. 21, further chilled his speech.  Ex. 2, Bionaz Decl. ¶¶ 18-21.

**37.    Defendant Carter testified that because CSU's Cyberbullying Policy covers all forms of harassment, her investigation of Tom Wogan's complaint against Plaintiff Bionaz was conducted pursuant to the requirements of the Cyberbullying Policy.  Tab "G" – Carter Dep. Tr. at 53:1-18; 90:13-17; 121:22-122:11.  The Cyberbullying Policy requires the University EEO Officer to investigate harassment complaints.  Tab "J" – Cyberbullying Policy at 7-8.  Additionally, General Counsel Cage, assigned her to investigate the harassment complaint.  Tab "G" – Carter Dep. Tr. at 53:2-18.**

**RESPONSE:**  Disputed and non-factual.  This is a legal argument based on Defendants' interpretation of the Cyberbullying Policy.  To that end, the Cyberbullying Policy's use of vague and overbroad terms means administrators can call on disfavored speakers to defend their speech, and argue it is "required" by the Policy.  In any event, even if "investigation" were "required," Carter could have left Bionaz out of it altogether, by talking to Wogan and confirming that he did not feel threatened, which was the very basis for Carter's no-violation finding.  Such alternatives are required before questioning or challenging speakers for their protected expression.  *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 474-75 (6th Cir. 2016)

(law regulating speech fails strict scrutiny where "[t]here is no process for screening out frivolous complaints or complaints that, on their face, only complain of non-actionable statements").

**38.    Subsequently, on September 22, 2014, Defendant Carter notified Plaintiff Bionaz by letter that her investigation determined he had not violated the Cyberbullying Policy.  Tab "G" – Carter Dep. Tr. at 111:14-20; 124:7-16; 122:24-5:16.**

**RESPONSE:**  Undisputed, with the clarification that Carter warned Bionaz that "if your behavior continues, you could be found responsible for violating the policy and subjected to disciplinary action," Ex. 21, a warning she explained was based on Bionaz's "inflammatory comments."  Ex. 11, Carter Tr. 123:9-124:4.  *See also* Ex. 8, Bionaz Tr. 64:16-65:23 (describing this as "a qualified finding of innocent").

**39.    Plaintiff Bionaz acknowledged that Defendant Carter's investigation of the complaint against him was not retaliation in violation of his constitutional rights.  Tab "A" – Bionaz Dep. Tr. at 65:12-14.**

**RESPONSE:**  Disputed.  Bionaz testified that the Carter's conclusion that "if your behavior continues, you could be found responsible for violating the policy and subjected to disciplinary action," Ex. 21, a warning she explained was based on Bionaz's "inflammatory comments," Ex. 11, Carter Tr. 123:9-124:4, was retaliatory.  Ex. 8, Bionaz Tr. 65:12-23.  *See also id.* (describing this as "a qualified finding of innocent").  Plaintiffs identified Carter's "effort to apply the policy" to "a face-to-face conversation between Professor Bionaz and Tom Wogan," as an example of retaliation set forth in their Complaint.  Compl. ¶ 43.  Additionally, whether the application of the Cyberbullying Policy to Professor Bionaz' speech was an example of retaliation is immaterial to whether Professor has standing to challenge the policy and whether the policy's terms are unconstitutionaly vague and overbroad.

40.	Rather, Plaintiff Bionaz testified that he objects to what he calls Defendant Carter's "qualified finding of his innocen[ce]" because it contained references to his inflammatory and unprofessional behavior and mentioned that continued behavior of this nature might violate the Cyberbullying Policy.  Tab "A" – Bionaz Dep. Tr. at 65:4-8; 65:19-23.

**RESPONSE:**  Disputed.  Bionaz more than "object[ed]" to Carter's finding, he testified that it was retaliatory.  Ex. 8, Bionaz Tr. 65:12-23.  Plaintiffs identified Carter's "effort to apply the policy" to "a face-to-face conversation between Professor Bionaz and Tom Wogan," as an example of retaliation set forth in their Complaint.  Compl. ¶ 43.

41.	However, Defendant Carter – using her judgment – thought it reasonable to put Plaintiff Bionaz on notice that persistent or pervasive harassing conduct *might* violate the Cyberbullying Policy.  Tab "G" – Carter Dep. Tr. at 122:13-123:8; *see also* Tab "J" – Cyberbullying Policy at 5.

**RESPONSE:**  Disputed.  The letter warns Bionaz "if your behavior continues you could be found responsible for violating the policy and subjected to disciplinary action," Ex. 21, but does not clarify what behavior would be subject to discipline.  Carter testified that the "behavior" she was referencing was "the behavior in which [Bionaz] walked up to Mr. Wogan … and made some inflammatory comments towards him," Ex. 11, Carter Tr. 123:9-17, even though such behavior was not determined to be harassment.  *Id*. 123:18-124:10.  Reminders that speech "might" violate a policy is an actionable threat.  *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230-31 (7th Cir. 2015).

42.	In the more than two years since Defendant Carter issued the letter, Plaintiff Bionaz has never been charged with violating the Cyberbullying Policy.  Tab "A" – Bionaz Dep. Tr. at 89:24-90:5.

**RESPONSE:**  Disputed and immaterial.  Plaintiffs were constrained by operation of the Computer Usage and Cyberbullying Policies, Pls.' SMF ¶¶ 19-22, and the imposition of the Policies, as well as Defendants' pattern of retaliation, caused a drop-off in contributors to the

blog, Beverly Suppl. Decl. ¶¶ 5-9 (ECF 75).  That Defendants have not subsequently enforced the Cyberbullying Policy against Plaintiffs is immaterial and a function of the Court-brokered Standstill Agreement, (ECF 112), and the pendency of this suit.  As this Court has noted, it would work to Defendants' great detriment to further interfere with Plaintiffs' speech given the pending lawsuit and active judicial over-sight.  *Beverly v. Watson*, 78 F.Supp.3d at 723 ("if the defendants, in fact, have no intention of ever enforcing" the Policies "this case is ripe for settlement").

**43.     Additionally, Tom Wogan who filed the complaint, alleging he was harassed by Plaintiff Bionaz, no longer works at CSU.**

**RESPONSE:**  Immaterial.

### Plaintiffs' Claims Related to Defendant Cage

**44.     With respect to the allegations against Defendant Cage, Plaintiffs allege that Defendant Cage violated their First Amendment rights by issuing a 2013 cease-and-desist letter to Plaintiffs.  Tab "A" – Bionaz Dep. Tr. at 67:1-14; *see also* Tab "B" – Beverly Dep. Tr. at 167:8-169:10.**

**RESPONSE:**  Undisputed, with the clarification that sending the cease-and-desist letter is just one of Plaintiffs' allegations regarding Cage's retaliatory conduct.  *See* Pls.' SMF ¶¶ 14-18, 23-35.

