## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PHILLIP BEVERLY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:14-CV-04970 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| WAYNE D. WATSON, *et al.*, | ) | Magistrate Judge Sheila Finnegan |
| | ) | |
| Defendants. | ) | |

### PLAINTIFFS' ADDITIONAL STATEMENT OF UNDISPUTED FACTS

Plaintiffs Phillip Beverly and Robert Bionaz, by and through their undersigned counsel, pursuant to Fed. R. Civ. P. 56(c) and LR 56.1(b)(3), hereby submit their Additional Statement of Undisputed Facts.

1.     The Computer Usage Policy requires CSU students, faculty, and staff to "[r]espect the rights and sensibilities of others," and "the mission of the University in the larger community," without defining either "respect" or the "larger community."  Ex. 36 (Computer Usage Policy).

2.     The Computer Usage Policy commands students, faculty and staff to "adhere to the University standards which prohibit any communication which tends to embarrass or humiliate any member of the community," and to "[r]espect others you contact electronically by avoiding … harassing comments," without defining "embarrass" or "humiliate," or what it means to "harass."  Ans. ¶ 49; Ex. 36 (Computer Usage Policy).  *See also* Pls.' Reply to Defs.' Resp. Opp. Mot. Partial Summ. J. 2 & n.4, ECF 200 (citing Defs.' SMF ¶ 11 & Ex. A, ECF 190).

3.     Users of CSU information systems must certify that failure to comply can "result in disciplinary action up to and including termination of [] employment and possible criminal prosecution."  Ans. ¶ 47; *see also* Defs.' Resp. SMF ¶ 11, ECF 191; Pls.' SMF ¶ 12, ECF 165.

4.     The Cyberbullying Policy applies to any (a) "deliberate or repeated conduct [that] harasses [or] intimidates an individual … or has the effect of substantially disrupting the individual's daily life," (b) "deliberate, repeated, and hostile course of conduct that is intended to harm," and (c) "intentional and repeated harm inflicted through … computers, cell phones, and electronic devices," all falling under the misnomer "electronic speech."  Ans. ¶¶ 53, 54, 59; Ex. 37 (Cyberbullying Policy).  *See also* Pls.' SMF ¶¶ 26-27 & Ex. F, ECF 165; Defs.' Resp. SMF ¶ 27, ECF 190.

5.     The Cyberbullying Policy does not define "harm," or "harass," nor requires harassment to be "severe," pervasive," and/or "objectively offensive."  Ans. ¶¶ 55, 56, 81; Ex. 37 (Cyberbullying Policy).  *See also* Pls.' SMF ¶¶ 28-29 & Ex. F, ECF 165; Defs.' Resp. SMF ¶¶ 28-29, ECF 190.

6.     Defendants admit the Policies' operative terms are undefined.  Defs.' Resp. SMF ¶¶ 9, 11, 27, 29, 30, 32 ECF 190; Defs.' SMF ¶¶ 5, 15, ECF 191.  Defendants do not dispute that Cage, CSU's General Counsel, insisted such key qualifiers were omitted intentionally.  Pls.' SMF ¶¶ 13-15, 32 ECF 165; Defs.' Resp. SMF ¶¶ 13-15, 32 ECF 190.

7.     Cage testified that "comments that tend to embarrass or humiliate others," as used in the Computer Usage Policy, should be interpreted according to "the commonly accepted definition of those words," and that "humiliate, embarrass mean humiliate or embarrass."  Ex. 10, Cage Tr. 72:18-24.

8.     Cage maintained the Computer usage Policy imposes an "objective test" based on "a person of ordinary sensibilities," but confirmed that there is no such test in the policy "nor should it be."  Ex. 10, Cage Tr. 73:6-74:19.

9. Cage further testified that there is no indication in the Computer Usage Policy of how pervasive the embarrassing or humiliating comments must be, "nor should it be." Ex. 10, Cage Tr. 74:20-75:4. Cage testified that the Computer Usage Policy's admonitions not to engage in, e.g., defamatory or harassing comments, required no definition because the policy "means what it says it means" and anybody wishing to understand what speech or expression was prohibited under the policy could refer to "dictionaries." *Id.* 75:5-15.

10. With regard to "conduct or speech that may reasonably be interpreted as making submission or rejection of unwelcome sexual advances, harassment," Cage testified that the "fact finder's" perspective is applied to the facts and allegations to determine whether the Cyberbullying Policy has been violated. Ex. 10, Cage Tr. 186:3-12.

11. Renee Mitchell, CSU's Associate Vice President of Human Resources, testified that she did not investigate whether there had been any informal investigations at CSU pursuant to the Computer Usage Policy and that she did not confer with anyone outside of her department regarding whether there had been any efforts to enforce the Computer Usage Policy that had not been reported to the CSU Human Resources office. Ex., 13, Mitchell Tr. 121:10-21.

