# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| PHILLIP BEVERLY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | **Case No. 14 C 4970** |
| | ) | |
| | ) | **Judge Joan B. Gottschall** |
| v. | ) | |
| | ) | |
| WAYNE D. WATSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Phillip Beverly ("Beverly) and Robert Bionaz ("Bionaz") (Beverly and Bionaz

together, "plaintiffs") are professors at Chicago State University ("CSU" or "the University"),

who allege that two of the University's policies violate the First Amendment. Named as

defendants in the suit are Wayne Watson ("Watson"), CSU's former President; Patrick Cage

("Cage"), CSU's former Vice President of Labor and Legal Affairs and General Counsel; and

Janelle Carter ("Carter"), CSU's former Associate General Counsel (Watson, Cage, and Carter

together, "defendants").[1] Before the court are defendants' motion pursuant to Federal Rule of

Civil Procedure 12(b)(1) to dismiss the suit for lack of subject-matter jurisdiction; and their

---

[1] Counts I and II are asserted against defendants in their official capacities; Count III is asserted against defendants in their individual capacities. None of the defendants remains employed by CSU at this time. Thus, with respect to plaintiffs' official-capacity claims, Watson, Cage, and Carter have been replaced by their successors pursuant to Federal Rule of Civil Procedure 25. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party."). However, Watson, Cage, and Carter remain defendants with respect to the claims brought against them in their individual capacities. The suit originally also named CSU's Board of Trustees as a defendant. In a previous order, the court dismissed with prejudice all claims against the Board. *See* ECF No. 21.

motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed below, the motion to dismiss is denied and the motion for summary judgment is granted in part and denied in part.

## I. Background

In 2009, Beverly and Bionaz, along with several other CSU professors, founded a blog entitled *CSU Faculty Voice*. The blog was intended to serve as "an outlet for the personal opinions of the contributing faculty members." Comp. ¶ 19. Articles appearing on the blog are frequently critical of CSU's administration, accusing the University's officials of all manner of misdeeds, including mismanagement, nepotism, and plagiarism.

The events at issue in this suit began in November 2013. Plaintiffs claim that during a November 6, 2013 meeting of CSU's President's Executive Council, Beverly was questioned by Watson and Cage "about the tone of posts on the *CSU Faculty Voice* and why the blog did not adhere to generally accepted 'civility' standards." Pls.' Ex. 1, Beverly Decl. ¶ 8, ECF No. 226-3. According to Beverly, the questioning was prompted by an article Bionaz had posted on the blog five days earlier, which reported that Watson's girlfriend had falsified her application for employment at CSU. *Id*. Watson and Cage did not claim that any information posted on the blog was inaccurate but instead complained that the article "was 'uncivil' and that feelings had been hurt." *Id*.

Within a week of the meeting, Cage sent Beverly a cease-and-desist letter ordering him to "disable" the *CSU Faculty Voice* or face legal action. *See* Pls.' Ex. 19, Letter from Cage to Beverly (Nov. 11, 2013), ECF No. 226-6. In the letter, Cage stated that plaintiffs were using CSU's trade names and marks without permission. *Id*. He also stated that "high standards of civility and professionalism are central tenants [sic] of the University's values and included in

the standards of conduct required of faculty members," and that the "lack of civility and professionalism expressed on the blog violates the University's values and policies requiring civility and professionalism of all University faculty members." *Id*. Plaintiffs claim that the civility standards alluded to in the letter were references to CSU's Computer Usage Policy, which "provides guidelines for appropriate use by students, faculty and staff of computers, and other technological facilities and services at Chicago State University." *See* Pls.' Ex. 36, CSU Computer Usage Policy, ECF No. 226-6.

Plaintiffs refused to cease their blogging activities. They claim that, beginning in January 2014, Watson, Cage, and other CSU administrators met on several occasions to come up with other ways of silencing them and retaliating against them. According to plaintiffs, these efforts included an attempt by Watson to trump up sexual harassment charges against Beverly. Plaintiffs cite a declaration submitted by LaShondra Peebles, CSU's then-Interim Vice President of Enrollment and Student Affairs, who states that on several occasions between January and March 2014, Watson pressured her to say that Beverly had sexually harassed her. *See* Pls.' Ex. 5, Peebles Decl. ¶ 21, ECF No. 226-4 ("Watson said that he and the CSU administration were in a fight against Beverly and that he wanted to get rid of Beverly. Watson told me that he needed my help in the fight and advised me to file a lawsuit for sexual harassment against Beverly based on Beverly's visit to my office. I told Watson that I did not feel threatened or harassed by Beverly's conversation. Nevertheless, Watson asserted that I had been harassed and that I 'did not realize it.'").

Another incident occurred in April 2014, when Beverly, who serves as President of CSU's Faculty Senate, presided over an Executive Committee Hearing regarding "Repression at CSU." According to plaintiffs, the event was intended to highlight free speech abuses on the

CSU campus. Beverly required the students in one of his classes to attend the hearing. Two of the students later filed complaints with the administration, stating that presenters at the event had verbally attacked them, and that Beverly did nothing to stop them. *See* Defs.' Ex. P, Kanis Decl. ¶¶ 2-3, ECF No. 224-2. The complaints were investigated by David Kanis ("Kanis"), then interim Dean of CSU's College of Arts & Sciences, who found that Beverly had violated various provisions of the CSU Board of Trustees' Governing Policies Related to Academic Freedom.[2] *Id*. Kanis recommended that Beverly be suspended for one day without pay; however, Watson, apparently at the suggestion of another administrator, increased the suspension to two days. Plaintiffs claim that the University's reliance on the Board of Trustees' Governing Policies was pretextual and that Beverly's punishment was actually in retaliation for his criticism of the CSU's administration.