**45.     On November 11, 2013, Defendant Cage sent a cease-and-desist letter to Plaintiff Beverly to address the use of "CSU's trade names and marks [on the *CSU Faculty Voice* blog] without permission or license from the University to do so."  Compl. at Ex. A. Defendant Cage testified this was done as part of CSU's effort to update and enforce their protected marks upon joining the Western Athletic Conference.  Tab "H" – Cage Dep. Tr. at 105:6-106:15.**

**RESPONSE:**  Disputed.  Cage took no actions consistent with claims that the cease-and-desist letter was sent to address trademark concerns and he admitted CSU held no registered trademarks when he sent the cease-and-desist.  Ans. ¶ 26; Ex. 10, Cage Tr. 122:2-125:12; Ex. 28

(Nov. 27, 2013 CSU Trademark Applications); Exs. 29, 30 (Apr. 9, 2014, and Mar. 26, 2014 U.S. Trademark Notices of Publication, respectively). Cage further admitted that he did not research whether the blog engaged in commerce. Ex. 10, Cage Tr. 63:15-64:6. Ultimately, Cage acknowledged he was concerned the blog had "capacity to do harm," based on "subject matter" and asserted "people at the university have been defamed by the blog." Ex. 10, Cage Tr. 41:1-23.

Less than a week before sending the cease-and-desist letter, Defendants Wayne Watson and Patrick Cage admonished Professor Beverly at CSU's President's Executive Council meeting on November 6, 2013 for violating CSU "civility" standards by publishing the blog. Ex. 1, Beverly Decl. ¶ 8. Tom Wogan, CSU's Director of Public Relations, confirmed Watson criticized the "overall tone of the blog" at the meeting, and said it "was having a negative effect on the university's image." Ex. 17, Wogan Tr. 22:6-23:21. Cage confirmed that the issue of the blog's content was raised: "I asked him in that meeting, I said, 'Do you have content standards?' And I believe he said, 'No.'" Ex. 10, Cage Tr. 108:11-109:19.

Within a week of the November 6, 2013 CSU President's Executive Council meeting, Cage sent a cease-and-desist letter that ordered Beverly to "disable" the CSU Faculty Voice, alleging it "lack[ed] civility and professionalism" in violation of CSU policy, and because it assertedly violated CSU trademarks. Compl. ¶¶ 23-25; Ex. 19 (cease-and-desist letter); Ex. 10, Cage Tr. 110:4-6. Though Cage denied the "civility standard" he cited was CSU's Computer Usage Policy, Ex. 10, Cage Tr. 70:4-8, he could not name any other policies intended by that reference.

Notwithstanding Cage's claim that the letter "had nothing to do with content," Ex. 10, Cage Tr. 132:24-133:1, LaShondra Peebles, CSU's then-interim Vice President of Enrollment

Management and Student Affairs, said attendees at a November 2013 meeting discussed "how you could shut down the blog using a cease-and-desist." Ex. 15, Peebles Tr. 93:20-94:4.

Although Cage claims he sent the cease-and-desist to prevent "confusion of source," Ex. 10, Cage Tr. 57:6-16, other CSU witnesses confirmed there was no actual confusion on this point. Ex. 13, Mitchell Tr. 130:24-131:23; Ex. 14, Muscadin Tr. 85:21-86:17 (acknowledging articles that criticized administration, *e.g.*, that Watson gave friends jobs, did not come from administration).

Moreover, Cage was not alone in conceiving and drafting the cease-and-desist letter. Carter reviewed a draft and assisted in its editing. Ex. 11, Carter Tr. 37:14-22. Watson testified he "assume[d] that my general counsel would have shared it with me beforehand." Ex. 16, Watson Tr. 42:23-43:19. According to Peebles, the cease-and-desist letter was drafted to address Watson's repeated requests for "different ways that we could … shut down the blog." Ex. 15, Peebles Tr. 97:20-98:12; *see also* Ex. 5, Peebles Decl. ¶¶ 11-12 ("The letter was conceived to shut down the … blog and silence Beverly and other blog authors who criticized Watson's administration."). According to Peebles, "Watson suggested that even if the intellectual property claim did not 'stick' he wanted the letter sent." *Id*. ¶ 12. And it was Watson who "suggested the letter reference CSU's civility standard, as set forth in the Computer Use Policy." *Id*.

**46. Defendant Cage testified that he evaluated Plaintiffs' blog for trademark concerns prior to sending the cease-and-desist letter. Based on his evaluation of the blog, Defendant Cage issued the cease-and-desist letter related to the blog's improper use of "CSU trade names and marks." Tab "H" – Cage Dep. Tr. at 112:4-114:11; Compl. at Ex. A.**

**RESPONSE:** Disputed. Cage took no actions consistent with claims that the cease-and-desist letter was sent to address trademark concerns and he admitted CSU held no registered

trademarks when he sent the cease-and-desist.  Ans. ¶ 26; Ex. 10, Cage Tr. 122:2-125:12; Ex. 28

(Nov. 27, 2013 CSU Trademark Applications); Exs. 29, 30 (Apr. 9, 2014, and Mar. 26, 2014

U.S. Trademark Notices of Publication, respectively).  Cage further admitted that he did not

research whether the blog engaged in commerce.  Ex. 10, Cage Tr. 63:15-64:6.  Ultimately,

Cage acknowledged he was concerned the blog had "capacity to do harm," based on "subject

matter" and asserted "people at the university have been defamed by the blog."  Ex. 10, Cage Tr.

41:1-23.


**47.    Defendant Cage's cease-and-desist letter informed Plaintiffs that the *CSU Faculty Voice* blog included the "unauthorized use of the CSU names and marks" and explained that the use of the marks falsely denoted association with CSU and created confusion regarding whether the blogs' comments and views were endorsed by the University.  *See* Compl. at Ex. A. As such, the blog's use of CSU tradenames and marks threatened to give blog readers the false impression that CSU operated a blog contrary to standards governing CSU-owned technology.  Tab "H" – Cage Dep. Tr. at 55:2-57:4; *see also* 58:15-59:5.**

**RESPONSE:**  Disputed.  Cage took no actions consistent with claims that the cease-

and-desist letter was sent to address trademark concerns and he admitted CSU held no registered

trademarks when he sent the cease-and-desist.  Ans. ¶ 26; Ex. 10, Cage Tr. 122:2-125:12; Ex. 28

(Nov. 27, 2013 CSU Trademark Applications); Exs. 29, 30 (Apr. 9, 2014, and Mar. 26, 2014

U.S. Trademark Notices of Publication, respectively).  Cage further admitted that he did not

research whether the blog engaged in commerce.  Ex. 10, Cage Tr. 63:15-64:6.  Ultimately,

Cage acknowledged he was concerned the blog had "capacity to do harm," based on "subject

matter" and asserted "people at the university have been defamed by the blog."  Ex. 10, Cage Tr.

41:1-23.

Although Cage claims he sent the cease-and-desist to prevent "confusion of source," Ex.