12. Bernetta Bush, CSU's Ethic's Officer, testified that her responsibilities include "computer use issues." Ex. 9, Bush Tr. 64:22-65:13. Bush enforces the Computer Usage Policy by sending notices to CSU employees regarding their misuse of the University's computer systems, instructing the users to "cease and desist" from engaging in an violating CSU's policy, and threatening that failure to do so "could result in disciplinary action being taken against you." *Id.* 66:19-69:10. Bush further testified that she does not report her Computer Usage Policy enforcement emails to the Human Resources department. *Id.* 70:24-72:2.

13.     Since its inception in 2009, the *CSU Faculty Voice* has been a forum to expose administrative malfeasance to the CSU community.  Ex. 1, Beverly Decl. ¶ 2; Ex. 2, Bionaz Decl. ¶ 2.

14.     Defendants Wayne Watson and Patrick Cage admonished Professor Beverly at CSU's President's Executive Council meeting on November 6, 2013 for violating CSU "civility" standards by publishing the blog.  Ex. 1, Beverly Decl. ¶ 8.  Tom Wogan, CSU's Director of Public Relations, confirmed Watson criticized the "overall tone of the blog" at the meeting, and said it "was having a negative effect on the university's image."  Ex. 17, Wogan Tr. 22:6-23:21. Cage confirmed that the issue of the blog's content was raised:  "I asked him in that meeting, I said, 'Do you have content standards?' And I believe he said, 'No.'"  Ex. 10, Cage Tr. 108:11-109:19.

15.     Within a week of the November 6, 2013 CSU President's Executive Council meeting, Cage sent a cease-and-desist letter that ordered Beverly to "disable" the *CSU Faculty Voice*, alleging it "lack[ed] civility and professionalism" in violation of CSU policy, and because it assertedly violated CSU trademarks.  Compl. ¶¶ 23-25; Ex. 19 (Cease-and-desist Ltr.); Ex. 10, Cage Tr. 110:4-6.  Though Cage denied the "civility standard" he cited was CSU's Computer Usage Policy, Ex. 10, Cage Tr. 70:4-8, he could not name any other policies intended by that reference.  *Id*. 109:20-110:6.

16.     Cage was not alone in conceiving and drafting the cease-and-desist letter.  Carter reviewed a draft and assisted in its editing.  Ex. 11, Carter Tr. 37:14-22.  Watson testified he "assume[d] that my general counsel would have shared it with me beforehand."  Ex. 16, Watson Tr. 42:23-43:19.

17. Although Cage claims he sent the cease-and-desist to prevent "confusion of source," Ex. 10, Cage Tr. 57:6-16, other CSU witnesses testified there was no actual confusion on this point. *E.g.*, Ex. 13, Mitchell Tr. 130:24-131:23; Ex. 14, Muscadin Tr. 85:21-86:17 (acknowledging articles that criticized administration, *e.g.*, that Watson gave friends jobs, did not come from administration).

18. Cage admitted CSU held no registered trademarks when he sent the cease-and-desist. Ans. ¶ 26; Ex. 10, Cage Tr. 122:2-125:12; Ex. 28 (Nov. 27, 2013 CSU Trademark Applications); Ex. 29 (Apr. 9, 2014 U.S. Trademark Notice of Publication); Ex. 30 (Mar. 26, 2014 U.S. Trademark Notice of Publication). Cage further admitted that he did not research whether the blog engaged in commerce. Ex. 10, Cage Tr. 63:15-64:6. Ultimately, Cage acknowledged he was concerned the blog had "capacity to do harm," based on "subject matter" and asserted "people at the university have been defamed by the blog." Ex. 10, Cage Tr. 41:1-23.

19. The admonition at the November President's Executive Council meeting followed shortly by cease-and-desist letters convinced Plaintiffs they needed to protect their sources from retaliation, and affected what they were willing to publish. *E.g.*, Ex. 8, Bionaz Tr. 37:18-24; 67:1-14, 79:8-24, 149:5-11; Ex. 7, Beverly Tr. 52:20-53:11, 67:7-68:3. *See also* Ex., 7, Beverly Tr. 167:8-17 (referring to Ex. 27 (Jan. 3, 2014 Ltr. from Levine to Johnson) regarding belief that Cage's hiring outside counsel for cease-and-desist follow-up revealed intent to chill blog).

20. Beverly testified that if an untenured, confidential source shared potentially newsworthy information, he would post a story reporting it only if he could cite other sources, so that confidential sources remained anonymous, Ex. 7, Beverly Tr. 127:21-129:20, a process he called "triangulation." *Id*. 134:14-24.