In May 2014, CSU adopted an "Electronic-Harassment/Cyberbullying Policy," which sets forth guidelines designed to prevent harassment in the online communications of CSU faculty and students. *See* Ex. 37. According to plaintiffs, the policy was adopted at Watson's behest and was another measure intended to stifle their speech. Later that month, Tom Wogan

---

[2] The provisions in question are as follows:

- Membership in an academic community imposes on students, faculty members, and administrators an obligation to respect the dignity of others, to acknowledge their right to express differing opinions, and to foster and defend intellectual honesty, freedom of inquiry and instruction, and free expression on and off campus.
- The expression of dissent and the attempt to produce change, therefore, may not be carried out in ways which injure individuals or damage institutional facilities or disrupt the classes of one's teachers or colleagues.
- Students are entitled to an atmosphere conducive to learning and to even-handed treatment in all aspects of the teacher-student relationship.
- Students should not be forced by the authority inherent in the instructional role to make particular personal choices as to political action or their own part of society.

Kanis Decl. ¶ 6.

("Wogan"), CSU's Director of Public Relations, filed a harassment complaint against Bionaz under the Cyberbullying Policy. The complaint arose not as a result of online communication but in connection with a face-to-face confrontation in which Bionaz allegedly leaned over a table where Wogan was seated, pointed a finger in his face, called him a liar, and made other "inflammatory statements." Pls.' Ex. 21, Letter from J. Carter to R. Bionaz at 1 (Sept. 22, 2014), ECF No. 226-6. Wogan's complaint was investigated by Carter, who determined that, based on the single incident in question, Bionaz had not violated the policy. *Id*. However, in a letter to Bionaz, Carter stated: "if your behavior continues, you could be found responsible for violating the Policy and subjected to disciplinary action." *Id*.

Plaintiffs' complaint asserts three causes of action under 42 U.S.C. § 1983: Count I asserts a facial challenge to CSU's Computer Usage Policy, alleging that it violates the First Amendment on overbreadth and vagueness grounds. Count II challenges CSU's Cyberbullying Policy on the same grounds. Count III is styled as an as-applied challenge to the Policies. In addition, the complaint asserts a fourth count seeking a declaratory judgment and injunction based on Counts I-III.

Defendants have moved to dismiss the complaint for lack of subject-matter jurisdiction, alleging that plaintiffs lack standing to bring suit. They also move for summary judgment on the merits of plaintiffs' claims. The court addresses each motion in turn.

## II. Motion to Dismiss

Defendants first move pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss plaintiffs' suit for lack of subject-matter jurisdiction, i.e., standing. Motions for lack of subject-matter jurisdiction can be either facial or factual. *See, e.g.*, *Apex Digital, Inc. v. Sears, Roebuck & Co*., 572 F.3d 440, 443 (7th Cir. 2009). "In reviewing a facial challenge, the court must accept

all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc*., 807 F.3d 169, 173 (7th Cir. 2015). However, "when considering a motion that launches a factual attack against jurisdiction, [t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital*, 572 F.3d at 444 (quotation marks omitted).

Defendants previously asserted a facial challenge to the court's subject-matter jurisdiction, arguing principally that plaintiffs lacked standing to sue under Article III of the Constitution. *See Beverly v. Watson*, 78 F. Supp. 3d 717, 722 (N.D. Ill. 2015). Under Article III, federal courts' review is limited "to actual 'Cases' and 'Controversies' brought by litigants who demonstrate standing." *Groshek v. Time Warner Cable, Inc*., 865 F.3d 884, 886 (7th Cir. 2017). "The 'irreducible constitutional minimum of standing' consists of three elements: injury in fact, causation, and redressability." *Id*. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Defendants' previous motion focused on the injury-in-fact requirement. To establish injury-in-fact, plaintiffs "must show that [they] suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id*. (quotation marks omitted). Plaintiffs alleged that they had suffered an actual injury because, fearing discipline under the policies, their speech had been chilled. *Beverly*, 78 F. Supp. 3d at 722. Defendants argued that plaintiffs' allegations were insufficient because neither of the policies had ever been enforced against plaintiffs and there was no reasonable probability of future enforcement against them. *Id*. The court denied the motion. *Id.* at 724. Defendants' current Rule 12(b)(1) motion raises essentially the same challenge, but argues that plaintiffs have

failed to present any evidence that their speech has actually been chilled or that they have suffered any other injury.

The court notes that this argument addresses only plaintiffs' facial challenges to the policies in Counts I and II of the complaint. Standing with respect to Count III, which asserts a claim for retaliation, is premised on harm resulting from defendants' alleged retaliatory actions, not on the chilling of plaintiffs' speech. Nevertheless, plaintiffs must establish their standing for each of the claims they assert. *See, e.g.*, *Town of Chester, N.Y. v. Laroe Estates, Inc*., 137 S. Ct. 1645, 1650 (2017) ("Our standing decisions make clear that standing is not dispensed in gross. To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.") (citation and quotation marks omitted). The court therefore discusses the question of standing with respect to Counts I and II separately from Count III.