10, Cage Tr.  57:6-16, other CSU witnesses confirmed there was no actual confusion on this

point.  *E.g.*, Ex. 13, Mitchell Tr. 130:24-131:23; Ex. 14, Muscadin Tr. 85:21-86:17

(acknowledging articles that criticized administration, *e.g.*, that Watson gave friends jobs, did not come from administration).

Notwithstanding Cage's claim that the letter "had nothing to do with content," Ex. 10, Cage Tr. 132:24-133:1, LaShondra Peebles, CSU's then-interim Vice President of Enrollment Management and Student Affairs, said attendees at a November 2013 meeting discussed "how you could shut down the blog using a cease-and-desist." Ex. 15, Peebles Tr. 93:20-94:4.

**48.    In addition to his own evaluation, Defendant Cage hired outside legal counsel to evaluate the marks on the blog.  Tab "H" – Cage Dep. Tr. at 114:12-115:6.**

<u>**RESPONSE**</u>:  Undisputed, except Plaintiffs have no insight into why Defendant Cage hired outside counsel and the Defendants did not disclose any privileged attorney-client communications on this subject.  Moreover, Plaintiffs do not have sufficient information to form a belief whether outside counsel also advised on the propriety of claiming the blog violated CSU civility standards, or advised on whether sending the cease-and-desist letter was unconstitutional.

**49.    Plaintiff Bionaz testified that the trademark correspondence Plaintiffs received from the University's outside legal counsel included "a whole slew of suggestions as to what [Plaintiffs] should do to prevent [trademark] litigation."  Tab "A" – Bionaz Dep. Tr. at 67:10-14.**

<u>**RESPONSE**</u>:  Disputed.  Bionaz's testimony was that the cease-and-desist letter "attempted to close us down," by "threaten[ing] us with trademark infringement claims," and "order[ing] the blog to cease and desist operations."  Ex. 8, Bionaz Tr. 67:1-14.  Bionaz testified that after Plaintiffs responded to Cage's threat, "the university hired private counsel, who in January of 2014 reiterated the trademark infringement claims and had a whole slew of suggestions as to what we should do to basically prevent litigation."  *Id.*  Also disputed that the January 2014 letter from Defendants' outside counsel, Ex. 27, was "trademark correspondence."

The counsel who Cage retained in October 2013 to address university intellectual property concerns, Ex. 10, Cage Tr. 114:7-115:23; Ex. 25 (Oct. 23, 2013 Ltr. from Kendall to Cage), was not the same counsel Defendants hired in January 2014 to double-down on Cage's cease-and-desist letter. Ex. 27 (Jan. 3, 2014 Ltr. from Levine to Johnson).

**50.** **Within approximately six days of Plaintiff Beverly receiving the November 2013 cease- and-desist letter, references to "Chicago State University" and related images in the *CSU Faculty Voice* blog masthead were either removed or altered to no longer expressly reference the University. Tab "B" – Beverly Dep. Tr. at 60:17-62:8; *see also* 63:12-64:17.**

**RESPONSE:** Undisputed that subsequent to receiving the cease-and-desist letter of November 11, 2013, Professor Beverly altered the masthead for the *CSU Faculty Voice* blog, but disputed as to whether this change occurred "approximately six days" after receipt of Cage's letter and disputed whether the alterations "no longer expressly reference[d] the University."

**51.** **On November 27, 2013 – after removing the references to "Chicago State University" and CSU-related images – Plaintiffs' counsel sent a letter to Defendant Cage, articulating Plaintiffs' position with respect to images on their blog. Compl. at Ex. C.**

**RESPONSE:** Disputed insofar as whether Beverly made alterations to the masthead for the CSU Faculty Voice blog before November 27, 2013. Disputed as to whether Beverly removed all "CSU-related images" from the CSU Faculty Voice blog. Undisputed that Plaintiffs retained counsel to send a letter to Cage in response to his cease-and-desist demand. Ex. 26.

**52.** **On January 3, 2014, CSU's outside counsel acknowledged the changes made to the blog and reserved the University's right to pursue future legal action if the blog improperly used University names and marks. Compl. at Ex. D.**

**RESPONSE:** Undisputed.

53.	This January 2014 letter explicitly stated, "it is not the University's intention to censor or inhibit the professors' speech." Compl. at Ex. D.

**RESPONSE:** Undisputed that Defendants' outside counsel disclaimed stifling speech in response to the letter from Plaintiffs' counsel, which "insist[e]d that [Cage] and CSU stop threatening the faculty members with a lawsuit," and informing Cage that "[s]hould CSU follow through on its legal threats, we will move to dismiss the lawsuit under the Citizen Participation Act and we will seek the faculty members' attorney fees and court costs." Ex. 26.

54.	In the over three years following the issuance of Defendant Cage's cease-and-desist letter, there has been no action by the University, Defendant Cage or any University counsel related to the cease-and-desist. Tab "B" – Beverly Dep. Tr. at 168:20-169:1.

**RESPONSE:** Immaterial. Other retaliatory acts subsequent to sending the cease-and-desist letter were designed to silence Plaintiffs' speech, including their blog. That Defendants have not subsequently taken action in furtherance of the cease-and-desist letter is a function of the Court-brokered Standstill Agreement, (ECF 112), and the pendency of this suit. As this Court has noted, it would work to Defendants' great detriment to further interfere with Plaintiffs' speech given the pending lawsuit and active judicial over-sight. *Beverly v. Watson*, 78 F.Supp.3d at 723 ("if the defendants, in fact, have no intention of ever enforcing" the Policies "this case is ripe for settlement"). Moreover, after the cease and desist letter failed to close down the blog, defendants embarked on a number of other actions to achieve the same objective, including adoption of the Cyberbullying Policy.

55.	In the over three years following the issuance of Defendant Cage's cease-and-desist letter, the *CSU Faculty Voice* blog continuously operated without interruption. Tab "A" – Bionaz Dep. Tr. at 178:20-179:8.

**RESPONSE:** Disputed and immaterial. Normal operation of the blog was adversely affected by continuing efforts to penalize Plaintiffs for their expressive activities.

**56.    Plaintiff Bionaz admitted he has no evidence regarding Defendant Cage's motivations in sending the cease-and-desist letter and does not know why Defendant Cage sent the letter.  Tab "A" – Bionaz Dep. Tr. at 71:8-16.**

<u>**RESPONSE**</u>**:**  Disputed because evidence adduced in discovery has revealed Cage took no actions consistent with claims that the cease-and-desist letter was sent to address trademark concerns and he admitted CSU held no registered trademarks when he sent the cease-and-desist. Ans. ¶ 26; Ex. 10, Cage Tr. 122:2-125:12; Ex. 28 (Nov. 27, 2013 CSU Trademark Applications); Exs. 29, 30 (Apr. 9, 2014, and Mar. 26, 2014 U.S. Trademark Notices of Publication, respectively).  Cage further admitted that he did not research whether the blog engaged in commerce.  Ex. 10, Cage Tr. 63:15-64:6.  Ultimately, Cage acknowledged he was concerned the blog had "capacity to do harm," based on "subject matter" and asserted "people at the university have been defamed by the blog."  Ex. 10, Cage Tr. 41:1-23.