21. Plaintiffs also adopted ways to allow contributors to blog anonymously. *E.g.*, Ex. 8, Bionaz Tr. 143:11-144:2; Ex. 7, Beverly Tr. 132:14-136:11; *see also* Ex. 2, Bionaz Decl. ¶¶ 6-7; Ex. 6, Suppl. Bionaz Decl. ¶¶ 4, 6-9. If they could not assure sources' anonymity, they would not publish new information over concern Defendants would retaliate against the source. Ex. 8, Bionaz Tr. 143:23-144:2; Ex. 7, Beverly Tr. 52:20-53:11, 136:7-15.

22. Although Beverly and Bionaz continued to publish the blog because they are protected by tenure, the threatened restrictions affected *their own* willingness to post certain materials. Ex. 8, Bionaz Tr. 137:7-140:12 (initially refrained from posting Peebles' June 2014 allegations, and Jokari Miller audio, because "embarrassing" and could violate Computer Usage Policy); Ex. 1, Beverly Decl. ¶ 9 (attesting to "concern" the "Computer Usage Policy could be applied to discipline *CSU Faculty Voice* contributors for [] articles that expose [CSU] malfeasance"); Ex. 2, Bionaz Decl. ¶ 6 (attesting Computer Usage Policy "caused me to forego posting information.").

23. When Plaintiffs refused to cease publishing the blog, Defendants admit Watson, Cage and other CSU administrators met in the winter of 2014 to address ways of dealing with the *CSU Faculty Voice*, including possibly contacting Google, Inc., owner of the blog's host service, to take down the site. Ans. ¶¶ 34-35. Muscadin and Peebles confirmed the details of the meeting, as well as the fact that Cage attended, as did numerous CSU administrators and Watson's community allies. Attendees included Peebles, CSU Provost Angela Henderson, her husband Victor, Bernetta Bush, among several others. Ex. 14, Muscadin Tr. 171:5-173:5; Ex. 15, Peebles Tr. 84:2-14.

24. The winter 2014 meeting came after the *Chicago Tribune* reported allegations – from a story on the *CSU Faculty Voice* – that CSU's then-interim Provost Angela Henderson had

plagiarized portions of her dissertation. Ex. 14, Muscadin Tr. 173:19-174:1; Ex. 15, Peebles Tr. 84:15-21; Ex. 18, Pls.' Dep. Ex. 1 (Tribune article).

25. Defendants punished Beverly for his involvement in an April 2014 event entitled *Repression at CSU*, intended to highlight free speech abuses on the CSU campus. Compl. ¶ 37. Cage was notified when Beverly's room request for the event was denied, Ex. 10, Cage Tr. 204:13-206:4, then copied Watson, Henderson, and Bush. Ex. 22 (Apr. 7, 2014 Email from Cage to Watson and Bush). Cage admitted his actions arose from concerns about speech at the event: "There was some noise that in spite of the room request denial that they were going to move forward with this protest – I mean with this event, with this forum. * * * * I was alerting the president … about my response to that[.]" Ex. 10, Cage Tr. 207:2-13. "My concern was that … in spite of the denial," they "were insisting that they were going to go ahead …." *Id*. 207:24-208:16.

26. David Kanis, the then-interim Dean of the College of Arts & Sciences, who investigated complaints of two students who claimed they felt compelled to attend *Repression at CSU*, "interpreted" the event, and Beverly's involvement in it, as "an instructor attempting to influence the personal choices on political action of people in the room." *See* Ex. 4, Kanis Decl.; Ex. 12, Kanis Tr. 194:20-195:6. However, he was concerned not that Beverly spoke to influence anyone, but that "It was what he let happen as the [event's] moderator." *Id*. 195:7-12. Kanis felt students were encouraged to engage in political action to "rise up against the administration." *Id*. 196:9-14. And, Kanis was concerned by Beverly's silence while other members of the CSU campus community insulted certain members of student government. *Id*. 115:22-116:8.

27. Kanis recommended a one-day suspension of Beverly for his involvement, Ex. 12, Kanis Tr. 212:8-212:20; 254:11-255:19, but Watson doubled it. Ex. 16, Watson Tr. 210:24-

211:9; Ex. 4, Kanis Decl. (Ex. 2 of Ex. H, Ltr. from Watson to Beverly); Ex. 24 (Jun. 17 Memorandum from Henderson to Watson).

28.     On March 7, 2014, Watson proposed a "Cyberbullying Policy" to the Board of Trustees, stating, "the purpose of this policy is to protect members of the CSU family from bullying through any form of electronic communication." The policy was later adopted on May 9, 2014 as CSU's Electronic-Harassment/Cyberbullying Policy. Ans. ¶¶ 41-42, 53.