**A.      Counts I and II**

The court begins by examining defendants' challenge to plaintiffs' standing as to Counts I and II of the complaint. As noted above, the chilling of expression is the injury alleged in support of standing with respect to these counts. Plaintiffs have presented sufficient evidence that their speech has been chilled by the Computer Usage and Cyberbullying Policies. *See, e.g. Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) ("If standing is challenged as a factual matter, the plaintiff must come forward with 'competent proof'—that is a showing by a preponderance of the evidence—that standing exists."). Bionaz specifically testified to this effect. *See, e.g.*, Bionaz Decl. Supp. Prelim. Injunction ¶ 23, ECF No. 226-4 ("Since the university administration has exhibited no inclination to modify its behavior, I firmly believe that at some point in the near future I will again run afoul of their various 'policies' for limiting speech. While I have not

ceased blogging, I have been more reticent to post materials and have avoided making certain critiques that I previously would have posted without hesitation.").[3]

Against this, defendants point out that "a plaintiff's notional or subjective fear of chilling is insufficient to sustain a court's jurisdiction under Article III," *Lee*, 330 F.3d at 454, and that "[t]here must be a claim of specific present objective harm or a threat of specific future harm," *Bigelow v. Virginia*, 421 U.S. 809, 816-17 (1975) (brackets and quotation marks omitted). According to defendants, there is no basis for plaintiffs' concern that either of the policies will be applied to them. Indeed, defendants maintain that the policies have never been applied to anyone.

The court is unpersuaded. To begin with, plaintiffs contend that the policies *were* applied to them. Specifically, they claim that the Cyberbullying Policy was applied to Bionaz when Wogan filed the harassment complaint against him in May 2014. It is true that Bionaz was not found to have violated the policy; but it can fairly be argued that the investigation itself was an "application" of the policy. In any case, regardless of whether it can be deemed an "application" of the policy, the investigation alone is enough to establish that Bionaz's concern about the policy's enforcement is more than merely notional.

---

[3] It is somewhat more difficult to determine the extent to which Beverly's speech has been chilled. While he testified that he has often refrained from publishing material on the blog because of the policies, it appears that this was generally due to his concern that others (e.g., anonymous sources) might be disciplined. *See, e.g.*, Pls.' Ex. 7 at 128:13-17 ("Q. Well, would you -- to the extent that you said earlier that you were hesitant to post articles, why again were you hesitant? A. The person identified might be retaliated against."). As is discussed more fully below, it is unnecessary to show that the plaintiffs' own speech was chilled. Nevertheless, the court notes that Beverly testified that he had personally suffered in other ways because of the policies. *Id*. at 183:21-184:8 ("Am I really sad that we're going through all this? Am I really sad that I have to protect people who are vulnerable? Am I really sad that the university because of administration ineptitude brings its reputation down regularly? Yeah, I'm really sad. And is that painful? Yeah, it's really painful…. Am I -- am I in pain because of the normal amount of stress that I feel around what's the next thing that they are going to try to do to me or to us? Yeah, that's painful.").

Plaintiffs also maintain that the Computer Usage Policy was applied to them. On this point, they cite Cage's cease-and-desist letter. Although the letter does not invoke the policy expressly, plaintiffs plausibly contend that Cage's reference to "the University's values and policies requiring civility" was a reference to the Computer Usage Policy. Indeed, in denying defendants' previous motion to dismiss, the court held that it was "eminently reasonable to conclude that those civility standards [referred to in the cease-and-desist letter] are the ones memorialized in CSU's Computer Usage Policy." *Id*. at 722. This assessment remains valid in light of factual record now before the court. The court notes, for example, that Cage was given an opportunity during his deposition to identify other civility standards to which he might have been referring in the letter. He was unable to do so. *See* Pls.' Ex. 10, Cage Dep. at 109:20-110:6.

Defendants repeatedly urge that the Computer Usage Policy could not possibly have been applied to plaintiffs' blog because the policy applies only to CSU-owned technology assets. Given that the *CSU Faculty Voice* is not hosted on a CSU server, defendants maintain, the blog is not a CSU technology asset and thus is not subject to the policy. The court is unpersuaded. As an initial matter, the mere fact that the blog is not hosted on a CSU server does not render the Computer Usage Policy inapplicable to plaintiffs' conduct. For example, CSU computers and other devices constitute CSU's technology assets within the meaning of the policy. Thus, for example, if a professor were to compose a blog post on a CSU computer and upload the post to the *CSU Faculty Voice* from that computer, this might well bring his or her conduct within the policy's purview. Moreover, regardless of whether the policy could properly have been applied to plaintiffs' activities in connection with the blog, the cease-and-desist letter may have represented an attempt by defendants to apply the policy (wittingly or not) beyond its proper scope.

In any case, it is unnecessary for plaintiffs to show that the policies were *actually* applied to themselves—or to anyone else for that matter. The question is whether plaintiffs' concern that the policies might be applied to them was merely a "notional or subjective fear." In light of the events recounted above, and the general acrimony between plaintiffs and the CSU administration, the court cannot say that plaintiffs' apprehension was unwarranted.[4]

Nevertheless, defendants purport to cite evidence proving that plaintiffs' speech has not in fact been chilled. They point out that plaintiffs continued to publish articles on the *CSU Faculty Voice* even after receiving the cease-and-desist letter. Indeed, the evidence indicates that plaintiffs began to post more frequently after they received the letter. According to a report submitted by defendants, Bionaz's posting increased from an average of 1.53 times per month, prior to the November 2013 cease-and-desist letter, to 11.35 posts per month as of September 2015; and Beverly's posting increased from 2.21 per month to 3.09 per month over the same time period. *See* Defs.' Ex. O, Expert Report of Michal A. Malkiewicz, ECF No. 224-2.

For several reasons, the court is unimpressed by this evidence. First, as plaintiffs point out, the parties entered into a Standstill Agreement after plaintiffs filed the instant suit and moved for a preliminary injunction. According to the Standstill Agreement, defendants agreed that they would not take any steps to shut down or interfere with the *CSU Faculty Voice*, and agreed "not to impose sanctions on Plaintiffs for publication of the *CSU Faculty Voice* blog or any other lawful expression critical of Chicago State University … officials or administrators." *See* Order ¶¶ 1, 2, ECF No. 112. With the agreement in place, plaintiffs no longer had to worry about the policies' enforcement against them.