This is consistent with evidence that less than a week before sending the cease-and-desist letter, Defendants Wayne Watson and Patrick Cage admonished Professor Beverly at CSU's President's Executive Council meeting on November 6, 2013 for violating CSU "civility" standards by publishing the blog.  Ex. 7, Beverly Decl. ¶ 8.  Cage confirmed that the issue of the blog's content was raised:   "I asked him in that meeting, I said, 'Do you have content standards?' And I believe he said, 'No.'" Ex. 10, Cage Tr. 108:11-109:19.

And, notwithstanding Cage's claim that the letter "had nothing to do with content," Ex. 10, Cage Tr. 132:24-133:1, LaShondra Peebles, CSU's then-interim Vice President of Enrollment Management and Student Affairs, said attendees at a November 2013 meeting discussed "how you could shut down the blog using a cease-and-desist."  Ex. 15, Peebles Tr. 93:20-94:4.  Moreover, although Cage claims he sent the cease-and-desist to prevent "confusion of source," Ex. 10, Cage Tr.  57:6-16, other CSU witnesses confirmed there was no actual confusion on this point.  *E.g.*, Ex. 13, Mitchell Tr. 130:24-131:23; Ex. 14, Muscadin Tr. 85:21-

86:17 (acknowledging articles that criticized administration, *e.g.*, that Watson gave friends jobs, did not come from administration).

**57.     Plaintiff Bionaz also admitted he has no evidence that Defendant Cage had any involvement in the creation of the Computer Usage or Cyberbullying policies.  Tab "A" – Bionaz Dep. Tr. at 153:1-20.**

<u>RESPONSE</u>:  Disputed.  Evidence adduced in discovery showed that after a meeting LaShondra Peebles attended with Cage, Watson, and Angela Henderson, she was asked to draft a policy that could "be used potentially to shut down the blog."  Ex. 15, Peebles Tr. 46:8-49:12, 50:8-14, 81:5-9; *see also* Ex. 5, Peebles Decl. ¶¶ 13-16.  Muscadin confirmed, recalling a conversation with Cage, Henderson, and Peebles "about the blog as it related to cyberbullying," where they "discussed a [draft] policy that [] Peebles presented."  Ex. 14, Muscadin Tr. 59:3-59:20; 70:19-24.

**58.     Further, Plaintiff Bionaz testified Defendant Cage has not taken any action to enforce the Computer Usage Policy against any content posted on Plaintiffs' blog.  Tab "A" – Bionaz Dep. Tr. at 78:16-19; *see also* 79:18-80:4.**

<u>RESPONSE</u>:  Disputed.  Bionaz testified that "[t]he cease and desist letter included language that certainly sounded like it came right out of the computer usage policy," insofar as the policy requires the campus community to "adhere to certain standards of civility" and Defendants' November 11, 2013 cease-and-desist letter "talks about how the faculty blog has no content civility standards," which "sounded like it came out of the computer usage policy."  Ex. 8, Bionaz Tr. 78:20-79:24.  Bionaz believed the cease-and-desist letter constituted "an attempt to stop us from publishing the blog."  *Id.*  And, although Cage denied the "civility standard" he cited was CSU's Computer Usage Policy, Ex. 10, Cage Tr. 70:4-8, he could not name any other policies intended by that reference.

**Plaintiffs' Claims Related to Defendant Watson**

59.　With respect to Defendant Watson, Plaintiffs appear to claim that Defendant Watson sanctioned Plaintiff Beverly in 2014 because of his expressive activities.  However, according to former CSU Dean, David Kanis, Plaintiff Beverly was sanctioned because he moved his Political Science class to a "Repression at CSU" event (for which class attendance accounted for a portion of students' grades) and students were mistreated during the class.  Tab "P" – Declaration of David Kanis, PhD, in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction at ¶¶ 1-6, 9.  *See also* Tab "Q" – Declaration of Dennis Johnson in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction; Tab "R" – Deposition transcript of Angela Henderson at p. 152:11-17.

<u>**RESPONSE:**</u>　Disputed.　First, Plaintiffs dispute the implication of the heading to Defendants' statement that this claim is against only Watson as opposed to all three Defendants. Defendants punished Beverly for his involvement in an April 2014 event entitled Repression at CSU, intended to highlight free speech abuses on the CSU campus.  Compl. ¶ 37.  Cage was notified when Beverly's room request for the event was denied, Ex. 10, Cage Tr. 204:13-206:4, then copied Watson, Henderson, and Bush.  Ex. 22.  Cage admitted his actions arose from concerns about speech at the event:  "There was some noise that in spite of the room request denial that they were going to move forward with this protest – I mean with this event, with this forum.  * * * * I was alerting the president … about my response to that[.]"  Ex. 10, Cage Tr. 207:2-13.  "My concern was that … in spite of the denial," they "were insisting that they were going to go ahead …."  *Id*. 207:24-208:16.

David Kanis, the then-interim Dean of the College of Arts & Sciences, who investigated complaints of two students who claimed they felt compelled to attend Repression at CSU, "interpreted" the event, and Beverly's involvement in it, as "an instructor attempting to influence the personal choices on political action of people in the room."  *See* Ex. 4, Kanis Decl.; Ex. 12, Kanis Tr. 194:20-195:6.  However, he was concerned not that Beverly spoke to influence any¬one, but that "It was what he let happen as the [event's] moderator."  *Id*. 195:7-

12. Kanis felt students were encouraged to engage in political action to "rise up against the administration." *Id*. 196:9-14. He ultimately recommended a one-day suspension of Beverly for his involvement, *id.* 212:8-212:20; 254:11-255:19, but Watson doubled it. Ex. 16, Watson Tr. 210:24-211:9; Ex. 4, Kanis Decl. (Ex. 2 of Ex. H, Ltr. from Watson to Beverly); Ex. 24 (Jun. 17, 2014 Mem. from Henderson to Watson).

**60.  Plaintiff Beverly confirmed in his deposition testimony that he moved his class to the "Repression at CSU" event, and that attendance was not optional. Tab "B" – Beverly Dep. Tr. at 97:12-99:11.**

**RESPONSE:** Undisputed, however, there was no consequence for students missing isolated class sessions, including this one, during the course.