29.     Watson admitted he believed CSU needed such a policy, asserting "students were being bullied" by the blog, Ex. 16, Watson Tr. 134:19-22; *see also* Ex. 14, Muscadin Tr. 58:22-61:18. Watson cited the *Repression at CSU* event for which Beverly was punished as an example of such bullying, Ex. 16, Watson Tr. 139:3-11, even though it occurred in April 2014, *after* the Cyberbullying Policy's introduction to CSU's Board of Trustees in March. *Compare* Ex. 4, Kanis Decl. ¶ 2 (*Repression at CSU* event held April 9, 2014) *with* Ex. 23 (CSU Bd. of Trustees Mar. 7, 2013 Meeting Mins.).

30.     Watson's claim of need for the Policy focused on actions of Beverly, Bionaz and another blog contributor. Ex. 16, Watson Tr. 135:14-136:2.

31.     After a meeting Peebles attended with Henderson, Cage, Watson, and others, she was asked to draft a policy that could "be used potentially to shut down the blog." Ex. 15, Peebles Tr., 46:8-49:12, 50:8-14, 81:5-9; *see also* Ex. 5, Peebles Decl. ¶¶ 13-16. Muscadin confirmed, recalling a conversation with Cage, Henderson, and Peebles "about the blog as it related to cyberbullying," where they "discussed a [draft] policy that [] Peebles presented." Ex. 14, Muscadin Tr. 59:3-59:20; 70:19-24.

32.     Defendants applied the Cyberbullying Policy to Professor Bionaz based on an in-person conversation he had with Wogan, Compl. ¶ 43, who in May 2014 filed a "harassment"

complaint based on a brief exchange in which Bionaz called Wogan Watson's "mouthpiece." Ex. 17, Wogan Tr. 68:10-72:10; Ex. 20 (Wogan harassment complaint form).

33. Defendant Carter investigated the remark under CSU's Cyberbullying Policy, Ex. 11, Carter Tr. 54:14-56:7, even though she admitted "Wogan did not find it … threatening," and she ultimately "determined [Bionaz's behavior] wasn't threatening." *Id*. 124:16-125:16.

34. Carter confirmed the terms "harass" and "bully" are not defined in the Cyberbullying Policy, Ex. 11, Carter Tr. 58:12-59:5, nor are "severe and pervasive," *id*. 59:7-21, nor "harm." *Id*. 60:21-2. She added she did not consider the three-minute exchange the complaint described to be severe harassment, a pervasive atmosphere of harassment, or repeated harassment. *Id*. 75:21-76:14. Nevertheless, she opened an investigation and kept Cage informed of her communications to and from Bionaz. *Id.* 76:23-77:5; Exs. 31, 32, 33 (Emails between Carter and Bionaz regarding Complaint of harassment); Ex. 34 (Jun. 11, 2014 Notes regarding Bionaz interview).

35. Although CSU did not impose sanctions on Bionaz as a result of Wogan's complaint, Carter warned Bionaz that, based on his "inflammatory comments," Ex. 11, Carter Tr. 123:9-124:4, "if your behavior continues, you could be found responsible for violating the policy and subjected to disciplinary action." Ex. 21 (Sept. 22, 2014 Ltr. from Carter to Bionaz regarding Complaint of harassment). *Cf.* Ex. 8, Bionaz Tr. 64:16-65:23 (describing this as "a qualified finding of innocent").

36. Plaintiffs suffered injuries as a result of Defendants' retaliatory actions. *See* Ex. 8, Bionaz Tr. 177:18-178:14 (Defendants' actions made him "angry," and "frustrated that I feel that we have to tippy-toe around"); Ex. 7, Beverly Tr. 183:13-184:8 (attesting it was "painful" to "have to protect people who are vulnerable," and to the "stress" of worrying "what's the next

thing they are going to try to do"). *See also* Ex. 7, Beverly Tr. 184:18-185:1 (describing having people at CSU tell him "I can't be seen with you because then they'll think [] I'm telling you something").

DATED:  February 10, 2017

Respectfully submitted,

_____/s/  Robert Corn-Revere_____
ROBERT CORN-REVERE (*pro hac vice*)
bobcornrevere@dwt.com
RONALD G. LONDON (*pro hac vice*)
ronnielondon@dwt.com
LISA B. ZYCHERMAN (*pro hac vice*)
lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC  20006
Telephone: (202) 973-4200

JESSICA TOVROV
GOODMAN TOVROV HARDY &
    JOHNSON LLC
105 West Madison Street, Suite 1500
Chicago, IL  60602
Telephone: (312) 252-7362
jessica@tovrovlaw.com

Attorneys for Plaintiffs Phillip Beverly
and Robert Bionaz

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing Additional Statement of Undisputed Facts was served upon all counsel of record on this 10th day of February, 2017 via use of the Court's ECF system.


_/s/ Robert Corn-Revere_____
Robert Corn-Revere