---

[4] It is of no moment that the defendants named in the complaint are no longer employed by CSU. Given that criticism of the university's administration is the blog's *raison d'être*, the threat of the policies' enforcement exists irrespective of who the administrators happen to be.

More importantly, the number of plaintiffs' blog posts is not determinative of whether their speech has been chilled; the relevant question is whether the content of their posts has changed. Defendants point out that plaintiffs have continued to post articles that are critical of CSU. But it does not follow that plaintiffs' speech has not been chilled. Plaintiffs have suffered an injury-in-fact to the extent that they have muted or watered-down their criticism of the University's administration to any appreciable degree. As already noted, there is sufficient record evidence to show that the policies have had such an effect. *See, e.g.*, Bionaz Decl. Supp. Prelim. Injunction ¶ 23.

In the final analysis, however, it is not necessary for plaintiffs to show that their own speech was chilled (or indeed that they suffered any injury-in-fact at all). Rather, plaintiffs have standing to pursue their claims if they can show that the speech of others has been chilled as a result of the policies. Although injuries to third parties ordinarily are not sufficient to confer standing, this rule has been relaxed in the first amendment context. *See, e.g.*, *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 957–58 (1984) ("[W]here the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another without regard to the ability of the other to assert his own claims and with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.") (quotation marks omitted).

Plaintiffs have adduced evidence that the speech of other CSU faculty members has indeed been chilled. For example, in a declaration submitted in support of plaintiffs' motion for a preliminary injunction, Beverly averred that, once the allegations in this suit came to light, contributors to the *CSU Faculty Voice* dropped sharply. *See* Beverly Supp. Decl. ¶ 5, ECF No. 75 ("Since 2009, the *Voice* has maintained a stable of 10 individuals who regularly posted to the

blog. However, since July 1, 2014, when the Complaint in this action brought public light to the retaliatory tactics of the Watson administration against the blog and speech critical of the administration, that number has been cut in half – meaning that aside from Professor Bionaz and me, we are down to three other contributors. And even among those remaining contributors, the pace and frequency of postings has slowed."). Similarly, Bionaz avers that he has "received numerous emails from CSU staff explaining that they even refrain from posting comments to the blog because they fear retaliation from the CSU administration." Pls.' Ex. 2, Bionaz Decl. ¶ 7. Based on the chilling of their own speech and that of other faculty members, the court concludes that plaintiffs have presented evidence sufficient to satisfy the injury-in-fact requirement.

Of course, injury-in-fact is only one of the requirements necessary for standing. Plaintiffs must also show that their injuries are traceable to defendants' actions and may be redressed by a favorable decision. The court is satisfied that the requirements are met here. The chilling discussed above is a direct result of the policies; and a judgment in plaintiffs' favor will redress the harm they have alleged—if the policies are declared unconstitutional, they will no longer exert a chilling effect on their (and others') expression.

For these reasons, the court concludes that plaintiffs have standing with respect to Counts I and II of the complaint.

## B. Count III: Retaliation

Count III has been the source of some confusion. The complaint characterizes the claim as an as-applied challenge to the policies. Over time, however, Count III has developed into a retaliation claim. Specifically, plaintiffs contend that they suffered retaliation for their criticism of defendants and the CSU administration generally. As examples of retaliation, plaintiffs cite,

inter alia, Cage's cease-and-desist letter, and Watson's attempt to coax Peebles into filing a baseless sexual harassment claim against Beverly.

These forms of discipline plainly satisfy Article III's injury-in-fact requirement. And indeed, defendants do not directly challenge plaintiffs' standing in connection with the retaliation claim. Rather, they argue that any retaliation claim should be dismissed because it was not alleged in the complaint. The court is unpersuaded. It is true that retaliation was not expressly alleged as a separate cause of action in the complaint. Nevertheless, the complaint clearly asserts that plaintiffs suffered retaliation on account of their criticism of the CSU administration. *See* Compl. ¶ 36 ("Following [the January-February 2014] meeting, Defendants have initiated various formal and informal actions in retaliation for Plaintiffs' speech criticizing the CSU administration."). Notably, defendants themselves have proceeded throughout the litigation on the assumption that plaintiffs are asserting a retaliation claim. Indeed, defendants previously sought dismissal of the retaliation claim in their prior motion to dismiss. *See Beverly v. Watson*, 78 F. Supp. 3d 717, 721 n.2 (N.D. Ill. 2015) (declining to reach the argument because it was "buried in a motion to dismiss for lack of subject matter jurisdiction and [was] entangled in arguments about standing"). In addition, defendants have addressed the merits of the retaliation claim in their briefing on the summary judgment motion. *See* Reply Br. 14-15. Thus, as with Counts I and II, plaintiffs have standing to assert their retaliation claim.

Because plaintiffs have shown that they possess standing to bring each of the claims asserted in this suit, and because plaintiffs may properly assert their retaliation claim at this stage in the litigation, defendants' motion to dismiss for lack of subject-matter jurisdiction is denied.