**61.  Based on Dean Kanis' investigation, CSU Provost Angela Henderson recommended to then-CSU President, Defendant Watson, that Plaintiff Beverly be sanctioned. Tab "R" – Henderson Dep. Tr. at 150:13-152:2. Defendant Watson adopted the position taken by Provost Henderson. Tab "D" – Watson Dep. Tr. at 214:13-216: 20, 217:14-22; *see also* Tab "S" – Recommendation of Provost Henderson to Defendant Watson at 3; Tab "P" – Declaration of David Kanis at Ex. 2 (Defendant Watson's sanction letter to Plaintiff Beverly).**

**RESPONSE:** Disputed insofar as Kanis recommended a one-day suspension of Beverly for his involvement, Ex. 12, Kanis Tr. 212:8-212:20; 254:11-255:19, but Watson doubled that. Ex. 16, Watson Tr. 210:24-211:9; Ex. 4, Kanis Decl. (Ex. 2 of Ex. H, Ltr. from Watson to Beverly); Ex. 24 (Jun. 17, 2014 Mem. from Henderson to Watson).

**62.  The CSU Faculty Union contract governs how sanctions are to be addressed and imposed as relates to faculty members. Tab "B" – Beverly Dep. Tr. at 123:17-124:4.**

**RESPONSE:** Disputed insofar as the decision of what sanction to impose was Watson's and not dictated by the CSU Faculty Union contract and immaterial to the constitutionality or the lawfulness of Defendants' retaliation.

63. Under the union contract, the President of the University (or his designee), is the only person with authority to issue an official sanction against a tenured professor. Tab "T" – Contract 2010-2015, Chicago State University and UPI Local 4100, Units A, B and C at Article 5(c) and (h). Accordingly, only Defendant Watson, as the then-CSU President, or his designee, had authority to issue an official sanction against Plaintiff Beverly in response to the sanction recommendation concerning Plaintiff Beverly in response to a student complaint. *Id.*

**RESPONSE:** Disputed insofar as Watson did sanction Beverly – a point Defendants cannot deny – and can be held liable in his personal and official capacity for that decision, which was made in furtherance of his efforts to retaliate against Plaintiffs for their speech criticizing his administration. Defendant Wayne Watson said he was in a "fight" with the *CSU Faculty Voice* and routinely had assistants print articles that angered him, which he would share with other CSU officials. Ex. 5, Peebles Decl. ¶ 7. This prompted various efforts to shut down the blog and penalize Professors Beverly and Bionaz. *See*, *e.g.*, *id.* ¶ 10 (describing meetings involving Defendants and other CSU officials). The statement is also immaterial to the constitutionality or the lawfulness of Defendants' retaliation.

64. Based on the recommendation of Provost Henderson, in June 2014 Defendant Watson issued a sanction against Plaintiff Beverly that resulted in the loss of two days' pay. Tab "B" – Beverly Dep. Tr. at 119:18-24; Tab "P" – Declaration of David Kanis at Ex. 2 (Defendant Watson's sanction letter to Plaintiff Beverly).

**RESPONSE:** Undisputed, however the sanction imposed a stigma that his conduct was unprofessional.

65. Plaintiff Bionaz testified that he cannot identify an action by Defendant Watson where Defendant Watson attempted to directly censor content on the blog. Tab "A" – Bionaz Dep. Tr. at 155:5-8.

**RESPONSE:** Disputed. Evidence adduced in discovery confirms that Defendant Wayne Watson said he was in a "fight" with the CSU Faculty Voice and routinely had assistants print articles that angered him, which he would share with other CSU officials. Ex. 5, Peebles

Decl. ¶ 7. This prompted various efforts to shut down the blog and penalize Professors Beverly and Bionaz. *See, e.g.*, *id.* ¶ 10 (describing meetings involving Defendants and other CSU officials).

Watson and Cage admonished Professor Beverly at CSU's President's Executive Council meeting on November 6, 2013 for violating CSU "civility" standards by pub¬lishing the blog. Ex. 1, Beverly Decl. ¶ 8. Tom Wogan, CSU's Director of Public Relations, confirmed Watson criticized the "overall tone of the blog" at the meeting, and said it "was having a negative effect on the university's image." Ex. 17, Wogan Tr. 22:6-23:21. This was followed-up within a week when Cage sent a cease-and-desist letter that ordered Beverly to "disable" the CSU Faculty Voice, alleging it "lack[ed] civility and professionalism" in violation of CSU policy, and because it assertedly violated CSU trademarks. Compl. ¶¶ 23-25; Ex. 36 (Computer Usage Policy); Ex. 10, Cage Tr. 110:4-6.

Cage was not alone in conceiving and drafting the cease-and-desist letter. Watson testified he "assume[d] that my general counsel would have shared it with me beforehand." Ex. 16, Watson Tr. 42:23-43:19. According to Peebles, the cease-and-desist letter was drafted to address Watson's repeated requests for "different ways that we could … shut down the blog." Ex. 15, Peebles Tr. 97:20-98:12; *see also* Ex. 5, Peebles Decl. ¶¶ 11-12 ("The letter was conceived to shut down the … blog and silence Beverly and other blog authors who criticized Watson's administration."). According to Peebles, "Watson suggested that even if the intellectual property claim did not 'stick' he wanted the letter sent." Ex. 5, Peebles Decl. ¶ 12. And it was Watson who "suggested the letter reference CSU's civility standard, as set forth in the Computer Use Policy." *Id.*

When Plaintiffs refused to cease publishing the blog, Defendants admit Watson, Cage and other CSU administrators met in the winter of 2014 to address ways of dealing with the CSU Faculty Voice, including possibly contacting Google, Inc., owner of the blog's host service, to take down the site. Ans. ¶¶ 34-35. Muscadin and Peebles confirmed the details of the meeting, as well as the fact that Cage attended, as did numerous CSU administrators and Watson's community allies. Attendees included Peebles, CSU Provost Angela Henderson, her husband Victor, Bernetta Bush, among several others. Ex. 14, Muscadin Tr. 171:5-173:5; Ex. 15, Peebles Tr. 84:2-14. Muscadin confirmed attendees discussed the blog, "content on it," and its "impact on the university," Ex. 14, Muscadin Tr. 176:9-22, as well as the need to "protect[] the brand" of CSU, *id*. 177:8-11, which Watson and others believed the blog harmed. *Id*. 177:12-22, 182:14-183:7.

Peebles testified that Watson went so far as to try to coerce her into filing a false sexual harassment claim against Beverly despite her assurances to Watson and other administrators she never felt harassed or intimated by Beverly. Ex. 15, Peebles Tr. 57:14-63:5; Ex. 5, Peebles Decl. ¶¶ 17-36. Those at the meeting discussed "the fact that they needed me to file this sexual harassment claim that could also be used to terminate Dr. Beverly." Ex. 15, Peebles Tr. 84:15-85:23. Peebles recalls Watson haranguing her as "not being a team player," and that he yelled: "you were threatened, you were harassed, and you need to file this claim." Ex. 15, Peebles Tr. 85:5-9; Ex. 5, Peebles Decl. ¶¶ 27-35.