### III. Summary Judgment

The court now turns to defendants' motion for summary judgment. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, the Court construes the facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of that party. *See, e.g*., *Liberty Lobby, Inc*., 477 U.S. at 255. The existence of a factual dispute alone is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the summary judgment motion. *See, e.g*., *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

### A.      Count I: CSU's Computer Usage Policy

Count I asserts that CSU's Computer Usage policy is facially violative of the First Amendment on overbreadth and vagueness grounds. "A law is unconstitutionally overbroad when 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Bauer v. Shepard*, 620 F.3d 704, 715 (7th Cir. 2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n. 6 (2008)). "A law is unconstitutionally vague if it fails to sufficiently define the conduct it prohibits; the point of vagueness doctrine is to permit individuals to conform their conduct to the

law's requirements and to guard against arbitrary or discriminatory enforcement." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 785 (7th Cir. 2011). Although analytically distinct, "vagueness and overbreadth are two sides of the same coin, and the two sorts of challenges are often conceived of as 'alternative and often overlapping' theories for relief on the same claim." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012) (quoting *Jordan v. Pugh*, 425 F.3d 820, 827 (10th Cir. 2005)). "[B]oth the vagueness and overbreadth questions involve the same preliminary inquiry into whether the statute will have a substantial effect on constitutionally protected activity: 'In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.'" *Id.* (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982)).

The Computer Usage Policy "provides guidelines for appropriate use by students, faculty and staff of computers, and other technological facilities and services at Chicago State University." Pls.' Ex. 36. The policy requires individuals to certify their understanding that failure to comply with the policies "may result in disciplinary action up to and including termination of University employment and possible criminal prosecution, depending on the nature of the violation." *Id.* at 6. Plaintiffs express no objection to most of the guidelines set forth in the document. Their challenge focuses on the policy's prohibition on "any communication which tends to embarrass or humiliate any member of the community," as well as "lewd, obscene, defamatory or harassing comments"; and the policy's more general requirement that users "[r]espect the mission of the University in the larger community." *Id.*

These provisions appear to encompass a substantial amount of constitutionally protected expression. Although the First Amendment does not protect obscenity or defamation, it protects

speech amounting to harassment or that causes embarrassment or humiliation. Indeed, courts have struck down on overbreadth and vagueness grounds university speech codes based on similar language. *See, e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301, 320 (3d Cir. 2008) (declaring overbroad a university policy prohibiting "all forms of sexual harassment are prohibited, including … expressive, visual or physical conduct of a sexual or gender-motivated nature when ... such conduct has the purpose or effect of creating an intimidating, hostile, or offensive environment"); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 870 (N.D. Tex. 2004) (striking on overbreadth grounds a campus speech code banning "insults, epithets, ridicule, or personal attacks"); *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 370–72 (M.D. Pa. 2003) (granting preliminary injunction against enforcement of university code that prohibited, *inter alia*, "acts of intolerance which demonstrate malicious intent towards others," and directed "students to communicate their beliefs in a manner that does not provoke, harass, intimidate, or harm anther [sic]") (quotation marks omitted).

Against this, defendants contend that the expression covered by the Computer Usage Policy is not entitled to full first amendment protection. They contend that the policy is limited solely to expression involving CSU's computer and technology assets; and the University's technology assets, they insist, constitute a non-public forum. As defendants correctly maintain, the degree of first amendment protection afforded to expression depends on the kind of forum in which the expression occurs. *See, e.g.*, *Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 530 (7th Cir. 2009). Courts have generally recognized three types of forums: traditional public forums, designated public forums, and non-public forums.[5] *See, e.g.*, *Women's Health*

---

[5] "Traditional public forums are places with a long history of being devoted to assembly and debate, such as public streets and parks. Designated public forums are locations or channels of communication that the government opens up for use by the public for expressive activity. Public

*Link, Inc. v. Fort Wayne Pub. Transportation Corp*., 826 F.3d 947, 950-51 (7th Cir. 2016). In

traditional public forums and designated public forums, restrictions on speech are subject to strict

scrutiny, "meaning that the government must show the exclusion is necessary to serve a

compelling state interest and that it is narrowly drawn to achieve that end." *Surita v. Hyde*, 665

F.3d 860, 869 (7th Cir. 2011). In non-public forums, however, restrictions on expression are

permitted so long as they are reasonable in light of the forum's purpose and they do not

discriminate based on viewpoint. *See, e.g.*, *Choose Life Illinois, Inc. v. White*, 547 F.3d 853, 864

(7th Cir. 2008) ("Restrictions on speech within a nonpublic forum must not discriminate on the

basis of viewpoint and "must be reasonable in light of the forum's purpose.").

Defendants maintain that since the University's technology assets represent a non-public

forum, any regulations imposed by the Computer Usage Policy are permissible so long as they

are reasonable and do not discriminate on the basis of viewpoint. They point out that plaintiffs

have made no attempt to show that the policy's provisions are unreasonable. They also contend

that the policy does not engage in viewpoint discrimination.

The problem with this argument, however, is that defendants offer no support for their

underlying premise that the University's technology assets constitute a non-public forum. Nor is

this proposition self-evident. Rather, courts have explained that determining what kind of forum

the government has created "requires an examination of the government's intent in establishing

---

property not open for public communication by tradition or designation is deemed a nonpublic forum." *Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011). Courts occasionally mention a fourth type of forum, a so-called a "limited public forum" or a "limited designated public forum," which refers to "a public facility limited to the discussion of certain subjects or reserved for some types or classes of speaker, such as an open space in a state university in which members of the university community and their guests—but not uninvited outsiders—are allowed to give talks." *Women's Health Link, Inc. v. Fort Wayne Pub. Transportation Corp.*, 826 F.3d 947, 951 (7th Cir. 2016).

and maintaining the property." *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chicago*, 45 F.3d 1144, 1152 (7th Cir. 1995). In order to glean the government's intent, the court must look to "the policy and practice of the government with respect to the underlying property," and "must examine the nature of the property and its compatibility with expressive activity." *Id.* (quotation marks omitted). Notably, this inquiry may often involve a factual dimension. *See, e.g.*, *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000) ("The issue before us is whether city hall's steps are, instead, a public forum. Insofar as this issue is a matter of law (there might also be a factual question, e.g., whether a forum has been transformed into a public one by historical practice), a long line of cases concerning public fora fails to provide a definitive answer."); *Potenza v. Molinaro*, No. 03 CV 5534 CB A, 2006 WL 898026, at *1 (E.D.N.Y. Mar. 31, 2006) (factual questions prevented court from deciding on Rule 12(b)(6) motion whether defendants' production facilities constituted a public or non-public forum).