Defendants adopted a Cyberbullying Policy in May 2014 to target the blog. Watson admitted he believed CSU needed such a policy, asserting "students were being bullied" by the blog, Ex. 16, Watson Tr. 134:19-22. Watson cited the Repression at CSU event for which Beverly was punished as an example of such bullying, *id*. 139:3-11, even though it occurred in

April 2014, after the Cyberbullying Policy's introduction to CSU's Board of Trustees in March. *Compare* Ex. 4, Kanis Decl. ¶ 2 (Repression at CSU event held April 9, 2014) *with* Ex. 23, Pls.' Dep. Ex. 25 (CSU Bd. of Trustees Mar. 7, 2013 Meeting Mins.).

Watson's claim of need for the Policy focused on actions of Beverly, Bionaz and another blog contributor, Ex. 16, Watson Tr. 135:14-136:2, motivations that were confirmed by Peebles, who testified he told her and others "the faculty blog was something that needed to be shut down and that participants could be reprimanded, and since we didn't have a policy, we needed to have one." Ex. 15, Peebles Tr. 50:18-24. After a meeting Peebles attended with Henderson, Cage, Watson, and others, she was asked to draft a policy that could "be used potentially to shut down the blog." *Id*. 46:8-49:12, 50:8-14, 81:5-9; *see also* Ex. 5, Peebles Decl. ¶¶ 13-16. Muscadin confirmed, recalling a conversation with Cage, Henderson, and Peebles "about the blog as it related to cyberbullying," where they "discussed a [draft] policy that [] Peebles presented." Ex. 14, Muscadin Tr. 59:3-59:20; 70:19-24.

**66.     Plaintiff Bionaz testified that Defendant Watson has never investigated or sanctioned Plaintiffs based on something posted on the *CSU Faculty Voice*. Tab "A" – Bionaz Dep. Tr. at 155: 18-21.**

**RESPONSE:**     Disputed.     Evidence adduced in discovery confirms that Defendant Wayne Watson said he was in a "fight" with the CSU Faculty Voice and routinely had assistants print articles that angered him, which he would share with other CSU officials. Ex. 5, Peebles Decl. ¶ 7. This prompted various efforts to shut down the blog and penalize Professors Beverly and Bionaz. *See, e.g.*, *id.* ¶ 10 (describing meetings involving Defendants and other CSU officials).

Watson and Cage admonished Professor Beverly at CSU's President's Executive Council meeting on November 6, 2013 for violating CSU "civility" standards by publishing the

blog. Ex. 1, Beverly Decl. ¶ 8. Tom Wogan, CSU's Director of Public Relations, confirmed Watson criticized the "overall tone of the blog" at the meeting, and said it "was having a negative effect on the university's image." Ex. 17, Wogan Tr. 22:6-23:21. This was followed-up within a week when Cage sent a cease-and-desist letter that ordered Beverly to "disable" the CSU Faculty Voice, alleging it "lack[ed] civility and professionalism" in violation of CSU policy, and because it assertedly violated CSU trademarks. Compl. ¶¶ 23-25; Ex. 36 (Computer Usage Policy); Ex. 10, Cage Tr. 110:4-6.

Cage was not alone in conceiving and drafting the cease-and-desist letter. Watson testified he "assume[d] that my general counsel would have shared it with me beforehand." Ex. 16, Watson Tr. 42:23-43:19. According to Peebles, the cease-and-desist letter was drafted to address Watson's repeated requests for "different ways that we could … shut down the blog." Ex. 15, Peebles Tr. 97:20-98:12; *see also* Ex. 5, Peebles Decl. ¶¶ 11-12 ("The letter was conceived to shut down the … blog and silence Beverly and other blog authors who criticized Watson's administration."). According to Peebles, "Watson suggested that even if the intellectual property claim did not 'stick' he wanted the letter sent." *Id.* ¶ 12. And it was Watson who "suggested the letter reference CSU's civility standard, as set forth in the Computer Use Policy." *Id.*

When Plaintiffs refused to cease publishing the blog, Defendants admit Watson, Cage and other CSU administrators met in the winter of 2014 to address ways of dealing with the CSU Faculty Voice, including possibly contacting Google, Inc., owner of the blog's host service, to take down the site. Ans. ¶¶ 34-35. Muscadin and Peebles confirmed the details of the meeting, as well as the fact that Cage attended, as did numerous CSU administrators and Watson's community allies. Attendees included Peebles, CSU Provost Angela Henderson, her

husband Victor, Bernetta Bush, among several others. Ex. 14, Muscadin Tr. 171:5-173:5; Ex. 15, Peebles Tr. 84:2-14. Muscadin confirmed attendees discussed the blog, "content on it," and its "impact on the university," Ex. 14, Muscadin Tr. 176:9-22, as well as the need to "protect[] the brand" of CSU, *id*. 177:8-11, which Watson and others believed the blog harmed. *Id*. 177:12-22, 182:14-183:7.

Peebles testified that Watson went so far as to try to coerce her into filing a false sexual harassment claim against Beverly despite her assurances to Watson and other administrators she never felt harassed or intimated by Beverly. Ex. 15, Peebles Tr. 57:14-63:5; Ex. 5, Peebles Decl. ¶¶ 17-36. Those at the meeting discussed "the fact that they needed me to file this sexual harassment claim that could also be used to terminate Dr. Beverly." Ex. 15, Peebles Tr. 84:15-85:23. Peebles recalls Watson haranguing her as "not being a team player," and that he yelled: "you were threatened, you were harassed, and you need to file this claim." Ex. 15, Peebles Tr. 85:5-9; Ex. 5, Peebles Decl. ¶¶ 27-35.

Defendants adopted a Cyberbullying Policy in May 2014 to target the blog. Watson admitted he believed CSU needed such a policy, asserting "students were being bullied" by the blog, Ex. 16, Watson Tr. 134:19-22. Watson cited the Repression at CSU event for which Beverly was punished as an example of such bullying, *id*. 139:3-11, even though it occurred in April 2014, after the Cyberbullying Policy's introduction to CSU's Board of Trustees in March. *Compare* Ex. 4, Kanis Decl. ¶ 2 (Repression at CSU event held April 9, 2014) *with* Ex. 23, Pls.' Dep. Ex. 25 (CSU Bd. of Trustees Mar. 7, 2013 Meeting Mins.).

Watson's claim of need for the Policy focused on actions of Beverly, Bionaz and another blog contributor, Ex. 16, Watson Tr. 135:14-136:2, motivations that were confirmed by Peebles, who testified he told her and others "the faculty blog was something that needed to be shut down

and that participants could be reprimanded, and since we didn't have a policy, we needed to have one." Ex. 15, Peebles Tr. 50:18-24. After a meeting Peebles attended with Henderson, Cage, Watson, and others, she was asked to draft a policy that could "be used potentially to shut down the blog." *Id*. 46:8-49:12, 50:8-14, 81:5-9; *see also* Ex. 5, Peebles Decl. ¶¶ 13-16. Muscadin confirmed, recalling a conversation with Cage, Henderson, and Peebles "about the blog as it related to cyberbullying," where they "discussed a [draft] policy that [] Peebles presented." Ex. 14, Muscadin Tr. 59:3-59:20; 70:19-24.