Defendants have simply made no attempt to address these factors or to provide any other basis for their contention that the University's technology assets constitute a non-public forum.[6] Consequently, defendants have failed conclusively to show that the Computer Usage Policy is not unconstitutionally vague or overbroad. It does not follow that the policy *is* facially unconstitutional or that plaintiffs are entitled to summary judgment as to Count I. It means only that defendants have failed to show that they are entitled to summary judgment as to the Computer Usage Policy.

**B.     Count II:  CSU's Cyberbullying Policy**

---

[6] Defendants devote some attention to the issue in their reply brief. It is well-settled, however, that "arguments not fully developed until a reply brief are waived." *See, e.g.*, *Cornucopia Inst. v. U.S. Dep't of Agric.*, 560 F.3d 673, 677 (7th Cir. 2009) (citing *United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir. 2006)).

Count II asserts a facial challenge to CSU's Cyberbullying Policy. The policy's stated purpose is to "enhance [CSU's] efforts to prevent and redress harassment within the CSU community by expressly addressing the problem of electronic harassment/cyberbullying." Pls.' Ex. 37 at 1. The policy defines "cyberbullying" as follows:

> (i) deliberate and repeated conduct or activity that threatens, harasses, intimidates an individual, places an individual in reasonable fear of harm to the individual or damage to the individual's property, or has the effect of substantially disrupting the individual's daily life via the use of electronic information and communication devices; (ii) the use of information and communication technologies to support a deliberate, repeated, and hostile course of conduct that is intended to harm others; or (iii) intentional and repeated harm inflicted through the use of computers, cell phones, and electronic devices.

*Id*. at 3.

The Cyberbullying Policy distinguishes between expressive conduct occurring on campus or at university-sponsored events and expressive conduct taking place off campus. With respect to off-campus speech, the policy further refines the proscribed expression. Among other things, the policy prohibits off-campus speech "that is intended by the speaker to reach the CSU campus and does, in fact, reach the CSU campus" and that "creates (i) a material and substantial disruption of CSU's educational mission, operations, activities, or programs, or (ii) a reasonabl[y] foreseeable risk/likelihood of causing such a disruption," *id*. ¶ (A); or that "communicates a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals and an objective, reasonable recipient of the expressive conduct would regard it as a serious expression of intent to harm," *id*. ¶ (F).

These refinements certainly go some way toward ameliorating concerns about vagueness and overbreadth. Because they apply only to off-campus expression, however, concerns remain about the Cyberbullying Policy's application to on-campus expression. Parts of the definition of "cyberbullying" are arguably overbroad and vague. For example, prong (iii) of the definition

includes "intentional and repeated harm inflicted through the use of computers, cell phones, and electronic devices." Without any definition of "harm," this arguably covers protected speech. More significantly, the policy does not merely proscribe cyberbullying; it prohibits "harassment," of which cyberbullying is only one example. Thus, for example, the policy provides that harassment under the policy includes "[e]xpressive conduct (verbal, physical, aural, graphic, symbolic, or written), including, without limitation, cyberbullying and electronic harassment, engaged in while on-campus," and "[e]xpressive conduct (verbal, physical, aural, graphic, symbolic, or written), including, without limitation, cyberbullying and electronic harassment, engaged in while participating in a CSU sponsored program or activity on-campus or off-campus." Ex. 37 at 4, ECF No. 226-6. These provisions clarify the various settings in which the policy applies, but they do little to elucidate what, substantively, falls under the policy's definition of "harassment."

As noted above, the central question in the case of both the vagueness and overbreadth challenges is "whether the enactment reaches a substantial amount of constitutionally protected conduct.'" *Ctr. for Individual Freedom*, 697 F.3d at 479 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 494 (1982)). Based on the foregoing, it is difficult to say whether the Cyberbullying Policy covers a substantial amount of constitutionally protected conduct or expression. Importantly, different constitutional protections apply to different members of the university community. For example, professors' rights are subject to the test outlined for public employees generally in *Pickering v. Board of Education*, 391 U.S. 563 (1968), *Connick v. Myers*, 461 U.S. 138 (1983), and their progeny. *See, e.g.*, *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (applying *Pickering* and *Connick* to professor's first amendment rights). With respect to the first amendment rights of university students, the

standard is less clear. Various standards have been announced for different issues arising in the context of K-12 schooling. *See, e.g.*, *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 513 (1969) (school officials may restrict student expression only if students' expression would "materially and substantially disrupt the work and discipline of the school"); *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 272–73 (1988) (schools may exercise "editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns"). However, there is little consensus regarding how these precedents apply, if at all, in the university setting. *See, e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301, 320 (3d Cir. 2008) (applying *Tinker* to university student's speech rights).

Unfortunately, plaintiffs have made no attempt to show the extent to which the Cyberbullying Policy reaches protected expression on the part of various members of the university community. As a result, defendants are entitled to summary judgment as to Count II. Once again, this does not mean that the Cyberbullying Policy is not unconstitutionally vague or overbroad; it means only that plaintiffs have failed adequately to respond to defendants' arguments against facial invalidation. As a result, the court has no basis for finding the existence of a disputed issue of material fact.