**67. Plaintiff Bionaz was unable to testify to any occasion where Defendant Watson subjected him to disciplinary procedures based on Plaintiff Bionaz's expressive activities. Tab "A" – Bionaz Dep. Tr. at 156: 2-6.**

**RESPONSE:** Disputed. Less than two weeks after the University enacted the Cyberbullying Policy it was invoked in connection with CSU Public Relations Director Thomas Wogan's May 20, 2014 Discrimination/Harassment complaint against Professor Bionaz. Ex. 20. CSU Defendant CSU Associate General Counsel Janelle Carter commenced an investigation, and on May 29, 2014, began efforts, by phone and by email to have Professor Bionaz appear before her in connection with the complaint. Ex. 31. A meeting was held on June 11, 2014, as memorialized in notes take by Carter, in which Professor Bionaz was called on to respond to the complaint. Ex. 34. On September 22, 2014, Carter sent Professor Bionaz a letter explaining that Wogan's complaint had alleged violation of the Cyberbullying Policy, that she had applied the Policy to the matter, and that based on her investigation, "it cannot be determined that [Bionaz] harassed Mr. Wogan in violation of the Policy." Ex. 21. However, the letter characterized Professor Bionaz's conduct as "inflammatory" and "unprofessional," and stated that "if your behavior continues, you could be found responsible for violating the Policy and subjected to disciplinary action." *Id.*

**68.** Although Plaintiffs portray Defendant Watson as the "mastermind of the purported plot to chill their speech and shut down their blog," Order Overruling Pls.' Objections to U.S. Magistrate Judge Finnegan's Order Granting Defs.' Mot. to Compel, Aug. 3, 2016 (Doc. 185 at 4), Plaintiff Bionaz testified he has no knowledge of whether Watson had any involvement in CSU's development of the Computer Usage and Cyberbullying Policies. Tab "A" – Bionaz Dep. Tr. at 74:16-21.

**RESPONSE:** Disputed. Evidence adduced in discovery confirms that Defendant Wayne Watson said he was in a "fight" with the CSU Faculty Voice and routinely had assistants print articles that angered him, which he would share with other CSU officials. Ex. 5, Peebles Decl. ¶ 7. This prompted various efforts to shut down the blog and penalize Professors Beverly and Bionaz. *See, e.g.*, *id.* ¶ 10 (describing meetings involving Defendants and other CSU officials).

Watson and Cage admonished Professor Beverly at CSU's President's Executive Council meeting on November 6, 2013 for violating CSU "civility" standards by publishing the blog. Ex. 1, Beverly Decl. ¶ 8. Tom Wogan, CSU's Director of Public Relations, confirmed Watson criticized the "overall tone of the blog" at the meeting, and said it "was having a negative effect on the university's image." Ex. 17, Wogan Tr. 22:6-23:21. This was followed-up within a week when Cage sent a cease-and-desist letter that ordered Beverly to "disable" the CSU Faculty Voice, alleging it "lack[ed] civility and professionalism" in violation of CSU policy, and because it assertedly violated CSU trademarks. Compl. ¶¶ 23-25; Ex. 36 (Computer Usage Policy); Ex. 10, Cage Tr. 110:4-6.

Cage was not alone in conceiving and drafting the cease-and-desist letter. Watson testified he "assume[d] that my general counsel would have shared it with me beforehand." Ex. 16, Watson Tr. 42:23-43:19. According to Peebles, the cease-and-desist letter was drafted to address Watson's repeated requests for "different ways that we could … shut down the blog." Ex. 15, Peebles Tr. 97:20-98:12; *see also* Ex. 5, Peebles Decl. ¶¶ 11-12 ("The letter was

conceived to shut down the … blog and silence Beverly and other blog authors who criticized Watson's administration."). According to Peebles, "Watson suggested that even if the intellectual property claim did not 'stick' he wanted the letter sent." *Id.* ¶ 12. And it was Watson who "suggested the letter reference CSU's civility standard, as set forth in the Computer Use Policy." *Id.*

When Plaintiffs refused to cease publishing the blog, Defendants admit Watson, Cage and other CSU administrators met in the winter of 2014 to address ways of dealing with the CSU Faculty Voice, including possibly contacting Google, Inc., owner of the blog's host service, to take down the site. Ans. ¶¶ 34-35. Muscadin and Peebles confirmed the details of the meeting, as well as the fact that Cage attended, as did numerous CSU administrators and Watson's community allies. Attendees included Peebles, CSU Provost Angela Henderson, her husband Victor, Bernetta Bush, among several others. Ex. 14, Muscadin Tr. 171:5-173:5; Ex. 15, Peebles Tr. 84:2-14. Muscadin confirmed attendees discussed the blog, "content on it," and its "impact on the university," Ex. 14, Muscadin Tr. 176:9-22, as well as the need to "protect[] the brand" of CSU, *id*. 177:8-11, which Watson and others believed the blog harmed. *Id.* 177:12-22, 182:14-183:7.

Peebles testified that Watson went so far as to try to coerce her into filing a false sexual harassment claim against Beverly despite her assurances to Watson and other administrators she never felt harassed or intimated by Beverly. Ex. 15, Peebles Tr. 57:14-63:5; Ex. 5, Peebles Decl. ¶¶ 17-36. Those at the meeting discussed "the fact that they needed me to file this sexual harassment claim that could also be used to terminate Dr. Beverly." Ex. 15, Peebles Tr. 84:15-85:23. Peebles recalls Watson haranguing her as "not being a team player," and that he yelled:

"you were threatened, you were harassed, and you need to file this claim." Ex. 15, Peebles Tr. 85:5-9; Ex. 5, Peebles Decl. ¶¶ 27-35.

Defendants adopted a Cyberbullying Policy in May 2014 to target the blog. Watson admitted he believed CSU needed such a policy, asserting "students were being bullied" by the blog, Ex. 16, Watson Tr. at 134:19-22. Watson cited the Repression at CSU event for which Beverly was punished as an example of such bullying, *id.* 139:3-11, even though it occurred in April 2014, after the Cyberbullying Policy's introduction to CSU's Board of Trustees in March. *Compare* Ex. 4, Kanis Decl. ¶ 2 (Repression at CSU event held April 9, 2014) *with* Ex. 23, Pls.' Dep. Ex. 25 (CSU Bd. of Trustees Mar. 7, 2013 Meeting Mins.).

Watson's claim of need for the Policy focused on actions of Beverly, Bionaz and another blog contributor, Ex. 16, Watson Tr. 135:14-136:2, motivations that were confirmed by Peebles, who testified he told her and others "the faculty blog was something that needed to be shut down and that participants could be reprimanded, and since we didn't have a policy, we needed to have one." Ex. 15, Peebles Tr. 50:18-24. After a meeting Peebles attended with Henderson, Cage, Watson, and others, she was asked to draft a policy that could "be used potentially to shut down the blog." *Id.* 46:8-49:12, 50:8-14, 81:5-9; *see also* Ex. 5, Peebles Decl. ¶¶ 13-16. Muscadin confirmed, recalling a conversation with Cage, Henderson, and Peebles "about the blog as it related to cyberbullying," where they "discussed a [draft] policy that [] Peebles presented." Ex. 14, Muscadin Tr. 59:3-59:20; 70:19-24.