## C.    Sovereign Immunity

As an additional basis for summary judgment, defendants argue that plaintiffs' claims are barred by the Eleventh Amendment. "The Eleventh Amendment grants states immunity from private suits in federal court without their consent." *Nu%25nez v. Indiana Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016). Moreover, "[f]or purposes of sovereign immunity, a suit against a state official in his or her official capacity is ... no different than a suit against the State

itself." *Nelson v. Miller*, 570 F.3d 868, 883 (7th Cir. 2009) (quotation marks omitted). As a result, defendants argue, plaintiffs' official-capacity claims are barred by the Eleventh Amendment. As plaintiffs point out, *Ex Parte Young*, 209 U.S. 123 (1908), permits suits against government officials insofar as they seek prospective injunctive relief. Counts I and II seek only such relief. [7]

Defendants maintain that *Ex Parte Young* applies only where there is an *ongoing violation* of a plaintiff's constitutional rights. Regardless of whether the policies are unconstitutional, defendants argue, plaintiffs have not shown any ongoing violation of their rights. The court disagrees. While it is true that cases frequently state that *Ex Parte Young*'s exception to immunity arises where there is an ongoing violation, "[t]he requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001); *see also Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999) ("*Ex parte Young* requires the allegation of an ongoing and continuous violation of federal law. This requirement does not mean that the enforcement of the allegedly unconstitutional state statute actually must be in progress against the particular plaintiffs initiating suit. Rather, … the ongoing and continuous requirement merely distinguishes between cases where the relief sought is prospective in nature, i.e., designed to prevent injury that will occur in the future, and cases where relief is retrospective ….Thus, where there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied.") (citation omitted); *cf. Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 645 (7th Cir. 2006) (attorney general was not immune from suit

---

[7] This argument applies only to Counts I and II because only they are asserted against defendants in their official capacities. See Pls.' Resp. Br. 26.

seeking to enjoin enforcement of act because, although her primary duties did not involve the prosecution of ordinary criminal cases, she nevertheless had the power to enforce the act).

Because Counts I and II seek only prospective injunctive relief preventing the policies' enforcement, they are unaffected by sovereign immunity.

## D.     Count III: Retaliation

Finally, defendants seek summary judgment with respect to Count III of the complaint, which, as discussed above, asserts a retaliation claim. To prevail on such a claim, plaintiffs must show that "(1) [they] engaged in activity protected by the First Amendment; (2) [they] suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017) (quotation marks omitted).

Plaintiffs have presented sufficient evidence as to each of these elements. First, defendants do not dispute that the expression on the *CSU Faculty Voice*, and the other expression at issue in the case, is protected by the First Amendment. Second, plaintiffs point to several examples of adverse action based on their speech, including Cage's November 2013 cease-and-desist letter and Watson's attempts to coax Peebles into filing a false sexual harassment claim against Beverly. Finally, plaintiffs have presented sufficient evidence from which a jury could reasonably conclude that the retaliatory actions were based on plaintiffs' exercise of the right to freedom of speech.

Defendants argue that plaintiffs "present no evidence supporting their claims that Defendant Cage's actions related to the cease-and-desist were for any purpose other than to protect the University's intellectual property rights." Defs.' Mem. Supp. Summ. J. 23. This

argument is without merit. It is undisputed that CSU had no protected rights in its marks at the time the letter was sent. *See* Defs.' Ans. ¶ 26. In fact, Cage filed trademark applications three days after the cease-and-desist letter was sent. *Id.* ¶ 27. Moreover, in addition to citing plaintiffs' alleged intellectual property violations, the letter made numerous references to the *CSU Faculty Voice*'s lack of civility. Indeed, the letter came on the heels of the November 2013 President's Executive Council meeting, at which Watson expressed displeasure concerning an article about his girlfriend that had recently appeared on the blog. *See* Pls.' Ex. 1, Beverly Decl. ¶ 8. Based on this evidence, a jury could reasonably conclude that Cage's cease-and-desist letter was sent for a purpose other than protecting CSU's trademarks.

Defendants' main argument for summary judgment as to Count III is predicated on the doctrine of qualified immunity. Qualified immunity protects public officials from liability for damages if their actions did not violate clearly established rights of which a reasonable person would have known." *D.Z. v. Buell*, 796 F.3d 749, 753 (7th Cir. 2015). Thus, "[o]nce a public official has raised a defense of qualified immunity, the plaintiff must establish two things in order to defeat the defense: first, that the facts alleged describe a violation of a protected right; and second, that this right was clearly established at the time of the defendant's alleged misconduct." *Mordi v. Zeigler*, 770 F.3d 1161, 1163–64 (7th Cir. 2014).

As discussed above, plaintiffs have adduced evidence from which a jury could conclude that plaintiffs' first amendment rights were violated. Defendants' argument focuses on the "clearly established" prong of the analysis. They contend that "this case has its origins in [plaintiffs'] online blog, making Plaintiffs['] online and electronic speech rights central to this case," but that plaintiffs "have failed to demonstrate that their First Amendment constitutional rights in these areas were well established." Summ. J. Reply 14 (citation omitted). Putting aside

the question of whether first amendment rights in the context of online expression are well-established, defendants' argument misses the point: the right at issue in Count III is plaintiffs' right to free expression without retaliation. That right is firmly established, and it is not contingent on whether plaintiffs' expression took place online or elsewhere.