**69.    Plaintiff Bionaz also testified he does not have any evidence of Watson's involvement in the creation and drafting of the two CSU Challenged Policies at issue. Tab "A" – Bionaz Dep. Tr. at 153:15-17; *see also* 154:6-8.**

**RESPONSE:** Disputed. Defendants adopted a Cyberbullying Policy in May 2014 to target the blog. Watson admitted he believed CSU needed such a policy, asserting "students

were being bullied" by the blog, Ex. 16, Watson Tr. 134:19-22. Watson cited the Repression at CSU event for which Beverly was punished as an example of such bullying, *id*. 139:3-11, even though it occurred in April 2014, after the Cyberbullying Policy's introduction to CSU's Board of Trustees in March. *Compare* Ex. 4, Kanis Decl. ¶ 2 (Repression at CSU event held April 9, 2014) *with* Ex. 23, Pls.' Dep. Ex. 25 (CSU Bd. of Trustees Mar. 7, 2013 Meeting Mins.).

Watson's claim of need for the Policy focused on actions of Beverly, Bionaz and another blog contributor, Ex. 16, Watson Tr. 135:14-136:2, motivations that were confirmed by Peebles, who testified he told her and others "the faculty blog was something that needed to be shut down and that participants could be reprimanded, and since we didn't have a policy, we needed to have one." Ex. 15, Peebles Tr. 50:18-24. After a meeting Peebles attended with Henderson, Cage, Watson, and others, she was asked to draft a policy that could "be used potentially to shut down the blog." *Id*. 46:8-49:12, 50:8-14, 81:5-9; *see also* Ex. 5, Peebles Decl. ¶¶ 13-16. Muscadin confirmed, recalling a conversation with Cage, Henderson, and Peebles "about the blog as it related to cyberbullying," where they "discussed a [draft] policy that [] Peebles presented." Ex. 14, Muscadin Tr. 59:3-59:20; 70:19-24.

**70.    Plaintiff Beverly also testified he has no direct knowledge of Watson's involvement with the policies.    Rather, Plaintiff Beverly believes that, by virtue of Watson's job as President and "chief executive" of the University, Defendant Watson "is responsible for anything that happens at the institution whether … [he is] actually involved in it or not." Tab "B" – Beverly Dep. Tr. at 172:17-19, 173:9-12.**

**RESPONSE:**  Disputed.  Defendants adopted a Cyberbullying Policy in May 2014 to target the blog.  Watson admitted he believed CSU needed such a policy, asserting "students were being bullied" by the blog, Ex. 16, Watson Tr. 134:19-22.  Watson cited the Repression at CSU event for which Beverly was punished as an example of such bullying, *id*. 139:3-11, even though it occurred in April 2014, after the Cyberbullying Policy's introduction to CSU's Board

of Trustees in March. *Compare* Ex. 4, Kanis Decl. ¶ 2 (Repression at CSU event held April 9, 2014) *with* Ex. 23, Pls.' Dep. Ex. 25 (CSU Bd. of Trustees Mar. 7, 2013 Meeting Mins.).

Watson's claim of need for the Policy focused on actions of Beverly, Bionaz and another blog contributor, Ex. 16, Watson Tr. 135:14-136:2, motivations that were confirmed by Peebles, who testified he told her and others "the faculty blog was something that needed to be shut down and that participants could be reprimanded, and since we didn't have a policy, we needed to have one." Ex. 15, Peebles Tr. 50:18-24. After a meeting Peebles attended with Henderson, Cage, Watson, and others, she was asked to draft a policy that could "be used potentially to shut down the blog." *Id*. 46:8-49:12, 50:8-14, 81:5-9; *see also* Ex. 5, Peebles Decl. ¶¶ 13-16. Muscadin confirmed, recalling a conversation with Cage, Henderson, and Peebles "about the blog as it related to cyberbullying," where they "discussed a [draft] policy that [] Peebles presented." Ex. 14, Muscadin Tr. 59:3-59:20; 70:19-24.

**71.    The CSU Board of Trustees, not the CSU President, determines and adopts University policies. Tab "U" – Deposition transcript of Anthony Young (CSU Board of Trustees Chairman) at p. 67:11-13.**

**RESPONSE:** Disputed insofar as the Board of Trustees may "adopt" a policy after a vote, but it does not necessarily "determine" or draft policies. The Cyberbullying Policy, for example, was instigated by Watson, who admitted he believed CSU needed such a policy, asserting "students were being bullied" by the blog, Ex. 16, Watson Tr. 134:19-22. Watson's claim of need for the Policy focused on actions of Beverly, Bionaz and another blog contributor, Ex. 16, Watson Tr. 135:14-136:2, motivations that were confirmed by Peebles, who testified he told her and others "the faculty blog was something that needed to be shut down and that participants could be reprimanded, and since we didn't have a policy, we needed to have one." Ex. 15, Peebles Tr. 50:18-24. After a meeting Peebles attended with Henderson, Cage, Watson,

and others, she was asked to draft a policy that could "be used potentially to shut down the blog." *Id.* 46:8-49:12, 50:8-14, 81:5-9; *see also* Ex. 5, Peebles Decl. ¶¶ 13-16.  Muscadin confirmed, recalling a conversation with Cage, Henderson, and Peebles "about the blog as it related to cyberbullying," where they "discussed a [draft] policy that [] Peebles presented." Ex. 14, Muscadin Tr. 59:3-59:20; 70:19-24.  Moreover, whether the Board of Trustees "adopts" or "determines" CSU policy is immaterial to the constitutionality or the lawfulness of Defendants' retaliation.

        DATED:  February 10, 2017

                                  Respectfully submitted,

                                    */s/  Robert Corn-Revere*
ROBERT CORN-REVERE (*pro hac vice*)
bobcornrevere@dwt.com
RONALD G. LONDON (*pro hac vice*)
ronnielondon@dwt.com
LISA B. ZYCHERMAN (*pro hac vice*)
lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC  20006
Telephone: (202) 973-4200

JESSICA TOVROV
GOODMAN TOVROV HARDY &
   JOHNSON LLC
105 West Madison Street, Suite 1500
Chicago, IL  60602
Telephone: (312) 252-7362
jessica@tovrovlaw.com

Attorneys for Plaintiffs Phillip Beverly
and Robert Bionaz

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing Response to Defendants' Statement of Undisputed Material Facts in support of their Motion for Summary Judgment was served upon all counsel of record on this 10th day of February, 2017 via use of the Court's ECF system.

_/s/ Robert Corn-Revere_
Robert Corn-Revere