That said, there is a question as to whether the record evidence is sufficient to support the retaliation claim against Carter. As recounted above, the retaliation claim as to Carter is based primarily on her investigation of Wogan's complaint that Bionaz violated the Cyberbullying Policy. Defendants rightly question how Carter's investigation can be regarded as retaliatory. As the University's Associate General Counsel, it was her job to investigate such complaints. Plaintiffs appear to maintain that Carter should was aware, or should have been aware, that Wogan's complaint was baseless. But it is unclear how she could have made such a determination without investigating the matter. Plaintiffs argue that even if Carter was required to investigate the complaint, she "could have left Bionaz out of it altogether, by talking to Wogan and confirming he did not feel threatened, which was the basis of Carter's no violation finding." Pls.' Resp. 23 n.19. Whether or not it would have been possible for Carter to proceed without involving Bionaz at all, it is difficult to view her decision to involve Bionaz as evidence of retaliation. Nor is plaintiffs' retaliation claim against Carter strengthened by her admonition to Bionaz that he could be subject to disciplinary action if his incendiary conduct continued. Put differently, plaintiffs have offered no evidence to suggest that Carter conducted her investigation of Bionaz any differently than she would have conducted an investigation of a complaint against any other faculty member.

However, other evidence in the record is sufficient to sustain the retaliation claim as to Carter. For in addition to Carter's investigation of the Cyberbullying complaint against Bionaz,

plaintiffs cite evidence that Carter was involved in drafting Cage's 2013 cease-and-desist letter. Specifically, Carter testified that she reviewed drafts of the letter and that she commented on them. *See* Ex. 11, Carter Tr. 37:14-22; Pls.' Resp. 3 n.2. Her testimony does not disclose the precise extent of her involvement. Nevertheless, given that the cease-and-desist letter can be viewed as a form of retaliation against plaintiffs, a jury could find, based on Carter's involvement in preparing the letter, that she participated in the retaliation.

Finally, in addition to invoking the principle of qualified immunity, defendants contend that, at least insofar as the cease-and-desist letter is concerned, they are entitled to immunity under the *Noerr-Pennington* doctrine. "Under the *Noerr–Pennington* doctrine—established by *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc*., 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965)—defendants are immune from antitrust liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757, 188 L. Ed. 2d 816 (2014); *Tri–Corp Hous. Inc. v. Bauman*, 826 F.3d 446, 450 (7th Cir. 2016).

Defendants have failed to show that the *Noerr-Pennington* doctrine applies here. For one thing, plaintiffs argue that the *Noerr-Pennington* doctrine applies only to petitions to the government, and thus does not cover cease-and-desist letters such as the one at issue here. Courts are divided on this question. *Compare Sweet St. Desserts, Inc. v. Chudleigh's Ltd*., 655 F. App'x 103, 111 (3d Cir. 2016) ("Because it was objectively reasonable for Chudleigh's to send a cease-and-desist letter to Applebee's regarding its registered trademark, its conduct is protected under *Noerr–Pennington*."), *with Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 893 (10th Cir. 2000) ("[W]e hold that when the basis for immunity is the right to petition,

purely private threats of litigation are not protected because there is no petition addressed to the government."). The Seventh Circuit has not weighed in on the issue, and district courts in this circuit have been reluctant to extend *Noerr-Pennington* to cease-and-desist letters. *See, e.g.*, *Versatile Plastics, Inc. v. Sknowbest! Inc*., 247 F. Supp. 2d 1098, 1104 (E.D. Wis. 2003) (applying *Noerr-Pennington* to cease-and-desist letter in patent case but taking no position as to the doctrine's extension to non-patent cases). In any event, defendants cite no case in which the doctrine has been raised as a defense by a government actor to a first amendment retaliation claim. Indeed, defendants' reply brief fails to address the *Noerr-Pennington* doctrine at all. *Cf. Minemyer v. R-Boc Representatives, Inc*., No. 07 C 1763, 2012 WL 2155240, at *11 (N.D. Ill. June 13, 2012) ("[D]efendants don't respond to this argument in their reply brief. In this Circuit, failure to respond to an argument implies concession and generally results in a waiver of the point.") (internal citation omitted) (collecting cases).

Further, there is a so-called "sham exception" to the *Noerr-Pennington* doctrine, under which the doctrine affords no immunity for a communication made in the context of litigation that is "(1) 'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits' (the objective element), and (2) is motivated by a desire 'to interfere directly with the business relationships of a competitor' (the subjective element)." *GlobalTap LLC v. Smart Tap LLC*, No. 13 C 5322, 2015 WL 791256, at *6 (N.D. Ill. Feb. 24, 2015) (quoting *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993)). Whether or not the sham exception applies is generally a question of fact. *See, e.g.*, *Sonus Networks, Inc. v. Inventergy, Inc*., No. C-15-0322 EMC, 2015 WL 4539814, at *2 (N.D. Cal. July 27, 2015) (noting that "'[w]hether something is a genuine effort to influence government action, or a mere sham [for *Noerr–Pennington* purposes], is a question of fact.'")

(quoting *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253 (9th Cir. 1982)). As previously discussed, there is evidence in the record to suggest that defendants' cease-and-desist letter was pretextual: it is undisputed that CSU had no intellectual property rights at the time the letter was sent; there are also witnesses who testified that they attended meetings where defendants plotted various ways of shutting down plaintiffs' blog. On this record, the court is unable to say as a matter of law whether *Noerr-Pennington*'s application might be foreclosed in this case by virtue of the doctrine's sham exception.

For these reasons, defendants' motion for summary judgment is denied as to plaintiffs' retaliation claim.

### IV.  Conclusion

For the reasons discussed above, defendants' motion to dismiss [216] is denied and defendants' motion for summary judgment [224] is granted in part and denied in part.


Date:  September 29, 2017            _____/s/_____
                                                    Joan B. Gottschall
                                                    United States District Judge